# Exhibit L

                              VOLUME:  I
                              PAGES:  1 - 76
                              EXHIBITS:  1 - 5


            UNITED STATES DISTRICT COURT
             DISTRICT OF NEW HAMPSHIRE


        DOCKET COURT NO.: 1:25-cv-00092-SE-TSM


---------------------------------------x
ACADIA INSURANCE COMPANY A/S/O NEW ENGLAND TRUCK
TIRE CENTERS, INC.

and

NEW ENGLAND TRUCK TIRE CENTERS, INC.,

        Plaintiffs

v.

SBP BUILDERS, LLC,

        Defendant
---------------------------------------x


        DEPOSITION OF ROBERT CARDINAL taken on
behalf of the Plaintiffs, pursuant to the applicable
provisions of the Federal Rules of Civil Procedure,
before Lauren M. Buzzerio, a Registered Professional
Reporter, and Licensed Shorthand Reporter, in and
for the State of New Hampshire, at the offices of
Abramson, Brown & Duggan, 1819 Elm Street,
Manchester, New Hampshire, on Friday, September
5, 2025.

-------------------------------------------



                        A P P E A R A N C E S


Laurence H. Leavitt, Esq.
MCCOY LEAVITT LASKEY LLC
202 US Route 1
Suite 200
Falmouth, Maine 04105
(207) 835-0535/LLeavitt@MLLlaw.com
Attorney for the Plaintiffs


John Hugo, Esq.
MGM LAW
125 High Street
Boston, Massachusetts 02110
(617) 670-8800/jhugo@mgmlaw.com
Attorney for the Defendant


ALSO PRESENT:

Stanley Parker



I N D E X

Deposition of:                                          Page

ROBERT CARDINAL

Examination by Mr. Leavitt                                4


E X H I B I T S

No.                                                    Page

1          Photograph                                    37

2          Photograph                                    38

3          Diagram                                       62

4          Warning label                                 68

5          Warning instructions                          70



800.211.DEPO (3376)
EsquireSolutions.com

---------------------------------------------------

P R O C E E D I N G S

9:05 a.m.

---------------------------------------------------


ROBERT CARDINAL, duly sworn, was examined and testified as follows:


EXAMINATION BY MR. LEAVITT:

Q.  All right.  Could you please state your full name.

A.  Robert Cardinal.

MR. HUGO:  And just before we start, I assume we're going to work with the usual stipulations with respect to objections and everything?

MR. LEAVITT:  That's fine.

MR. HUGO:  Okay.

Q.  (By Mr. Leavitt) Mr. Cardinal, my name is Larry Leavitt.  We met briefly before we went on the record here.  I'm an attorney in a case called New England Truck Tire Centers, Inc. and Acadia Insurance versus SBP Builders that's pending here in New Hampshire.  I represent Acadia and New England Truck Tire Centers.  And you understand that you're



here today for a deposition and to give testimony in that case?

A. Yes.

Q. Have you ever had your deposition taken before?

A. No.

Q. All right. So let me just explain a little bit. A deposition is a procedure in a case where one party gets to ask questions of potential witnesses so they can learn what they have to say and what they know about the case. So everything that we discuss in the room today is going to be taken down and transcribed by the court reporter. So I'll be asking questions. You'll be giving answers to the best of your ability. But because it's not like a normal conversation, it's important that you allow me to finish my question before you respond because she's got to get us both down. So we try to avoid talking over one another.

A. Yes.

Q. So please allow me just to finish the question and then give your response. Second, because everything is being transcribed, it's important that you give a verbal response.

A. Okay.



Q.  So you need to say yes, no, or explain your answer.  Nodding heads, as you're doing now, or shaking your head can't be transcribed by the court reporter.

A.  Yes.

Q.  So try and give a verbal response.  I will do my best job to ask you questions that are clear and understandable by you.  But if I ask a question that you don't understand, just please let me know. I'm trying to be fair so you're giving answers to questions that you know what I'm talking about.

A.  Okay.

Q.  So if we can agree that if there's any question that's not clear or you don't understand, just let me know, and I will try and do a better job to rephrase the question.  Okay?

A.  Okay.

Q.  I don't think we're going to take very much time this morning.  But if for any reason you need to take a break, use the restroom, get some water, just let me know and we'll accommodate you.

A.  Okay.

Q.  All right.  Is there any reason that you can think of as to why you would not be able to provide truthful and accurate testimony today?



A.   It was two years ago.

Q.   Other than your memory?

A.   Yes.

Q.   Like you're not -- you're feeling well today?

A.   Yes.

Q.   You're not, like me, on any medications?

A.   No.

Q.   Okay.  Could you tell me what your date of birth is?

A.   7/25/91.

Q.   And what's your current home address?

A.   20 Blakslee Road.

Q.   Could you spell that?

A.   B-L-A-K-S-L-E-E Road, Dalton, New Hampshire.

Q.   Are you currently employed?

A.   Self-employed.

Q.   And what type of work do you do?

A.   Construction.

Q.   And how long have you been self-employed?

A.   Ten months.  Almost a year.

Q.   And as a self-employed contractor, do you do all aspects of construction?

A.   Yes.



Q.   So do you do plumbing?

A.   No.

Q.   Any electrical?

A.   No.  It's mostly carpentry.

Q.   Carpentry?

A.   Building.

Q.   Okay.  Do you do painting?

A.   Sometimes.  Yes.

Q.   Sometimes.  And you understand that the testimony that you are giving today in this deposition relating to the lawsuit that I described has to do with a fire that took place at the New England Truck Tire Center in Littleton, New Hampshire back in March of 2023?

A.   Yes.

Q.   And do you recall that the date of the fire was March 13, 2023?

A.   I don't recall the exact date, but.

Q.   That sounds about right?

A.   I think so.  Yes.

Q.   And as of the date of the fire -- you recall the fire, correct?

A.   Yes.

Q.   Okay.  At the time of the fire, you were working for SPB (sic) Builders?



A.   Correct.

Q.   Okay.  And if I understand the New England Truck Tire Center in Littleton at the time was located at 433 Cottage Street?

A.   Correct.

Q.   And the fire happened in the evening?

A.   No.  It would've been in the morning.

Q.   Okay.  The fire did not happen during working hours when you were at the facility?

A.   No.

Q.   But in the working hours prior to the fire, were you working at New England Truck Tire or at SPB Builders' space that day?

A.   SBP Builders' space.  Yes.

Q.   And at the time, you were employed by SBP Builders?

A.   Correct.

Q.   Were you employed by anyone else at that time?

A.   No.

Q.   And all of the work that you did on the day leading up to the fire was done by you in your capacity as an employee of SPB Builders?

A.   Yes.

Q.   And all of the work that you did while you



were at SPB Builders, the work hours prior to the
fire, were done as part of your employment duties
for SPB Builders?

A.    Correct.

Q.    Now, you understand -- you've met
Mr. Hugo, correct?

A.    Yes.

Q.    And you understand he's the attorney for
SBP Builders?

A.    Yes.

Q.    Are you represented by Mr. Hugo with
regard to the claims that are the subject of this
lawsuit?

A.    Yes.

Q.    Okay.  Did you ask him at some point in
time to represent you as counsel?

A.    No.  I didn't ask him.  He just -- it's
what happened.

Q.    He's offered to represent you personally?

A.    Yes.

MR. PARKER:  Personally.

MR. HUGO:  Yeah.

Q.    Thank you.  What did do you, if anything,
to prepare for today's deposition?  And I'm not
asking you to tell me what you talked about.  I'm



just asking you what you did?

A.   Thought about what had happened that night, that day.

Q.   Okay.  Did you meet with anyone other than Mr. Hugo to prepare for the deposition?

A.   No.

Q.   Did you review any documents in preparing for today's deposition?

A.   What was the gentleman's name?

THE WITNESS:  Are you allowed to answer that for me?

MR. HUGO:  No.  To your best memory.

A.   Wahlberg.  I think that was his name. Something along the lines of that.  His statement that he had written of what -- the information he had gathered from me.

Q.   Okay.  Are you referring to the investigator named Mr. Wheeler?

A.   I think that's his name.  Yes.

Q.   There were notes of his interviews of multiple witnesses which included a phone interview of yourself?

A.   I don't recall the phone interview.

Q.   Okay.  But you reviewed the notes purporting to describe an interview with you?



A.   Somewhat.  Yes.

Q.   Okay.  And you know Stan Parker?

A.   Yes.

Q.   And he owns SBP Builders, to your knowledge?

A.   Yes.

Q.   Now, during the course of today's deposition, I may ask a question that refers to Mr. Parker or I may ask a question that refers to SBP Builders.  For the purposes of my questions, I want you to treat them the same.  So if I'm asking about Mr. Parker, I'm only talking about Mr. Parker in his capacity as the owner of SBP Builders.  Okay?

A.   Okay.

Q.   So if I say Mr. Parker or SBP Builders, can we have an agreement that those terms can be used interchangeably?

A.   As the same.  Yes.

Q.   Let me back up for a minute.  Where did you spend your childhood?

A.   Littleton, New Hampshire.

Q.   So you grew up there?

A.   Yes.

Q.   Did you go to high school in Littleton?

A.   Franconia.  Yes.



Q.   Oh, Franconia?

A.   Yeah.

Q.   What's the name of the school?

A.   Profile.  Profile High School.

Q.   And did you graduate?

A.   Not from Profile.  But yes.

Q.   Okay.  What years did you spend in the -- like freshman?  Junior?  Sophomore?  What years were you at Profile?

A.   Junior.  Freshman.  Sophomore I was in Littleton.  I think I dropped out.  And then went back to a school called the North Country Charter Academy and got my high school diploma from there.

Q.   Where's North Country located?

A.   Out of Littleton.

Q.   Is that a private school?

A.   No.  It was online courses.  A computer school.

Q.   And what year did you get your high school diploma if you recall?

A.   I don't recall.

Q.   Do you remember about how old you were when you got it?

A.   Nineteen.

Q.   Did you ever pursue any education post



high school?

A.   As far as like college and stuff?  No.

Q.   College or a vocational/technical school?

A.   No.

Q.   Did you ever do any vocational training of any kind after high school?

A.   No.

Q.   When did you first become an employee of SBP Builders?

A.   I don't recall the year.

Q.   Can you give me an approximate range?

A.   I was 22, 23.

Q.   And when did you stop working for SBP Builders?

A.   About two years ago.

Q.   How old were you when you stopped working there?

A.   So 32.

Q.   And during that nine year time period, did you work continuously for SPB Builders?

A.   Yes.

Q.   All right.  Can you tell me what employment or work history you had from starting when you got your high school degree at the age of 19 up until when you were 23 and started working for



Mr. Parker?

A.    I was in and out of kitchens.

Q.    Had you had any formal carpentry training before you started working at --

A.    Not much.  No.

Q.    -- before you started working for SBP?

A.    No.

Q.    What about painting experience?

A.    Maybe a little.

Q.    For jobs?  Or just helping your family?

A.    Helping family, friends type stuff.

Q.    So between the ages of 19 and 23, you didn't do any employment-related carpentry or painting services?

A.    Not really, no, that I can recall.

Q.    When you started working at SPB, what types of work were you doing?

A.    I was a laborer on the roofing crew.

Q.    On the roofing crew?

A.    Yes.

Q.    And how long did you work in that capacity?

A.    As the laborer for the roofing crew, two, three years-ish.

Q.    And at some point that changed?



A.   I got promoted to -- I can't think of the word.  Can somebody help me here?  The manager of it or something like that.  The foreman.

MR. PARKER:  You were the lead.

A.   Lead roofer.

Q.   The foreman of the roofing crew?

A.   Yes.

Q.   And how long did you work in that capacity?

A.   Five, six years.

Q.   Were you still a foreman of the roofing crew when you were 32 and stopped working for SPB?

A.   No.

Q.   Okay.  What was your next work capacity for SPB after you were a roofing crew foreman?

A.   Maybe I got my timeline messed up.  But after a while the roofing crew just wasn't my thing, so Stan was having me do everything at that point.

Q.   Okay.

A.   From painting to carpentry to -- I was pretty much his right-hand man.  Whatever he needed I would do.

Q.   At the time you became what you characterized as a right-hand man doing painting, carpentry, or whatever Mr. Parker needed done, were



you working out of multiple locations or a single location?

A.   Multiple.

Q.   Okay.  What locations?  How many locations did SBP Builders have out of which you would do work?  And I'm not talking about buildings or apartments or places that might have been owned by someone else.  But just a place that was actually in SBP Builders' workspace where employees came to do work?

A.   So you're saying job sites?

Q.   Not job sites.  I'm saying -- so let me back up.  The space that SPB Builders occupied at 433 Cottage Street was not a job site, correct?

A.   No.

Q.   That was a company space where work was performed?

A.   Yes.

Q.   Did the company have any other spaces that were not job sites where work was performed?

A.   No.

Q.   So other than going to job sites, that was the only business location where you would go to work for SBP Builders?

A.   Correct.



Q.  Going back to the spring of 2023 when the fire happened.

A.  Okay.

Q.  What were your basic job responsibilities at that time?

A.  At that time it would've been spring.  So it would've been plowing and sanding driveways. When there was no snow, moving equipment around, materials around.  Prepping materials in the shop. All kind of stuff like that really.

Q.  Would you perform carpentry services at job sites?

A.  Sometimes.

Q.  And sometimes you'd perform carpentry-type work at the shop?

A.  Provided the job and what needed to be done.  Yeah.

Q.  Okay.  And would you do painting and staining at job sites?

A.  Again, it depended on the job.  But if we were doing trim or something, we would apply the poly stain, paint, whatever there and transfer it to the job site.

Q.  "There" being at the shop?

A.  At the shop.  Yes.  And then --



Q.   I'm not trying to use the word "shop" if it's not an accurate description.

A.   Okay.

Q.   But the workspace that SBP Builders occupied at 433 Cottage Street, did you guys refer to that as the shop?

A.   Yes.

Q.   Okay.  Who hired you to work at SPB?

A.   Stan Parker.

Q.   And when you were hired until the time you left, did you ever receive any formal training?

A.   All kinds.

Q.   Can you give me examples of the types of training you received?

A.   Well, when it came to the paint and stain and stuff, he properly taught me how to take care of stain rags and take care of paintbrushes.  Properly close paint lids, paint can lids.  Care for tools and equipment.  Vehicles.  The shop itself.  Yeah.

Q.   Did anyone other than Mr. Parker provide you with any training?

A.   I wouldn't say training, but definitely a peace of mind on things.

Q.   What do you mean by that?

A.   Like when it comes to the stain rags, you



know, they would pretty much back up what he was training me on, is, you know, those rags should be taken care of properly.

Q.   And what did he train you with regards to properly taking care of stain rags?

A.   When you're done to put them in water in a bucket.

Q.   Did you attend weekly safety meetings at SBP?

A.   No.

Q.   Did you attend any safety meetings at SBP?

A.   No.

Q.   Did you ever receive any specific training from SBP relating to fire safety?

A.   I don't recall.

Q.   Did you ever receive any training from SBP with regard to hazmat training?

MR. HUGO:   Objection.   Vague.

You can answer.

Q.   Do you know what hazmat means?

A.   Yes.

Q.   Hazardous materials.

A.   Yes.

Q.   Did you ever receive any hazmat training from SPB?



A.   No.   Because usually with hazardous materials like that wouldn't be associated with that.

Q.   I don't understand.   Could you explain, please.

A.   I would not deal with hazardous materials like that.

Q.   Did SBP have a location on-site at the shop where it kept material safety data sheets for products that it was using in its job?

A.   Can you repeat that?

Q.   Right.   Do you know what a MSDS sheet is?

A.   No.

Q.   Okay.   I'll represent to you that MSDS stands for material safety data sheet.   Often with chemicals, which can include stains or paints, there's an MSDS sheet that can accompany a product that talks about the hazards associated with that product and tells you what to do if you spill it or swallow it or get it on your skin or get it in your eyes or any number of situations.   So with that explanation in mind, were you ever advised that there was a location on-site at the shop where any MSDS sheets were kept for employees?

A.   No.



Q.  So you don't know if they had them or you were never advised?

A.  Both.

Q.  And I think you said that the sole training you got with regard to the use of oil-based stains and their application on wood products came from Mr. Parker directly?

A.  Can you repeat that.

Q.  I believe you testified earlier that the training that you received with the proper use and disposal of oil-based stains came only from Mr. Parker?

A.  Yes.

Q.  How often did you work directly with Mr. Parker?

A.  How often?  Often.

Q.  Like work side-by-side on a daily basis?

A.  Sometimes yes.  Sometimes no.

Q.  And when on those occasions where you were working directly with him either at the shop or at the job site, would he be your direct supervisor?

        MR. HUGO:  Objection.  Vague.

        You can answer.

Q.  If anyone was supervising you with regard to how you were doing your job at the shop, would it



be Mr. Parker?

A.   Yeah.

Q.   And if you were at a job site and anyone was supervising you, would it be Mr. Parker?

A.   Not always.  No.

Q.   Who else might be supervising you?

A.   Me or one of the other guys that was employed to Mr. Parker.

Q.   Who served in a capacity as a foreman or anybody?

A.   Can you repeat that?  Sorry.

Q.   I'm just trying to figure out in the course of doing your work whether there were any individuals other than Mr. Parker who provided you with direct supervision and therefore perhaps training you on what to do and what not to do?

A.   Yes.  Sometimes.  Yes.

Q.   And who would those individuals be?

A.   People that were employed by Mr. Parker.

Q.   And my question was were they, like, crew foremen or just anybody?

A.   Crew foremen.  Yeah.

Q.   Prior to starting work at SBP Builders as a member of the -- a laborer or member of the roofing crew, had you ever used oil-based stain



products before that?

A.    Probably and just didn't know.  Like helping my friends and family using stains and paints and stuff.  At that point, I just put it on a paintbrush and put it on type thing.

Q.    But you never received any training about the hazards associated with the use of oil-based stains prior to working at SPB Builders?

A.    Correct.

Q.    I apologize if I keep mixing the Bs and Ps, but I mean SBP.  Okay?

MR. PARKER:  It's common.  It happens a lot.

A.    Yeah, it does.

Q.    So going back to the date that the fire occurred, which was March 13, 2023, prior to that fire happening, were you familiar by that time with the hazards associated with oil-based stains?

A.    Yes.

Q.    And what did you understand to be the hazards?

A.    They can get in your skin.  When it comes to taking care of it, you have to dispose of it properly, take care of it properly.  You know, if it gets in your eyes, you have to flush it out.  The



odor sometimes can be overwhelming.

Q.   And with regard to any of those hazards that you've just enumerated, was the source of your knowledge training you had received from Mr. Parker?

A.   As far as disposing of it, yes.  The odor and stuff, the eyes, on your skin, that was me.

Q.   With respect to the proper methods for disposing of oil-based stained rags, did your knowledge of the hazards come from any source other than Mr. Parker?

A.   Yes.

Q.   What sources did they come from?

A.   Again, friends and family.  People I've talked to in the past who -- some professional painters and stainers, you know, would enlighten me on the -- what could potentially happen.

Q.   Other than Mr. Parker or other friends or families that may have worked with those products and enlightened you about the risks, did any of your knowledge or understanding come from the products themselves?

A.   No.

Q.   So none of your understanding of the risks or hazards of oil-based stains came from either a literature that accompanied the product or the



labels or warnings that were on the products themselves?

A.   At some point, I did end up -- when somebody brought it to my attention, at some point I did end up picking up a can and actually reading the labels.

Q.   Was that before or after the fire?

A.   Before.

Q.   Okay.  And who brought that to your attention, if you recall?

A.   Some friend of mine.

Q.   And do you recall what product specifically you finally read the labels for an oil-based stain?

A.   I believe it was some type of stain.  I don't recall exactly what it was.  No.

Q.   So you understand that there's more than one company that sells oil-based stains?

A.   Yes.

Q.   And you don't remember which company it was?

A.   No.

Q.   On the day of the fire, during the work hours, do you recall what specific stain product you were using that day?

A.   The day of the fire?

Q.   Yes.

A.   It was Old Master-something.

Q.   And was the Old Masters brand a product that you had used prior to that date?

A.   Yes.

Q.   Do you know how many occasions?

A.   A few.  No, I don't.

Q.   So you were familiar with the product?

A.   Yes.

Q.   Can you give me a basic description of the work you were doing at the shop with Old Masters stain on the day of the fire?

A.   Applying it to doors.

Q.   Doors?

A.   Doors.  And door jambs.

Q.   And are these interior doors for residential units?

A.   Yes.

Q.   Do you recall whether you used more than one can of stain that day?

A.   I don't recall.

Q.   Do you remember who opened the can of stain that day?

A.   More than likely it would've been me.



Q.  And on that day, did you read the warnings or instructions on the can prior to using the can that day?

A.  No.

Q.  Is that because you just didn't or you considered yourself already familiar with the language on the can?

A.  I had used that stain in the past.  So, yeah, I was familiar with it.

Q.  Prior to that day, had you ever read specifically the labels and warnings and instructions on an Old Masters brand can of stain?

A.  Can you repeat that?

Q.  Prior to the date of the fire.  So on the day of the fire, you said you did not read the warnings or labels that day.  So my question is prior to that day, had you specifically ever read the warnings and labels on a can of oil-based stain that was the Old Masters brand?

A.  Yeah.

Q.  Okay.  And do you remember when?

A.  Sometime within my employment with Mr. Parker.  Yes.

Q.  But you don't remember the day or the circumstances?



A.   Nope.

Q.   What is your best recollection of what the labels and warnings on that Old Masters can stated with regard to the disposal of oil-soaked rags?

A.   The disposal was to -- I don't even remember.  Somewhere in there it says to put them in a bucket of water.

Q.   And do you recall anything else about the instructions or warnings regarding the disposal of oil-based stain on the Old Masters brand can other than put them in a bucket with water?

A.   I don't recall.

Q.   Have you ever been informed by SBP Builders that it is a violation of New Hampshire code to dispose of oil-stained rags in anything other than listed suitable disposal containers?

A.   No.

Q.   Did Mr. Parker ever train you or inform you that the failure to dispose of oil-stained rags in a suitable container is a violation of New Hampshire law?

A.   No.

Q.   Going back to the work that you did on March 13, 2023, the date of the fire, you said you were staining doors and door jambs, correct?



ROBERT CARDINAL Vol.I                                September 19, 2025
ACADIA INS CO. vs SBP BUILDERS, LLC                                  30

A.  Correct.

Q.  Was there any other product in the room that you were staining that day?

A.  No.

Q.  Who physically performed the staining that day?

A.  Me.

Q.  Anyone other than you?

A.  No.

Q.  Was there anyone else present while you did the staining?

A.  No.

Q.  Now, my understanding of the space that SBP Builders occupied in Littleton, which we've referred to as "the shop," consisted of multiple rooms, garages, or parking areas, correct?

A.  Correct.

Q.  The room where you performed the staining activity, did that room have a designated name?

A.  Did it have a designated name?

Q.  Like was it called the paint room or the prep room or the stain room?  Or how did you -- how would you refer to that room?

A.  I think it was the paint room.

Q.  In any event, for the purposes of my



question, if I refer to it as the paint room, you will know what I'm talking about?

A. Yes.

Q. Did the paint room -- first of all, about how big was it?

A. The paint room?

Q. Yeah.

A. Big.

Q. Do you know about how many -- was it a rectangular-shaped room?

A. It was close enough to a rectangle. Probably 30 by 50, maybe 60.

Q. So a fairly sizable room?

A. Yes.

Q. You had plenty of room to maneuver and do the work?

A. Yes.

Q. And what were the walls made of in that room?

A. I believe it was brick.

Q. Brick walls?

A. No, not brick. Cinder blocks.

Q. Cinder block?

A. Some type of concrete.

Q. No Sheetrock anywhere?



A.  No.

Q.  And was there heat in the room?

A.  Yes.

Q.  What type of heat?

A.  I think -- I mean, that day that I was staining, there was a space heater plugged in.  But there's also, in the far back corner, was I think what they call a Modine heater.

Q.  Okay.  What about lighting?

A.  There was -- on the ceiling, there were light fixtures.  Yes.

Q.  Do you recall what type?

A.  Fluorescent light bulbs, I believe.

Q.  Were they mounted on the ceiling or suspended?

A.  I believe they were mounted.

Q.  Okay.  What was the ceiling made out of in the room?

A.  I don't recall.

Q.  Do you know whether there was a ceiling in the room?

A.  There was a ceiling in the room.  Yes.  I don't know if it was Sheetrock or what they call, like, particle board.  I'm not entirely sure.

Q.  Your best recollection is that there was a



ceiling and that the fluorescent lights were mounted to the ceiling?

A.   Correct.

Q.   And were those light fixtures switched at the wall?

A.   I believe so.  Yes.

Q.   Was there any other lighting that you recall in the room?

A.   No.

Q.   I'm going to show you a drone paragraph that was taken after the fire.  And I'm going to see -- I think I know where it is.  But I want to see if you can have a recollection as to which room.  And take your time to look at it and get oriented.

A.   Oh, boy.  Okay.

Q.   It's a little disorienting.  I understand.

A.   Yeah, it is.

Q.   So I'm not trying to --

A.   Man.

Q.   I'm also going to give you a second photo taken from, you know, the back of the building, because that might help you.

MR. LEAVITT:  Is it all right if I step around next to the witness?

MR. HUGO:  That's okay.  Can we go off the



record for a second.

(Discussion off the record.)

MR. HUGO:  We can go back on the record.

Q.  (By Mr. Leavitt) I'm not going to mark this yet, but I'm just going to ask a couple foundational questions to see if we make any headway.

A.  Okay.

Q.  So this picture I'm showing -- where's the one?  Back up.  Let's start with this one.  Just so we can get our orientation, in this photograph that I'm showing you here, the top of the photograph, that shows out to Cottage Street, correct?

A.  Correct.

Q.  And the bottom of the photograph is the driveway going behind the building?

A.  Yes.

Q.  And then the white roof section, that is part of New England Truck Tire Center?

A.  Correct.

Q.  And so basically from where this backhoe is, the extent of fire damage from the left over to this right wall, that's the SBP Builders space, correct?

A.  Correct.



Q.   And in the front, we've got the offices?

A.   Yes.

Q.   And on the left side, where you've got the iron girders, that was like a covered parking area for heavy equipment?

A.   Yes.

Q.   And then in this front area, there was a garage.  And I think you see the remains of a trailer?

A.   Yes.

Q.   And so then basically, other than the covered -- I call it like a carport area.  But the rooms where you were doing most of your work were going to be within this space here, correct?

A.   Correct.

Q.   So my understanding, and you can correct me if I'm wrong, is that this space here is essentially the paint room.  Does that seem accurate to you?

A.   Where the ladder's leaned up?

Q.   Sorry?

A.   Where this ladder is leaned up?

Q.   Yes.  Exactly.  So you can see the ladder here?

A.   Yes.



Q.   And there's two large openings?

A.   Yes.  So this would've been the paint room.  Right here.

Q.   Okay.  And then up in the corner here there was an electrical room?

A.   That I don't know.

MR. PARKER:  That wasn't in our part.

A.   Right.  That was not in our part.

Q.   All right.

A.   So if you see right here, there's this wall.  Behind that, in this area, was a furnace.

Q.   So a mechanical room?

A.   Correct.

Q.   And then the garage in front of it?

A.   And then the garage.

Q.   And then, again, where the ladder is leaning up, there's a fairly sizable room?

A.   The paint room.

MR. LEAVITT:  All right.  So I'm going to go ahead and mark these just because I want to be clear.

MR. HUGO:  Mr. Leavitt, does it make sense for him to circle the area that he identified as the paint room?

MR. LEAVITT:  Yeah.  We're going to do

that.  I just wanted to mark the exhibit first.

MR. HUGO:  Okay.

(Exhibit 1 marked for ID.)

Q.  (By Mr. Leavitt)  All right.  So Mr. Cardinal, I've marked as Exhibit 1 kind of the drone photograph that's taken from the perspective of the back of the property looking forward; is that correct?

A.  Sorry.  I'm in my own world.  I was thinking.  Go ahead.  Repeat.

Q.  Yeah.  I've marked as Exhibit 1 the drone photograph that is taken from the perspective of the back of the property looking forward towards Cottage Street?

A.  Correct.

Q.  And you've discussed on the record that there's a rectangular area that you believe is the paint room and has a ladder leaning up against the wall; is that correct?

A.  I believe so.  Yes.

Q.  Okay.  Could you just use this red Sharpie to just draw the outline of the paint room which was where you were working on the day of the fire. We'll get to those.  But is it more clear for you on this diagram?



A.   Yeah.   Because this more straight on, where this is at an angle.

MR. LEAVITT:  Okay.  We'll mark this as No. 2.  I'm also marking a direct overhead drone photo as Exhibit 2.

(Exhibit 2 marked for ID.)

Q.   And just so I understand, before you mark anything, you're referring to this left wall where the ladder is up against the wall, that's the left wall of the paint room?

A.   What do you mean by "left wall"?

Q.   Well, as the photo is sitting on the table, left, right, top, bottom?

A.   Yes.  Yes.

Q.   Okay.  Could you just use the Sharpie to do a line around the walls of the paint room.

A.   Yes.  One second.  I'm just trying to make sure it's the paint room.  I believe it is.

Q.   Okay.  And so going back to Exhibit 1, then that would be the paint room where I'm indicating with my finger?

A.   Yes.

Q.   Could you do the same thing on Exhibit 1?

A.   Maybe.

Q.   All right.  And then just down here write



in red "paint room."

A.   (Witness complied.)

Q.   And then on Exhibit 2, could you write the same thing right here.

A.   (Witness complied.)

Q.   Okay.  With regard to the paint room, do you recall what type of doors were in the paint room and where they led to?  Do you remember how many doors were in that room?

A.   I can't tell you exactly how many doors were in there.  That I don't recall.  What was your other question?

Q.   How many there were and where they were located?

A.   How many, I don't -- I can't recall.  But where, I can tell you is they were around the perimeter from -- can I say where that ladder is?  If I say that does --

Q.   Let's call the ladder wall the left wall.

A.   The ladder wall.  The left wall.  Okay.  So there was a couple on that wall.  And then on the bottom wall, there was some there.  And then on the right wall, there was some there.  Is there any on that?  I don't recall.

And we had screwed -- I had screwed



strappings from the shelves that were up against the walls to the top of the doors.  The doors sat four or five feet away from the shelves so that way we were able to work around the doors to be able to stain them without moving them.

Q.  Do you recall on the -- what we're calling the ladder wall or the left wall, whether there was two very large almost like garage-style door openings?

A.  That was built into the framing, if you will --

Q.  Yeah.

A.  -- of the bricks?  Yes.  There was one that was open roughly 12 feet wide, I think.  And one that we had -- was it -- we had put plywood up on that wall, I think.  I don't recall if we did. But I know there was one large opening.  As far as the second one, I'm not entirely sure.

Q.  Were the -- so there was no physical door that one could open and close --

A.  No.

Q.  -- on that wall?  Were the doors covered with anything?  Plywood?  Tarps?  Anything?

A.  There were no doors.  They were just open walkway spaces.



Q.   Okay.  So there were no tarps that would hang over the doors to keep dust from getting in the paint room?

A.   On the day that I was staining, I had a drop cloth there to keep heat in for the stain to cure.

Q.   Covering one of those doors?

A.   Yes.

Q.   On the ladder wall?

A.   On the ladder wall was the one that we walked through.  But I really -- I think the other opening that was there was plywood.  I think we at some point had tacked some sheathing up to it.

Q.   Permanently affixed plywood?

A.   I believe so.  Yes.

Q.   And what was the drop cloth made out of?

A.   Some type of fabric.

Q.   How did you suspend it over the door?

A.   There was -- I don't recall how I got that to stay there.  I might have taped it to the brick.

Q.   The cinder block?

A.   Yeah.  The cinder block.  Yeah.  Sorry.  Not brick.

Q.   When doing your work that day staining the doors, do you know how many doors you stained that



day?

A.    I don't recall.

Q.    How were the doors oriented in the room for staining?

A.    They kind of made a U shape around the room itself.  Again, I had screwed strapping to the top of the door and the shelf that it was near.  They were roughly four or five feet away.  So we were able to work around the doors.

Q.    Four or five feet away from the exterior wall of the room?

A.    The shelves that were up against the exterior wall.

Q.    What were the shelves made out of?

A.    Metal.

Q.    So you suspended the doors from this strapping?

A.    Yes.

Q.    So you could stain both sides of the door because they were hanging?

A.    I mean, they were resting on the floor as well.  They weren't completely suspended in the air.  But yeah.

Q.    They were in a resting upright position?

A.    Yes.



Q.   And they were a couple of feet away from the walls of the shelves?

A.   They were at least four feet away.

Q.   So you could comfortably walk on either side of the door?

A.   Yes.

Q.   And what tools did you use to perform the staining work?

A.   A rag.  Some gloves.

Q.   Any brushes?

A.   No.

Q.   Do you know where you got the Old Masters stain to use that day?

A.   I don't know.  No idea.

Q.   Do you know where you got the rags?

A.   No.

Q.   Do you know how many rags you used that day?

A.   Roughly around five.

Q.   What were the rags made out of?

A.   I think it's a cotton material.

Q.   Do you know what color they were?

A.   They were white when I started.

Q.   Do you recall what time that day you started working in the paint room and when you



finished?

A. I don't.

Q. Do you know if it was morning or afternoon?

A. I was just about to say I more than likely started sometime in the morning and got done in the afternoon.

Q. Did you do any other work on-site that day?

A. Yeah. Not -- no.

Q. So once you'd completed the staining, you left?

A. I was in the middle of -- I think it was -- I believe I was in the middle of almost the last door or something. Mr. Parker called me because he needed a dump trailer removed from a job site. So at that point, I was planning to come back, take care of the rags. And I had left and went to the job site. And I went to go hook up the trailer. The dump trailer jack had broke. So I fought with it for quite some time to get it onto the truck so I could pull it back to the shop. And when I was fighting with it to get it on the truck, I had somehow managed to slip or something. I smashed my face off the dump trailer, but managed to

get it on the truck.  And we got the truck and the trailer back to the shop.  Dropped the trailer where Mr. Parker had told me to put it.  And at that point, I was kind of hurting, pretty well hurt.  So I just climbed in my own vehicle and left.

Q.  Do you recall whether it was light out or dark out when you finally left?

A.  It was getting dark.

Q.  Okay.  And did you put the trailer in that garage at the back of the building?

A.  Yes.

Q.  And that's the one that was there for repairs that afternoon?

A.  Yes.

Q.  So at some point late morning or early afternoon, you left the paint room for the final time that day?

A.  It wasn't intended to be the final time.  But yeah.

Q.  Had you completed all the doors at the time Mr. Parker called and asked you to go get the trailer?

A.  I'm not 100 percent positive.  I maybe had one more to do or something.

Q.  So you might have, had things worked out



better, come back and done some more work in the paint room that day?

A.  I would have definitely properly taken care of my rags, that's for sure.  Yes.

Q.  So when you got the call from Mr. Parker to leave and get the trailer, where were the rags at that time?

A.  In the middle of the room on a milk crate that was right-side up.  And I had draped them over the edge.

Q.  When you say a milk crate, is that like a plastic rectangular box-type --

A.  A square.  Yes.

Q.  And what color was it?

A.  I don't recall.

Q.  What do you mean when it was standing upright?  Was it on its side?

A.  So the hole was facing up, like you were putting milk jugs into it.

Q.  You tell me.  I don't know.

A.  No.  That's what I'm telling you.  I said it was facing upright.  So if you were to put milk jugs into it, the hole was facing up.

Q.  And you draped the rags on the edges of the milk crate?



A.   Correct.

Q.   And that was the last time you saw them that day?

A.   Yes.

Q.   Now, I know you said in preparing for the deposition today you had a chance to read some notes of -- describing a conversation with you; is that correct?

A.   Yes.

Q.   Do you have a recollection of speaking to an investigator over the phone with Mr. Parker on the phone?

A.   No, sir.

Q.   I'm going to read a section of the investigator's notes.  And then I'll just ask you if there's anything in that -- in those two sentences that you disagree with.  Okay.

MR. LEAVITT:  And these have been produced in discovery.  So you know what I'm --

MR. HUGO:  Yeah.

Q.   (By Mr. Leavitt) Okay.  So Mr. David Wheeler, who's an investigator, interviewed Mr. Parker.  And this is Mr. Wheeler's account of what he believes he was told by Mr. Parker.  So I'm just going to read that to you.  "When I asked,



Mr. Parker stated that they had been painting and staining woodwork in the shop throughout the day using Old Masters oil-based stain."  Anything you disagree with there?

A.  No.

Q.  Continuing, "He," Mr. Parker, "stated that they used paint brushes and rags while applying the stain and then discarded the rags on the floor along the right-hand wall of the workshop."  Agree or disagree?

A.  Disagree.

Q.  What parts do you disagree with?

A.  I disagree with the paintbrush.  And I disagree with the rags being on the floor up against the right-hand wall.

Q.  Because, as you said, your best recollection is that you left them on an upright milk crate?

A.  Yes.

Q.  Later, these notes refer to a subsequent conversation on March 28 and 29 at the site.  Again, I'll read it to you.  "Mr. Parker appeared on the fire scene during the joint inspection and spoke with the various investigators present.  During these conversations, he provided a more detailed --



he provided more detailed information regarding the layout of the building, as well as identifying various furnishings, equipment, electrical circuitry, et cetera.  Mr. Parker described in detail the contents of the shop area where his employee Robbie Cardinal had been staining and painting doors and trim during the morning of March 13, 2023.  I'm not going to ask you about any of that.  I just wanted to put it in context for you.  Okay?

A.   Okay.

Q.   "He stated that they had seven bi-fold doors and two standard split-jamb doors that were being either painted or stained with Old Masters oil-based wiping stain."  Agree?

A.   Agree.  But I can't -- I don't recollect how many doors there were.  But as far as --

Q.   You don't know whether it was more or less or whether he nailed it right on the head?

A.   Knowing him, he probably nailed it.

Q.   Continuing, "He," Mr. Parker, "stated that the doors were suspended from the various metal shelving units via four-foot sections of wood strapping that was attached to the shelves and then screwed to the tops of the doors which enabled them



to stain both sides of the doors."  Agree or disagree?

A.  Agree.

Q.  Continuing, "And the trim was leaned against the shelving units next to the various doors."

A.  Disagree.  There was no trim.

Q.  No trim that day?

A.  No.

Q.  You're sure of that?

A.  100 percent positive.  I know it was just doors and the door jambs.

Q.  Continuing, "In total, according to Mr. Parker, the entire room had doors and trim surrounding the perimeter with a table in the center of the room which he was going to refinish for his wife."  I know you've said there was no trim.  But in terms of the doors surrounding the perimeter of the room, do you agree with that?

A.  Yes.

Q.  And do you recall whether there was a table in the middle of the room that he was going to refinish for his wife?

A.  I don't.  I don't recall.

Q.  Continuing again, "Mr. Parker described



the various openings in the walls and their respective condition at the time, stating that as you enter the room from the right side," which he meant the right side facing the loading dock.

A.   Okay.

Q.   -- "there are two large openings the size of garage doors which were covered with painters tarps to prevent saw dust from entering the staining area."  Do you agree or disagree?

A.   I don't know.  Can you repeat that, please.

Q.   Sure.  "Mr. Parker described the various openings in the walls and their respective condition at the time, stating as you enter the room from the right side," which is the side facing the loading dock, "there are two large openings the size of garage doors."  I'll start with that.  Do you agree with that?

A.   Well, there was only one opening.  Well, there was two.  But one we only walked through because the other one was closed.

Q.   Covered over with plywood?

A.   I believe so.  Yes.

Q.   "Which were covered with painters tarps to prevent saw dust from entering the room."  You agree



that one opening was covered with a painter's tarp?

A.   Yes.

Q.   "To the left, moving clockwise" -- so starting at the loading dock side and moving clockwise around the room -- "there was a door to the office area that would have been closed."  Do you agree?

A.   To the office area?  No.  That would've gone to the -- we're still talking the paint room, right?

Q.   The paint room moving from the loading dock side clockwise around the room.  So getting to the street side of the room, was there a door on the street side of the room to an office?

A.   Way over here?  I guess I'm not understanding.

Q.   Yeah.  So this is the loading dock side, correct?

A.   Uh-huh.

Q.   So if you moved in this room in a clockwise direction, on this wall was there a door that led to an office area?

A.   That's what's confusing me.  Because that wasn't an office area.  It was -- this is not an office area.  The office is way up here.



Q.   Okay.   But let's say in the direction of the office area, was there a door on this --

A.   That wall?

Q.   Yeah.

A.   Yes.

Q.   Okay.   And that was a door that you could open and close with a physical door?

A.   I don't even think the door was there.   It was more just a walkthrough room.

MR. HUGO:   And just to clarify, so we have it for the record.   If we were to say that the wall with the ladder is the left side, you were referring to the top -- the north or top to say there was a wall -- there was a door there, correct?

A.   Correct.

Q.   Which is -- the top is also the street side of the photo, correct?

A.   Correct.

Q.   Okay.   "Then continuing clockwise around the room" -- so I guess we're now on the wall opposite the loading dock side -- "there are no openings along the opposite wall, the wall closest to the tire company."

A.   Correct.

Q.   Continuing, "He stated that the two



openings along the right side wall, the wall facing the rear of the building" -- so we'd call that the bottom wall.

A.  Uh-huh.  And then there were --

Q.  -- "were covered with plywood."

A.  Two openings?

Q.  I'm just reading what Mr. Parker said. And I'm just asking you to agree or disagree?

A.  I disagree.  There was only one opening.

Q.  On the street side?  I mean, sorry, the back side?

A.  The back.  Correct.

Q.  Which is the bottom of the picture?

A.  Which is the bottom of the picture.

Q.  One opening?

A.  One opening that had plywood.

Q.  Okay.  And, finally, "The investigator explained to Mr. Parker that they had located a small ceramic heater in the paint room, to which Mr. Parker immediately replied that it was not running when he was there with Mr. George, nor was the LP space heater."  Do you have any knowledge one way or the other whether later in the day after you dropped off the trailer, whether the space heater or the LP heater were operating in that room?



ROBERT CARDINAL Vol.I                    September 19, 2025
ACADIA INS CO. vs SBP BUILDERS, LLC                      55

A.  I don't recall.

Q.  You have no information to dispute what Mr. Parker said?

A.  Nope.  I know there was a space heater in there.  And --

MR. HUGO:  Just to be clear too, you're saying what Mr. Wheeler said Mr. Parker said, right?

MR. LEAVITT:  That's correct.

Q.  Okay.  Continuing on in Mr. Wheeler's summary of his interview, it states, "Mr. Parker stated that there were fluorescent lighting fixtures on the ceiling which were controlled via a wall switch."  Agree?

A.  Agree.

Q.  "When asked, he," being Mr. Parker, "stated that he had difficulty recalling if there was a finished ceiling in the room or not, but thought it was comprised of open joists."  Any recollection one way or the other?

A.  I don't recall.

Q.  Earlier you understand you testified your best memory was that it was a finished ceiling?

A.  Yes.  I think I -- yeah.  I don't know if it was Sheetrock or that composite board stuff.  But I feel like I don't think there was joists.



Q.  Joists open to the --

A.  Joist beams.  Yeah.  So --

Q.  All right.  For context, I'm going to read to you the next section.  I don't have a question yet.  "When speaking with Mr. Parker on March 29 at 10:05 a.m., I inquired as to the placement of the material that was used to apply the stain, at which time he placed -- he called his employee Robbie Cardinal who agreed to speak with us and the phone was placed on speaker mode."  And you don't have a recollection of that phone call, correct?

A.  Correct.

Q.  All right.  It goes on to say Mr. Cardinal stated that he worked on the doors and trim all morning and finished up sometime between 12 and 1 p.m." other than I know you disagree with the trim, do you disagree with the timing?

A.  I'm not 100 percent sure with the timing. I don't know.

Q.  "He stated that he was somewhere between five to seven rags."  Agree or disagree?

A.  Agree.

Q.  "Which he described as being approximately 12 by" -- excuse me -- "10 by 12 inches."

A.  Roughly.  Yes.



Q.  And when he was -- "And when done, he placed them on top of three plastic milk crates."

A.  No.  I didn't place them.  I draped them over, like I explained earlier.  The milk crate was right-side up and they were draped over the edge.

Q.  Do you recall whether it was one milk crate or multiple milk crates?

A.  I know there was at least two --

Q.  Okay.

A.  -- stacked on top of each other.

Q.  "When asked" -- and this is you in the phone call -- "when asked where in the room the milk crates were located, he stated that they were approximately two feet to three feet from the side wall closest to the door covered with the tarp", which would be the loading dock side.

A.  No.  I disagree.  They were in the middle of that room.

Q.  Continuing, "Mr. Cardinal confirmed using Old Masters wiping stain."  Correct?

A.  Correct.

Q.  "And that he piled the rags on one edge of the milk crate that was positioned upright."

A.  Not on one side.  However many rags were draped all the way around it.



Q.   Okay.   Are you good to continue?   Do you need a break?   All set?   I'm going to ask you to use the Sharpie.   But just so we can have a diagram of where everything was positioned in the room when you left that day to the best of your memory, I'm going to ask you to do your best to just make a diagram of the walls of the room first.   And maybe if you could leave openings where you believe there were doors.  Do you understand what I'm --

A.   Uh-huh.   Yes.

Q.   Okay.

A.   Oh, I didn't do the openings.   Shit.

Q.   Well, we can write them in.   So let's first get ourselves oriented.

A.   Should I just flip it over and start over?

Q.   Or I can give you a fresh one.

A.   Yeah.   Can I have a new one?

Q.   Sure.   And just so you understand where I'm going, I'm going to ask you at the bottom to write "loading dock side" and then "back side" and "street side" so we know where things are.   Okay?

A.   Okay.   Now, am I leaving a gap for where I believe we had plywood and a wall?

Q.   I would leave a gap.   And then we can write in that there was plywood covering it.



A.  Gotcha.

Q.  And the one where you think there was a tarp, just write "tarp."

A.  (Witness complied.)

Q.  All right.  And then maybe just by using like little small rectangles, which would be the tops of the doors looking down from above, can you just position the doors around the room where you had them?

MR. HUGO:  If you can.

A.  I don't remember how many doors, so.

MR. HUGO:  If you don't remember --

A.  Yeah.  I'm probably drawing some extra doors.

Q.  It will be -- we've got on the record that you don't remember the exact number of doors.  But I'm just going to try and get the general orientation of how they were positioned in juxtaposition to the wall.  So they were a few feet from the walls?

A.  Uh-huh.

Q.  Okay.  And then where were the milk crates with the rags when you left that day?  Can you just draw the boxes for --

A.  Draw a box?



Q.  Yeah.

A.  (Witness complied.)

Q.  And you said there was at least two, right?

A.  Right.  That's what I was just about to ask.  You want the two milk crates or --

Q.  Okay.  So basically in the center of the room?

MR. HUGO:  Do you want to label those the milk crates so we know.

Q.  Yeah.  Just put an M in the middle.  All right.  And then just write -- put Ds in the middle of the rectangles that are the doors.

A.  Oh, those doors?

Q.  The doors that were getting stained.

MR. HUGO:  And any of those that are door jambs.

A.  I don't know.  I don't recall.  I would say these are jambs.

Q.  So when Attorney Hugo refers to door jambs, you understand that means the wood framing that goes around the inside of the door?

A.  Correct.

Q.  And do you recall staining any door jambs that day?



ROBERT CARDINAL Vol.I                        September 19, 2025
ACADIA INS CO. vs SBP BUILDERS, LLC                        61

A.   Uh-huh.

MR. HUGO:   You have to say yes or no.

A.   Yes.   Sorry.

Q.   And do you recall where those were positioned?   Leaning -- did you say those were leaning against shelves, or they were suspended too?

A.   They were suspended too.

Q.   Okay.   Do you know how many?

A.   I don't -- I don't recall exactly how many doors or door jambs.

Q.   At least one?

A.   I know there was at least one door jamb. Maybe even two.

Q.   And were they likewise in an orientation around the perimeter of the room for staining?

A.   Yes.   The same way.   Yeah.

Q.   All right.   With regard to the opening in the room which is a door, you believe there was no actual physical door there, right, on the street side of the paint room?

A.   I don't believe so.   No.

Q.   Okay.   And then on the back parking lot area of the building, you have another opening for a door?

A.   Yeah.

Q.  Was there a door in that one?  That was plywood?

A.  Uh-huh.

Q.  Okay.  So there were only two ways to get in and out of this room, pass under the tarp or use the opening toward the street side?

A.  I believe there was a tarp hanging there too.

Q.  On the street side?

A.  The street side opening.

Q.  Okay.  Then write "tarp," if that's your memory.

A.  Yeah.

Q.  And then could you hand that to the court reporter.

MR. LEAVITT:  And could you put an Exhibit 3 sticker on that.

(Exhibit 3 marked for ID.)

Q.  Just so the record is clear, you've done a diagram of the paint room using your best sketching abilities and recollection to indicate the orientation of the room where the doors were, where the door or where the physical doors to get in and out of the room were, as well as the doors that were being stained that day and the milk crates, correct?



A.   Correct.

Q.   And the rags that you left were on top of the milk crates?

A.   Draped over the sides.  Yes.

Q.   Okay.  And we've marked that as Exhibit 3?

A.   Yes.

Q.   Okay.  Now, I understand on the date you were working here prior to the fire, later that day, your work was interrupted because you got a call from Mr. Parker who needed you to go take a trailer off a job site, correct?

A.   Correct.

Q.   And at the time you left that day, you held the belief in your head that you might come back and do more staining?

A.   I was going to.  Yes.

Q.   But you never did?

A.   Correct.  No, I did not.

Q.   Now, in the past, when you've done staining with Old Masters stain in that room, have you -- had it been your practice to take the used rags and put them in a metal can in water?

A.   Yes.

Q.   And did SBP Builders supply you with those cans to use for disposal?



A.  Yes.

Q.  Were those cans available to you on the date in question?

A.  Yes.

Q.  Where were they located?

A.  I believe they were -- yeah.  It was outside on the loading dock.

Q.  Okay.  Do you know what kind of cans they were?

A.  The five gallon Home Depot buckets filled with water.

Q.  Were they metal or plastic?

A.  Plastic.

Q.  But on the date leading up to -- on the day that we've been discussing leading up to the fire, you never got to the point where you put those rags in a water-filled can, correct?

A.  Can you say that again?

Q.  Okay.  On the date that you were doing the staining in the paint room that we've talked about, you left to go get a trailer, so you never got to the point where you put those rags in a water-filled Home Depot can?

A.  Correct.

Q.  At some point after you had gone home from



work for the day with your banged up head, when did you learn that a fire had occurred?

A.   I think it was around midnight.

Q.   And how did you learn of the fire?

A.   One of my good friends was calling me.

Q.   Who was that?

A.   One of my good friends was calling me telling me that our shop was on fire.

Q.   Was there a fellow employee or just a friend?

A.   It was just a friend.

Q.   What's the name of your friend?

A.   May I ask why?

Q.   Because it may have information and you have to answer the question.

A.   His name is Matt.

Q.   And what's Matt's last name?

A.   Lucas.

Q.   And did he tell you anything about how the fire started?

A.   No.  He just sent me a phone call via Facebook messenger.  And he was telling me that my shop is on fire.  And he lives, I don't know, two, three towns away from Littleton.  And he had learned it from somebody else posting pictures on Facebook.



Q.    Subsequent to learning about the fire, has anyone ever told you why the fire happened?

A.    No.

Q.    And do you have any understanding that you developed on your own as to what caused the fire?

MR. HUGO:   Objection.   To the extent you know.   Not based on any conversations with me.   To the extent you know what caused fire.

A.    What caused the fire?   I don't know.

Q.    Does SBP have in place a policy that requires you to follow the material safety data sheets of products that you are using?

A.    Do they require us to follow?   I don't know.

Q.    You don't know?   That's not something you've ever been advised when you were working at SBP?

A.    The piece of paper?   Is that what you're asking?   I guess I'm not completely understanding your question.

Q.    I explain before that MSDS sheets --

A.    Yes.

Q.    -- which are material safety data sheets --

A.    Yes.



Q.  -- sometimes a company -- chemicals or products, when they're sold, they come in the box or you can get them online.

A.  Okay.

Q.  My question is were you ever advised that it is a policy of SBP Builders that its employees are required to follow the material safety data sheets for the products that it uses?

A.  I don't know how to answer that.  I don't believe so.

Q.  Does SBP Builders have a policy that you've been advised of that you're required to follow the warning labels on products that you are using?

A.  That would just be common knowledge.  But I don't think so.

Q.  Were you ever informed that SBP Builders has a policy that all employees are required to follow state code and law?

MR. HUGO:  Objection.  Vague.

A.  I don't know.

Q.  You recognize what that is, right?

A.  Yes.

Q.  What is it?

A.  It's wiping stain.  Old Masters wiping



stain.

Q.   And that's the type of product you were using to stain the doors?

A.   Maybe not the same color.  But yeah.  I think so.

Q.   Do you see the warning label on the top of the can?

A.   On the top.  Yes.

Q.   Are you aware of that warning label having used this product before?

A.   Yes.  It's on a lot of the cans.  Yes.

Q.   And you agree with it?

MR. HUGO:  Objection.

Q.   Okay.  Let me rephrase the question.  Take a minute to read it.

A.   Okay.

MR. LEAVITT:  Can you mark that as No. 4.

(Exhibit 4 marked for ID.)

Q.   Do you agree that the court reporter has marked as Exhibit 4 a photo of the warning label on top of the Old Masters stain can that's sitting in front of you?

A.   Yes.

Q.   And you've had a chance to read that now?

A.   Yes.



Q.  Is it fair to say that you were aware of this warning prior to doing the work on --

A.  Yes.

Q.  -- the date of the fire?

A.  Yes.

Q.  And that is something that had been not only trained to you by Mr. Parker, but you'd previously read these warnings on cans?

A.  Yes.

Q.  So you were familiar with it?

A.  Yes.

Q.  And you agree with the instructions that were given on the can?

MR. HUGO:  Objection.

You can answer.

A.  Yeah.

Q.  Was it your understanding on the date that you were doing the work we've been talking about today in the paint room that the language on Exhibit 4 is an industry standard for painters and stainers using this type of product?

MR. HUGO:  Objection.  Calls for speculation.

You can answer.

A.  Sure.



ROBERT CARDINAL Vol.I                                    September 19, 2025
ACADIA INS CO. vs SBP BUILDERS, LLC                                       70

Q.  And turning your attention away from the yellow label on the top of the can, but going to the back of the can, have you ever read those instructions?

A.  Some of it.  Yes.

MR. LEAVITT:  I'll mark that as No. 5.

(Exhibit 5 marked for ID.)

Q.  I'm going to show you what's been marked by the court reporter as Exhibit 5 and represent to you that that's a photograph of a section of the back of this can.  And I want to ask you to read the warning language in Exhibit 5, please.

A.  Okay.

Q.  With regard to the last sentence of this boxed-in warning that starts with the word "immediately," I take it that that sentence is consistent with your prior knowledge and understanding of the proper disposal of stained-soaked rags, correct?

A.  Uh-huh.  Yes.

Q.  So you have no -- you have no difference of opinion with regard to what this language says and how you'd been trained to dispose of rags?

A.  I mean, the only thing I'm -- the metal container is like the only thing I kind of don't



agree with.  But if the rags --

Q.  Because -- sorry.

A.  If the rags are in water, whether it's metal or plastic, I feel like that it's okay, I guess.

Q.  In any event, can we agree that at the time you left the paint room on the day of the fire, you had not complied with the instructions on the top of the can or the back of the can which have been marked as Exhibits 4 and 5?

A.  Correct.

MR. LEAVITT:  Okay.  Do you have any questions, John?

MR. HUGO:  No.

MR. LEAVITT:  I think we're done.  And we'll take a short break.  Thank you for your time today.

THE COURT REPORTER:  I just want to go through copy orders.  Larry, as we've discussed, you're ordering a copy of the transcript?

MR. LEAVITT:  Yes.

THE COURT REPORTER:  And you're ordering a copy as well, John?

MR. HUGO:  Yes.

(Whereupon the deposition was concluded at



10:38 a.m.)



ESQUIRE ERRATA SHEET

Esquire Job ID:  J13373890

Case Caption:  Acadia Insurance Company a/s/o New England Truck Tire Centers, Inc. v. SBP Builders, LLC


DECLARATION UNDER PENALTY OF PERJURY


I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the above-captioned matter or the same has been read to me and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ESQUIRE ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.


Signed on the_____ day of _____, 20___.


_____

ROBERT CARDINAL



ROBERT CARDINAL Vol.I                          September 19, 2025
ACADIA INS CO. vs SBP BUILDERS, LLC                          74

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


Page No._____Line No._____Change to:_____

_____

Reason for change:_____


Page No._____Line No._____Change to:_____

_____

Reason for change:_____


Page No._____Line No._____Change to:_____

_____

Reason for change:_____


Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____

ROBERT CARDINAL



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

ROBERT CARDINAL



C E R T I F I C A T E

        I, Lauren M. Buzzerio, a Licensed Shorthand Reporter for the State of New Hampshire, do hereby certify that the foregoing is a true and accurate transcript of my stenographic notes of the proceeding taken at the place and on the date hereinbefore set forth to the best of my skill and ability under the conditions present at the time.

        I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this proceeding was taken, and further that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

        The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

        IN WITNESS WHEREOF, I have hereunto set my hand on this 9th day of September, 2025.

_____
        Lauren M. Buzzerio
        LCR 173, RPR



**1**

**1**
37:3,5,11
38:19,23
56:15

**10**
56:24

**100**
45:23
50:11
56:18

**10:05**
56:6

**10:38**
72:1

**12**
40:14
56:15,24

**13**
8:17
24:16
29:24
49:8

**19**
14:25
15:12

**2**

**2**
38:4,5,6
39:3

**20**
7:13

**2023**
8:14,17
18:1
24:16
29:24

49:8

**22**
14:12

**23**
14:12,25
15:12

**28**
48:21

**29**
48:21
56:5

**3**

**3**
62:17,18
63:5

**30**
31:12

**32**
14:18
16:12

**4**

**4**
68:17,18,
20 69:20
71:10

**433**
9:4 17:14
19:5

**5**

**5**
70:6,7,9,
12 71:10

**50**
31:12

**6**

**60**
31:12

**7**

**7/25/91**
7:11

**9**

**9:05**
4:3

**A**

**a.m.**
4:3 56:6
72:1

**abilities**
62:21

**ability**
5:15

**Academy**
13:13

**Acadia**
4:22,24

**accommodate**
6:21

**accompanied**
25:25

**accompany**
21:17

**account**
47:23

**accurate**
6:25 19:2
35:18

**activity**
30:19

**actual**
61:19

**address**
7:12

**advised**
21:22
22:2
66:16
67:5,12

**affixed**
41:14

**afternoon**
44:4,7
45:13,16

**age**
14:24

**ages**
15:12

**agree**
6:13 48:9
49:15,16
50:1,3,19
51:9,17,
25 52:7
54:8
55:13,14
56:21,22
68:12,19
69:12
71:1,6

**agreed**
56:9

**agreement**
12:16

**ahead**
36:20
37:10

**air**
42:22

**allowed**
11:10

**angle**
38:2

**answers**
5:15 6:10

**apartments**
17:7

**apologize**
24:10

**appeared**
48:22

**application**
22:6

**apply**
18:21
56:7

**applying**
27:14
48:7

**approximate**
14:11

**approximate
ly**
56:23
57:14

**area**
35:4,7,12
36:11,23
37:17
49:5 51:9
52:6,8,
22,24,25
53:2
61:23

**areas**
30:16

**aspects**
7:24

**assume**



4:14

**attached**
49:24

**attend**
20:8,11

**attention**
26:4,10
70:1

**attorney**
4:21 10:8
60:20

**avoid**
5:19

**aware**
68:9 69:1

———————

**B**
———————

**B-L-A-K-S-
L-E-E**
7:15

**back**
8:14
12:19
13:12
17:13
18:1 20:1
24:15
29:23
32:7
33:21
34:3,10
37:7,13
38:19
44:18,22
45:2,10
46:1
54:11,12
58:20
61:22
63:15
70:3,11
71:9

**backhoe**
34:21

**banged**
65:1

**based**
66:7

**basic**
18:4
27:11

**basically**
34:21
35:11
60:7

**basis**
22:17

**beams**
56:2

**belief**
63:14

**believes**
47:24

**bi-fold**
49:12

**big**
31:5,8

**birth**
7:10

**bit**
5:8

**Blakslee**
7:13

**block**
31:23
41:21,22

**blocks**
31:22

**board**
32:24
55:24

**bottom**
34:15
38:13
39:22
54:3,13,
14 58:19

**box**
59:25
67:2

**box-type**
46:12

**boxed-in**
70:15

**boxes**
59:24

**boy**
33:15

**brand**
27:4
28:12,19
29:10

**break**
6:20 58:2
71:16

**brick**
31:20,21,
22 41:20,
23

**bricks**
40:13

**briefly**
4:20

**broke**
44:20

**brought**
26:4,9

**brushes**
43:10
48:7

**Bs**

24:10

**bucket**
20:7
29:7,11

**buckets**
64:10

**Builders**
4:23 8:25
9:16,23
10:1,3,9
12:4,10,
13,15
14:9,14,
20 17:5,
13,24
19:4
23:23
24:8
29:14
30:14
34:23
63:24
67:6,11,
17

**Builders'**
9:13,14
17:9

**building**
8:6 33:21
34:16
45:10
49:2 54:2
61:23

**buildings**
17:6

**built**
40:10

**bulbs**
32:13

**business**
17:23

———————

**C**
———————

**call**
32:8,23
35:12
39:19
46:5 54:2
56:11
57:12
63:9
65:21

**called**
4:21
13:12
30:21
44:15
45:21
56:8

**calling**
40:6
65:5,7

**Calls**
69:22

**cans**
63:25
64:2,8
68:11
69:8

**capacity**
9:23
12:13
15:22
16:9,14
23:9

**Cardinal**
4:6,12,19
37:5 49:6
56:9,13
57:19

**care**
19:16,17,
18 20:3,5



24:23,24
44:18
46:4

**carpentry**
8:4,5
15:3,13
16:20,25
18:11

**carpentry-type**
18:14

**carport**
35:12

**case**
4:21 5:2,
8,11

**caused**
66:5,8,9

**ceiling**
32:10,14,
17,20,22
33:1,2
55:12,17,
22

**center**
8:13 9:3
34:19
50:15
60:7

**Centers**
4:22,25

**ceramic**
54:19

**cetera**
49:4

**chance**
47:6
68:24

**changed**
15:25

**characterized**
16:24

**Charter**
13:12

**chemicals**
21:16
67:1

**childhood**
12:20

**cinder**
31:22,23
41:21,22

**circle**
36:23

**circuitry**
49:4

**circumstances**
28:25

**claims**
10:12

**clarify**
53:10

**clear**
6:7,14
36:21
37:24
55:6
62:19

**climbed**
45:5

**clockwise**
52:3,5,
12,21
53:19

**close**
19:18
31:11
40:20
53:7

**closed**
51:21
52:6

**closest**
53:22
57:15

**cloth**
41:5,16

**code**
29:15
67:19

**college**
14:2,3

**color**
43:22
46:14
68:4

**comfortably**
43:4

**common**
24:12
67:15

**company**
17:16,19
26:18,20
53:23
67:1

**completed**
44:11
45:20

**completely**
42:22
66:19

**complied**
39:2,5
59:4 60:2
71:8

**composite**
55:24

**comprised**
55:18

**computer**
13:17

**concluded**
71:25

**concrete**
31:24

**condition**
51:2,13

**confirmed**
57:19

**confusing**
52:23

**considered**
28:6

**consisted**
30:15

**consistent**
70:17

**construction**
7:20,24

**container**
29:20
70:25

**containers**
29:16

**contents**
49:5

**context**
49:9 56:3

**continue**
58:1

**continuing**
48:6
49:21
50:4,13,
25 53:19,
25 55:9
57:19

**continuously**
14:20

**contractor**
7:23

**controlled**
55:12

**conversation**
5:16 47:7
48:21

**conversations**
48:25
66:7

**copy**
71:19,20,
23

**corner**
32:7 36:4

**correct**
8:22 9:1,
5,17
10:4,6
17:14,25
24:9
29:25
30:1,16,
17 33:3
34:13,14,
20,24,25
35:14,15,
16 36:13
37:8,15,
19 47:1,8
52:18
53:14,15,
17,18,24
54:12
55:8
56:11,12
57:20,21
60:23
62:25



63:1,11,
12,18
64:17,24
70:19
71:11

**Cottage**
9:4 17:14
19:5
34:13
37:13

**cotton**
43:21

**counsel**
10:16

**Country**
13:12,14

**couple**
34:5
39:21
43:1

**courses**
13:17

**court**
5:13 6:3
62:14
68:19
70:9
71:18,22

**covered**
35:4,12
40:22
51:7,22,
24 52:1
54:5
57:15

**covering**
41:7
58:25

**crate**
46:8,11,
25 48:18
57:4,7,23

**crates**
57:2,7,13
59:22
60:6,10
62:25
63:3

**crew**
15:18,19,
23 16:6,
12,15,17
23:20,22,
25

**cure**
41:6

**current**
7:12

———————

**D**

———————

**daily**
22:17

**Dalton**
7:15

**damage**
34:22

**dark**
45:7,8

**data**
21:9,15
66:11,23
67:7

**date**
7:9 8:16,
18,21
24:15
27:5
28:14
29:24
63:7
64:3,14,
19 69:4,
17

**David**
47:21

**day**
9:13,22
11:3
26:23,25
27:1,13,
21,24
28:1,3,
10,15,16,
17,24
30:3,6
32:5
37:23
41:4,24
42:1
43:13,18,
24 44:9
45:17
46:2 47:3
48:2 50:8
54:23
58:5
59:23
60:25
62:25
63:8,13
64:15
65:1 71:7

**deal**
21:6

**degree**
14:24

**depended**
18:20

**deposition**
5:1,4,8
8:11
10:24
11:5,8
12:8 47:6
71:25

**Depot**
64:10,23

**describe**
11:25

**describing**
47:7

**description**
19:2
27:11

**designated**
30:19,20

**detail**
49:5

**detailed**
48:25
49:1

**developed**
66:5

**diagram**
37:25
58:3,6
62:20

**difference**
70:21

**difficulty**
55:16

**diploma**
13:13,20

**direct**
22:21
23:15
38:4

**direction**
52:21
53:1

**directly**
22:7,14,
20

**disagree**
47:17
48:4,10,
11,12,13,

14 50:2,7
51:9
54:8,9
56:16,17,
21 57:17

**discarded**
48:8

**discovery**
47:19

**discuss**
5:12

**discussed**
37:16
71:19

**discussing**
64:15

**discussion**
34:2

**disorientin
g**
33:16

**disposal**
22:11
29:4,5,9,
16 63:25
70:18

**dispose**
24:23
29:15,19
70:23

**disposing**
25:5,8

**dispute**
55:2

**dock**
51:4,16
52:4,12,
17 53:21
57:16
58:20
64:7



**documents**
11:7

**door**
27:16
29:25
40:8,19
41:18
42:7,19
43:5
44:15
50:12
52:5,13,
21 53:2,
6,7,8,14
57:15
60:16,20,
22,24
61:10,12,
18,19,24
62:1,23

**doors**
27:14,15,
16,17
29:25
39:7,9,10
40:2,4,
22,24
41:2,7,25
42:3,9,16
45:20
49:7,13,
17,22,25
50:1,6,
12,14,18
51:7,17
56:14
58:8
59:7,8,
11,14,16
60:13,14,
15 61:10
62:22,23,
24 68:3

**draped**
46:9,24

57:3,5,25
63:4

**draw**
37:22
59:24,25

**drawing**
59:13

**driveway**
34:16

**driveways**
18:7

**drone**
33:10
37:6,11
38:4

**drop**
41:5,16

**dropped**
13:11
45:2
54:24

**Ds**
60:12

**duly**
4:6

**dump**
44:16,20,
25

**dust**
41:2
51:8,25

**duties**
10:2

---

**E**

---

**earlier**
22:9
55:21
57:4

**early**
45:15

**edge**
46:10
57:5,22

**edges**
46:24

**education**
13:25

**electrical**
8:3 36:5
49:3

**employed**
7:17
9:15,18
23:8,19

**employee**
9:23 14:8
49:6 56:8
65:9

**employees**
17:9
21:24
67:6,18

**employment**
10:2
14:23
28:22

**employment-
related**
15:13

**enabled**
49:25

**end**
26:3,5

**England**
4:22,24
8:13 9:2,
12 34:19

**enlighten**
25:15

**enlightened**
25:19

**enter**
51:3,14

**entering**
51:8,25

**entire**
50:14

**enumerated**
25:3

**equipment**
18:8
19:19
35:5 49:3

**essentially**
35:18

**evening**
9:6

**event**
30:25
71:6

**exact**
8:18
59:16

**EXAMINATION**
4:9

**examined**
4:6

**examples**
19:13

**excuse**
56:24

**exhibit**
37:1,3,5,
11 38:5,
6,19,23
39:3
62:17,18
63:5
68:18,20

69:20
70:7,9,12

**Exhibits**
71:10

**experience**
15:8

**explain**
5:7 6:1
21:4
66:21

**explained**
54:18
57:4

**explanation**
21:22

**extent**
34:22
66:6,8

**exterior**
42:10,13

**extra**
59:13

**eyes**
21:21
24:25
25:6

---

**F**

---

**fabric**
41:17

**face**
44:25

**Facebook**
65:22,25

**facility**
9:9

**facing**
46:18,22,
23 51:4,



15 54:1

**failure**
29:19

**fair**
6:10 69:1

**fairly**
31:13
36:17

**familiar**
24:17
27:9
28:6,9
69:10

**families**
25:18

**family**
15:10,11
24:3
25:13

**feel**
55:25
71:4

**feeling**
7:4

**feet**
40:3,14
42:8,10
43:1,3
57:14
59:19

**fellow**
65:9

**fighting**
44:23

**figure**
23:12

**filled**
64:10

**final**
45:16,18

**finally**
26:13
45:7
54:17

**fine**
4:17

**finger**
38:21

**finish**
5:17,21

**finished**
44:1
55:17,22
56:15

**fire**
8:12,17,
21,22,24
9:6,8,12,
22 10:2
18:2
20:14
24:15,17
26:7,23
27:1,13
28:14,15
29:24
33:11
34:22
37:23
48:23
63:8
64:16
65:2,4,8,
20,23
66:1,2,5,
8,9 69:4
71:7

**fixtures**
32:11
33:4
55:11

**flip**
58:15

**floor**
42:21
48:8,14

**fluorescent**
32:13
33:1
55:11

**flush**
24:25

**follow**
66:11,13
67:7,13,
19

**foreman**
16:3,6,
11,15
23:9

**foremen**
23:21,22

**formal**
15:3
19:11

**forward**
37:7,13

**fought**
44:21

**foundational**
34:6

**four-foot**
49:23

**framing**
40:10
60:21

**Franconia**
12:25
13:1

**fresh**
58:16

**freshman**

13:8,10

**friend**
26:11
65:10,11,
12

**friends**
15:11
24:3
25:13,17
65:5,7

**front**
35:1,7
36:14
68:22

**full**
4:11

**furnace**
36:11

**furnishings**
49:3

———————

**G**

———————

**gallon**
64:10

**gap**
58:22,24

**garage**
35:8
36:14,15
45:10
51:7,17

**garage-
style**
40:8

**garages**
30:16

**gathered**
11:16

**general**

59:17

**gentleman's**
11:9

**George**
54:21

**girders**
35:4

**give**
5:1,22,24
6:6 14:11
19:13
27:11
33:20
58:16

**giving**
5:14 6:10
8:10

**gloves**
43:9

**good**
58:1
65:5,7

**Gotcha**
59:1

**graduate**
13:5

**grew**
12:22

**guess**
52:15
53:20
66:19
71:5

**guys**
19:5 23:7

———————

**H**

———————

**Hampshire**
4:24 7:16



8:14
12:21
29:14,21

**hand**
62:14

**hang**
41:2

**hanging**
42:20
62:7

**happen**
9:8 25:16

**happened**
9:6 10:18
11:2 18:2
66:2

**happening**
24:17

**hazardous**
20:22
21:1,6

**hazards**
21:18
24:7,18,
21 25:2,
9,24

**hazmat**
20:17,20,
24

**head**
6:3 49:19
63:14
65:1

**heads**
6:2

**headway**
34:7

**heat**
32:2,4
41:5

**heater**
32:6,8
54:19,22,
24,25
55:4

**heavy**
35:5

**held**
63:14

**helping**
15:10,11
24:3

**high**
12:24
13:4,13,
19 14:1,
6,24

**hired**
19:8,10

**history**
14:23

**hole**
46:18,23

**home**
7:12
64:10,23,
25

**hook**
44:19

**hours**
9:9,11
10:1
26:24

**Hugo**
4:13,18
10:6,11,
22 11:5,
12 20:18
22:22
33:25
34:3
36:22

37:2
47:20
53:10
55:6
59:10,12
60:9,16,
20 61:2
66:6
67:20
68:13
69:14,22
71:14,24

**hurt**
45:4

**hurting**
45:4

———————

**I**

———————

**ID**
37:3 38:6
62:18
68:18
70:7

**idea**
43:14

**identified**
36:23

**identifying**
49:2

**immediately**
54:20
70:16

**important**
5:16,24

**inches**
56:24

**include**
21:16

**included**
11:21

**indicating**
38:21

**individuals**
23:14,18

**industry**
69:20

**inform**
29:18

**information**
11:15
49:1 55:2
65:14

**informed**
29:13
67:17

**inquired**
56:6

**inside**
60:22

**inspection**
48:23

**instructions**
28:2,12
29:9
69:12
70:4 71:8

**Insurance**
4:23

**intended**
45:18

**interchangeably**
12:17

**interior**
27:17

**interrupted**
63:9

**interview**
11:21,23,

25 55:10

**interviewed**
47:22

**interviews**
11:20

**investigator**
11:18
47:11,22
54:17

**investigator's**
47:15

**investigators**
48:24

**iron**
35:4

———————

**J**

———————

**jack**
44:20

**jamb**
61:12

**jambs**
27:16
29:25
50:12
60:17,19,
21,24
61:10

**job**
6:7,15
17:11,12,
14,20,22
18:4,12,
16,19,20,
23 21:10
22:21,25
23:3
44:16,19



63:11

**jobs**
15:10

**John**
71:13,23

**joint**
48:23

**Joist**
56:2

**joists**
55:18,25
56:1

**jugs**
46:19,23

**Junior**
13:8,10

**juxtapositi
on**
59:19

———————

**K**
———————

**kind**
14:6
18:10
37:5  42:5
45:4  64:8
70:25

**kinds**
19:12

**kitchens**
15:2

**Knowing**
49:20

**knowledge**
12:5
25:4,9,20
54:22
67:15
70:17

———————

**L**
———————

**label**
60:9
68:6,9,20
70:2

**labels**
26:1,6,13
28:11,16,
18 29:3
67:13

**laborer**
15:18,23
23:24

**ladder**
35:22,23
36:16
37:18
38:9
39:17,19,
20 40:7
41:9,10
53:12

**ladder's**
35:20

**language**
28:7
69:19
70:12,22

**large**
36:1
40:8,17
51:6,16

**Larry**
4:20
71:19

**late**
45:15

**law**
29:21
67:19

**lawsuit**
8:11
10:13

**layout**
49:2

**lead**
16:4,5

**leading**
9:22
64:14,15

**leaned**
35:20,22
50:4

**leaning**
36:17
37:18
61:5,6

**learn**
5:10
65:2,4

**learned**
65:24

**learning**
66:1

**leave**
46:6
58:8,24

**leaving**
58:22

**Leavitt**
4:9,17,
19,20
33:23
34:4
36:19,22,
25 37:4
38:3
47:18,21
55:8
62:16
68:17
70:6

**led**
39:8
52:22

**left**
19:11
34:22
35:3
38:8,9,
11,13
39:19,20
40:7
44:12,18
45:5,7,16
48:17
52:3
53:12
58:5
59:23
63:2,13
64:21
71:7

**lids**
19:18

**light**
32:11,13
33:4 45:6

**lighting**
32:9 33:7
55:11

**lights**
33:1

**likewise**
61:14

**lines**
11:14

**listed**
29:16

**literature**
25:25

71:12,15,
21

**Littleton**
8:13 9:3
12:21,24
13:11,15
30:14
65:24

**lives**
65:23

**loading**
51:4,15
52:4,11,
17 53:21
57:16
58:20
64:7

**located**
9:4 13:14
39:14
54:18
57:13
64:5

**location**
17:2,23
21:8,23

**locations**
17:1,4

**long**
7:21
15:21
16:8

**lot**
24:13
61:22
68:11

**LP**
54:22,25

**Lucas**
65:18

———————

**M**
———————

**made**



31:18
32:17
41:16
42:5,14
43:20

**make**
34:6
36:22
38:17
58:6

**man**
16:21,24
33:19

**managed**
44:24,25

**manager**
16:2

**maneuver**
31:15

**March**
8:14,17
24:16
29:24
48:21
49:7 56:5

**mark**
34:4
36:20
37:1
38:3,7
68:17
70:6

**marked**
37:3,5,11
38:6
62:18
63:5
68:18,20
70:7,8
71:10

**marking**
38:4

**Master-
something**
27:3

**Masters**
27:4,12
28:12,19
29:3,10
43:12
48:3
49:14
57:20
63:20
67:25
68:21

**material**
21:9,15
43:21
56:7
66:11,23
67:7

**materials**
18:9
20:22
21:2,6

**Matt**
65:16

**Matt's**
65:17

**means**
20:20
60:21

**meant**
51:4

**mechanical**
36:12

**medications**
7:7

**meet**
11:4

**meetings**
20:8,11

**member**
23:24

**memory**
7:2 11:12
55:22
58:5
62:12

**messed**
16:16

**messenger**
65:22

**met**
4:20 10:5

**metal**
42:15
49:22
63:22
64:12
70:24
71:4

**methods**
25:7

**middle**
44:13,14
46:8
50:22
57:17
60:11,12

**midnight**
65:3

**milk**
46:8,11,
19,22,25
48:18
57:2,4,6,
7,12,23
59:22
60:6,10
62:25
63:3

**mind**
19:23

21:22

**mine**
26:11

**minute**
12:19
68:15

**mixing**
24:10

**mode**
56:10

**Modine**
32:8

**months**
7:22

**morning**
6:19 9:7
44:3,6
45:15
49:7
56:15

**mounted**
32:14,16
33:1

**moved**
52:20

**moving**
18:8 40:5
52:3,4,11

**MSDS**
21:12,14,
17,24
66:21

**multiple**
11:21
17:1,3
30:15
57:7

——————

**N**

——————

**nailed**

49:19,20

**named**
11:18

**needed**
16:21,25
18:16
44:16
63:10

**night**
11:3

**Nineteen**
13:24

**Nodding**
6:2

**normal**
5:16

**north**
13:12,14
53:13

**notes**
11:20,24
47:6,15
48:20

**number**
21:21
59:16

——————

**O**

——————

**Objection**
20:18
22:22
66:6
67:20
68:13
69:14,22

**objections**
4:15

**occasions**
22:19
27:7



occupied
  17:13
  19:5
  30:14

occurred
  24:16
  65:2

odor
  25:1,5

offered
  10:19

office
  52:6,8,
  14,22,24,
  25 53:2

offices
  35:1

oil-based
  22:5,11
  23:25
  24:7,18
  25:8,24
  26:14,18
  28:18
  29:10
  48:3
  49:15

oil-soaked
  29:4

oil-stained
  29:15,19

on-site
  21:8,23
  44:8

online
  13:17
  67:3

open
  40:14,20,
  24 53:7
  55:18
  56:1

opened
  27:23

opening
  40:17
  41:12
  51:19
  52:1
  54:9,15,
  16 61:17,
  23 62:6,
  10

openings
  36:1 40:9
  51:1,6,
  13,16
  53:22
  54:1,6
  58:8,12

operating
  54:25

opinion
  70:22

opposite
  53:21,22

ordering
  71:20,22

orders
  71:19

orientation
  34:11
  59:18
  61:14
  62:22

oriented
  33:14
  42:3
  58:14

outline
  37:22

overhead
  38:4

overwhelmin
g
  25:1

owned
  17:7

owner
  12:13

owns
  12:4

_____


        P
_____


p.m.
  56:16

paint
  18:22
  19:15,18
  30:21,24
  31:1,4,6
  35:18
  36:2,18,
  24 37:18,
  22 38:10,
  16,18,20
  39:1,6,7
  41:3
  43:25
  45:16
  46:2 48:7
  52:9,11
  54:19
  61:20
  62:20
  64:20
  69:19
  71:7

paintbrush
  24:5
  48:13

paintbrushe
s
  19:17

painted
  49:14

painter's
  52:1

painters
  25:15
  51:7,24
  69:20

painting
  8:7 15:8,
  14 16:20,
  24 18:18
  48:1 49:7

paints
  21:16
  24:4

paper
  66:18

paragraph
  33:10

Parker
  10:21
  12:2,9,
  12,15
  15:1
  16:4,25
  19:9,20
  22:7,12,
  15 23:1,
  4,8,14,19
  24:12
  25:4,10,
  17 28:23
  29:18
  36:7
  44:15
  45:3,21
  46:5
  47:11,23,
  24 48:1,
  6,22
  49:4,21
  50:14,25
  51:12

54:7,18,
  20 55:3,
  7,10,15
  56:5
  63:10
  69:7

parking
  30:16
  35:4
  61:22

part
  10:2
  34:19
  36:7,8

particle
  32:24

parts
  48:12

party
  5:9

pass
  62:5

past
  25:14
  28:8
  63:19

peace
  19:23

pending
  4:23

People
  23:19
  25:13

percent
  45:23
  50:11
  56:18

perform
  18:11,14
  43:7

performed



17:17,20
30:5,18

**perimeter**
39:17
50:15,18
61:15

**period**
14:19

**Permanently**
41:14

**personally**
10:19,21

**perspective**
37:6,12

**phone**
11:21,23
47:11,12
56:9,11
57:12
65:21

**photo**
33:20
38:5,12
53:17
68:20

**photograph**
34:11,12,
15 37:6,
12 70:10

**physical**
40:19
53:7
61:19
62:23

**physically**
30:5

**picking**
26:5

**picture**
34:9
54:13,14

**pictures**
65:25

**piece**
66:18

**piled**
57:22

**place**
8:12 17:8
57:3
66:10

**placement**
56:6

**places**
17:7

**planning**
44:17

**plastic**
46:12
57:2
64:12,13
71:4

**plenty**
31:15

**plowing**
18:7

**plugged**
32:6

**plumbing**
8:1

**plywood**
40:15,23
41:12,14
51:22
54:5,16
58:23,25
62:2

**point**
10:15
15:25
16:18
24:4

26:3,4
41:13
44:17
45:4,15
64:16,22,
25

**policy**
66:10
67:6,11,
18

**poly**
18:22

**position**
42:24
59:8

**positioned**
57:23
58:4
59:18
61:5

**positive**
45:23
50:11

**post**
13:25

**posting**
65:25

**potential**
5:9

**potentially**
25:16

**practice**
63:21

**prep**
30:22

**prepare**
10:24
11:5

**preparing**
11:7 47:5

**Prepping**
18:9

**present**
30:10
48:24

**pretty**
16:21
20:1 45:4

**prevent**
51:8,25

**previously**
69:8

**prior**
9:11 10:1
23:23
24:8,16
27:5
28:2,10,
14,17
63:8 69:2
70:17

**private**
13:16

**procedure**
5:8

**produced**
47:18

**product**
21:17,19
25:25
26:12,24
27:4,9
30:2
68:2,10
69:21

**products**
21:10
22:6 24:1
25:18,20
26:1
66:12
67:2,8,13

**professiona
l**
25:14

**Profile**
13:4,6,9

**promoted**
16:1

**proper**
22:10
25:7
70:18

**properly**
19:16,17
20:3,5
24:24
46:3

**property**
37:7,13

**provide**
6:25
19:20

**provided**
18:16
23:14
48:25
49:1

**Ps**
24:11

**pull**
44:22

**purporting**
11:25

**purposes**
12:10
30:25

**pursue**
13:25

**put**
20:6
24:4,5
29:6,11



40:15
45:3,9
46:22
49:9
60:11,12
62:16
63:22
64:16,22

**putting**
46:19

**Q**

**question**
5:17,22
6:8,14,16
12:8,9
23:20
28:16
31:1
39:12
56:4 64:3
65:15
66:20
67:5
68:14

**questions**
5:9,14
6:7,11
12:10
34:6
71:13

**R**

**rag**
43:9

**rags**
19:17,25
20:2,5
25:8
29:4,15,
19 43:15,
17,20

44:18
46:4,6,24
48:7,8,14
56:21
57:22,24
59:23
63:2,22
64:17,22
70:19,23
71:1,3

**range**
14:11

**read**
26:13
28:1,10,
15,17
47:6,14,
25 48:22
56:3
68:15,24
69:8
70:3,11

**reading**
26:5 54:7

**rear**
54:2

**reason**
6:19,23

**recall**
8:16,18,
22 11:23
13:20,21
14:10
15:15
20:15
26:10,12,
16,24
27:20,22
29:8,12
32:12,19
33:8
39:7,11,
15,24
40:6,16

41:19
42:2
43:24
45:6
46:15
50:21,24
55:1,20
57:6
60:18,24
61:4,9

**recalling**
55:16

**receive**
19:11
20:13,16,
24

**received**
19:14
22:10
24:6 25:4

**recognize**
67:22

**recollect**
49:16

**recollectio
n**
29:2
32:25
33:13
47:10
48:17
55:19
56:11
62:21

**record**
4:21
34:1,2,3
37:16
53:11
59:15
62:19

**rectangle**
31:11

**rectangles**
59:6
60:13

**rectangular**
37:17
46:12

**rectangular
-shaped**
31:10

**red**
37:21
39:1

**refer**
19:5
30:23
31:1
48:20

**referred**
30:15

**referring**
11:17
38:8
53:12

**refers**
12:8,9
60:20

**refinish**
50:16,23

**regard**
10:12
20:17
22:5,24
25:2 29:4
39:6
61:17
70:14,22

**relating**
8:11
20:14

**remains**
35:8

**remember**
13:22
26:20
27:23
28:21,24
29:6 39:8
59:11,12,
16

**removed**
44:16

**repairs**
45:13

**repeat**
21:11
22:8
23:11
28:13
37:10
51:10

**rephrase**
6:16
68:14

**replied**
54:20

**reporter**
5:13 6:4
62:15
68:19
70:9
71:18,22

**represent**
4:24
10:16,19
21:14
70:9

**represented**
10:11

**require**
66:13

**required**
67:7,12,
18



**requires**
66:11

**residential**
27:18

**respect**
4:15 25:7

**respective**
51:2,13

**respond**
5:18

**response**
5:22,24
6:6

**responsibil
ities**
18:4

**resting**
42:21,24

**restroom**
6:20

**review**
11:7

**reviewed**
11:24

**right-hand**
16:21,24
48:9,15

**right-side**
46:9 57:5

**risks**
25:19,23

**Road**
7:13,15

**Robbie**
49:6 56:8

**Robert**
4:6,12

**roof**
34:18

**roofer**
16:5

**roofing**
15:18,19,
23 16:6,
11,15,17
23:25

**room**
5:12
30:2,18,
19,21,22,
23,24
31:1,4,6,
10,13,15,
19 32:2,
18,21,22
33:8,13
35:18
36:3,5,
12,17,18,
24 37:18,
22 38:10,
16,18,20
39:1,6,7,
9 41:3
42:3,6,11
43:25
45:16
46:2,8
50:14,16,
19,22
51:3,14,
25 52:5,
9,11,12,
13,14,20
53:9,20
54:19,25
55:17
57:12,18
58:4,7
59:8 60:8
61:15,18,
20 62:5,
20,22,24
63:20
64:20

69:19
71:7

**rooms**
30:16
35:13

**roughly**
40:14
42:8
43:19
56:25

**running**
54:21

———————

**S**

———————

**safety**
20:8,11,
14 21:9,
15 66:11,
23 67:7

**sanding**
18:7

**sat**
40:2

**SBP**
4:23
9:14,15
10:9
12:4,10,
13,15
14:9,13
15:6
17:5,9,24
19:4
20:9,11,
14,16
21:8
23:23
24:11
29:13
30:14
34:23
63:24

66:10,17
67:6,11,
17

**scene**
48:23

**school**
12:24
13:3,4,
12,13,16,
18,19
14:1,3,6,
24

**screwed**
39:25
42:6
49:25

**section**
34:18
47:14
56:4
70:10

**sections**
49:23

**self-
employed**
7:18,21,
23

**sells**
26:18

**sense**
36:22

**sentence**
70:14,16

**sentences**
47:16

**served**
23:9

**services**
15:14
18:11

**set**

58:2

**shaking**
6:3

**shape**
42:5

**Sharpie**
37:21
38:15
58:3

**sheathing**
41:13

**sheet**
21:12,15,
17

**Sheetrock**
31:25
32:23
55:24

**sheets**
21:9,24
66:12,21,
24 67:8

**shelf**
42:7

**shelves**
40:1,3
42:12,14
43:2
49:24
61:6

**shelving**
49:23
50:5

**Shit**
58:12

**shop**
18:9,15,
24,25
19:1,6,19
21:9,23
22:20,25



27:12
30:15
44:22
45:2 48:2
49:5
65:8,23

**short**
71:16

**show**
33:10
70:8

**showing**
34:9,12

**shows**
34:13

**sic**
8:25

**side**
35:3 43:5
46:17
51:3,4,15
52:4,12,
13,14,17
53:12,17,
21 54:1,
10,11
57:14,16,
24 58:20,
21 61:20
62:6,9,10

**side-by-side**
22:17

**sides**
42:19
50:1 63:4

**single**
17:1

**sir**
47:13

**site**
17:14

18:23
22:21
23:3
44:17,19
48:21
63:11

**sites**
17:11,12,
20,22
18:12,19

**sitting**
38:12
68:21

**situations**
21:21

**sizable**
31:13
36:17

**size**
51:6,16

**sketching**
62:20

**skin**
21:20
24:22
25:6

**slip**
44:24

**small**
54:19
59:6

**smashed**
44:25

**snow**
18:8

**sold**
67:2

**sole**
22:4

**Sophomore**

13:8,10

**sounds**
8:19

**source**
25:3,9

**sources**
25:12

**space**
9:13,14
17:13,16
30:13
32:6
34:23
35:14,17
54:22,24
55:4

**spaces**
17:19
40:25

**SPB**
8:25
9:13,23
10:1,3
14:20
15:16
16:12,15
17:13
19:8
20:25
24:8

**speak**
56:9

**speaker**
56:10

**speaking**
47:10
56:5

**specific**
20:13
26:24

**specifically**

26:13
28:11,17

**speculation**
69:23

**spell**
7:14

**spend**
12:20
13:7

**spill**
21:19

**split-jamb**
49:13

**spoke**
48:23

**spring**
18:1,6

**square**
46:13

**stacked**
57:10

**stain**
18:22
19:15,17,
25 20:5
23:25
26:14,15,
24 27:13,
21,24
28:8,12,
18 29:10
30:22
40:5 41:5
42:19
43:13
48:3,8
49:15
50:1 56:7
57:20
63:20
67:25
68:1,3,21

**stained**
25:8
41:25
49:14
60:15
62:25

**stained-soaked**
70:19

**stainers**
25:15
69:21

**staining**
18:19
29:25
30:3,5,
11,18
32:6
41:4,24
42:4 43:8
44:11
48:2 49:6
51:8
60:24
61:15
63:15,20
64:20

**stains**
21:16
22:6,11
24:3,8,18
25:24
26:18

**Stan**
12:2
16:18
19:9

**standard**
49:13
69:20

**standing**
46:16

**stands**



21:15

**start**
4:13
34:10
51:17
58:15

**started**
14:25
15:4,6,16
43:23,25
44:6
65:20

**starting**
14:23
23:23
52:4

**starts**
70:15

**state**
4:10
67:19

**stated**
29:3
48:1,6
49:12,21
53:25
55:11,16
56:14,20
57:13

**statement**
11:14

**states**
55:10

**stating**
51:2,14

**stay**
41:20

**step**
33:23

**sticker**
62:17

**stipulations**
4:15

**stop**
14:13

**stopped**
14:16
16:12

**straight**
38:1

**strapping**
42:6,17
49:24

**strappings**
40:1

**street**
9:4  17:14
19:5
34:13
37:14
52:13,14
53:16
54:10
58:21
61:19
62:6,9,10

**stuff**
14:2
15:11
18:10
19:16
24:4  25:6
55:24

**subject**
10:12

**subsequent**
48:20
66:1

**suitable**
29:16,20

**summary**
55:10

**supervising**
22:24
23:4,6

**supervision**
23:15

**supervisor**
22:21

**supply**
63:24

**surrounding**
50:15,18

**suspend**
41:18

**suspended**
32:15
42:16,22
49:22
61:6,7

**swallow**
21:20

**switch**
55:13

**switched**
33:4

**sworn**
4:6

---

**T**

---

**table**
38:13
50:15,22

**tacked**
41:13

**taking**
20:5
24:23

**talked**
10:25
25:14

64:20

**talking**
5:19  6:11
12:12
17:6  31:2
52:9
69:18

**talks**
21:18

**taped**
41:20

**tarp**
52:1
57:15
59:3
62:5,7,11

**tarps**
40:23
41:1
51:8,24

**taught**
19:16

**telling**
46:21
65:8,22

**tells**
21:19

**Ten**
7:22

**terms**
12:16
50:18

**testified**
4:7  22:9
55:21

**testimony**
5:1  6:25
8:10

**thing**
16:17
24:5

38:23
39:4
70:24,25

**things**
19:23
45:25
58:21

**thinking**
37:10

**thought**
11:2
55:18

**time**
6:19  8:24
9:3,15,19
10:16
14:19
16:23
18:5,6
19:10
24:17
33:14
43:24
44:21
45:17,18,
21  46:7
47:2
51:2,14
56:8
63:13
71:7,16

**timeline**
16:16

**timing**
56:17,18

**tire**
4:22,25
8:13  9:3,
12  34:19
53:23

**today**
5:1,12
6:25  7:5



8:10 47:6
69:19
71:17

**today's**
10:24
11:8 12:7

**told**
45:3
47:24
66:2

**tools**
19:18
43:7

**top**
34:12
38:13
40:2 42:7
53:13,16
57:2,10
63:2
68:6,8,21
70:2 71:9

**tops**
49:25
59:7

**total**
50:13

**towns**
65:24

**trailer**
35:9
44:16,20,
25 45:2,
9,22 46:6
54:24
63:10
64:21

**train**
20:4
29:18

**trained**
69:7

70:23

**training**
14:5 15:3
19:11,14,
21,22
20:2,13,
16,17,24
22:5,10
23:16
24:6 25:4

**transcribed**
5:13,23
6:3

**transcript**
71:20

**transfer**
18:22

**treat**
12:11

**trim**
18:21
49:7
50:4,7,8,
14,17
56:14,16

**truck**
4:22,25
8:13 9:3,
12 34:19
44:22,23
45:1

**truthful**
6:25

**turning**
70:1

**type**
7:19
15:11
24:5
26:15
31:24
32:4,12

39:7
41:17
68:2
69:21

**types**
15:17
19:13

---

**U**

**Uh-huh**
52:19
54:4
58:10
59:21
61:1 62:3
70:20

**understand**
4:25 6:9,
14 8:9
9:2 10:5,
8 21:4
24:20
26:17
33:16
38:7
55:21
58:9,18
60:21
63:7

**understanda
ble**
6:8

**understandi
ng**
25:20,23
30:13
35:16
52:16
66:4,19
69:17
70:18

**units**
27:18

49:23
50:5

**upright**
42:24
46:17,22
48:17
57:23

**usual**
4:14

---

**V**

**Vague**
20:18
22:22
67:20

**vehicle**
45:5

**Vehicles**
19:19

**verbal**
5:24 6:6

**versus**
4:23

**violation**
29:14,20

**vocational**
14:5

**vocational/
technical**
14:3

---

**W**

**Wahlberg**
11:13

**walk**
43:4

**walked**
41:11

51:20

**walkthrough**
53:9

**walkway**
40:25

**wall**
33:5
34:23
36:11
37:19
38:8,9,
10,11
39:19,20,
21,22,23
40:7,16,
22 41:9,
10 42:11,
13 48:9,
15 52:21
53:3,11,
14,20,22
54:1,3
55:12
57:15
58:23
59:19

**walls**
31:18,21
38:16
40:2 43:2
51:1,13
58:7
59:20

**wanted**
37:1 49:9

**warning**
67:13
68:6,9,20
69:2
70:12,15

**warnings**
26:1
28:1,11,
16,18



29:3,9
69:8

**water**
6:21 20:6
29:7,11
63:22
64:11
71:3

**water-filled**
64:17,22

**ways**
62:4

**weekly**
20:8

**Wheeler**
11:18
47:22
55:7

**Wheeler's**
47:23
55:9

**white**
34:18
43:23

**wide**
40:14

**wife**
50:17,23

**wiping**
49:15
57:20
67:25

**witnesses**
5:10
11:21

**wood**
22:6
49:23
60:21

**woodwork**

48:2

**word**
16:2 19:1
70:15

**work**
4:14 7:19
9:21,25
10:1
14:20,23
15:17,21
16:8,14
17:6,10,
16,20,24
18:15
19:8
22:14,17
23:13,23
26:23
27:12
29:23
31:16
35:13
40:4
41:24
42:9 43:8
44:8 46:1
63:9 65:1
69:2,18

**worked**
25:18
45:25
56:14

**working**
8:25 9:9,
11,12
14:13,16,
25 15:4,
6,16
16:12
17:1
22:20
24:8
37:23
43:25
63:8

66:16

**workshop**
48:9

**workspace**
17:9 19:4

**world**
37:9

**would've**
9:7 18:6,
7 27:25
36:2 52:8

**write**
38:25
39:3
58:13,20,
25 59:3
60:12
62:11

**written**
11:15

**wrong**
35:17

---

**Y**

---

**year**
7:22
13:19
14:10,19

**years**
7:1 13:7,
8 14:15
16:10

**years-ish**
15:24

**yellow**
70:2





Paint Room

EXHIBIT 1
WIT: Rivera
DATE: 9/5/25
Lauren Buzzerio, RPR









Case 1:25-cv-00425-LM-TSM    Document 21-14    Filed 05/05/26    Page 100 of 100

**DANGER:** Rags, steel wool, sanding residue, and other wastes used or soaked with this product may spontaneously catch fire if improperly discarded. No ignition source is required for these wastes to start on fire by themselves. Immediately place rags, steel wool, sanding residue, and other wastes used or soaked with this product in a sealed, water-filled metal container. Dispose of in accordance with local fire regulations.

EXHIBIT ____5____
WIT: Cardenal
DATE: 9/15/25
Lauren Buzzerio, RPR