# Exhibit M

                              VOLUME:  I
                              PAGES:  1 - 71
                              EXHIBITS:  1

              UNITED STATES DISTRICT COURT
                DISTRICT OF NEW HAMPSHIRE


          DOCKET COURT NO.: 1:25-cv-00092-SE-TSM


---------------------------------------x
ACADIA INSURANCE COMPANY A/S/O NEW ENGLAND TRUCK
TIRE CENTERS, INC.

and

NEW ENGLAND TRUCK TIRE CENTERS, INC.,

      Plaintiffs

v.

SBP BUILDERS, LLC,

      Defendant
---------------------------------------x



        DEPOSITION OF STANLEY PARKER taken on
behalf of the Plaintiffs, pursuant to the applicable
provisions of the Federal Rules of Civil Procedure,
before Lauren M. Buzzerio, a Registered Professional
Reporter, and Licensed Shorthand Reporter, in and
for the State of New Hampshire, at the offices of
Abramson, Brown & Duggan, 1819 Elm Street,
Manchester, New Hampshire, on Friday, September
5, 2025.

-------------------------------------------



A P P E A R A N C E S


Laurence H. Leavitt, Esq.
MCCOY LEAVITT LASKEY LLC
202 US Route 1
Suite 200
Falmouth, Maine 04105
(207) 835-0535/LLeavitt@MLLlaw.com
Attorney for the Plaintiffs


John Hugo, Esq.
MGM LAW
125 High Street
Boston, Massachusetts 02110
(617) 670-8800/jhugo@mgmlaw.com
Attorney for the Defendant



                              I N D E X

Deposition of:                                              Page

STANLEY PARKER

Examination by Mr. Leavitt                                    4


                          E X H I B I T S

No.                                                         Page

1          Lease                                              19



--------------------------------------------------

                    P R O C E E D I N G S

                        10:53 a.m.

--------------------------------------------------


        STANLEY PARKER, duly sworn, was examined
and testified as follows:


EXAMINATION BY MR. LEAVITT:

    Q.  Can you please state your full name for
the record.

    A.  Stanley Barros Parker, III.

    Q.  I'm glad you got the right sequence of the
letters there.

    A.  Good.

    Q.  Have you ever had your deposition taken
before?

    A.  Once.

    Q.  Okay.  And you sat through the deposition
of Mr. Cardinal?

    A.  I did.

    Q.  And so would it be beneficial for me to
repeat the same instructions and rules?

    A.  No.  No need.

    Q.  Okay.  Any reason why you can't testify



truthfully and accurately today?

A. Nope.

Q. Feeling okay?

A. I'm good.

Q. No medications?

A. Nope. Not today. Not for a long time.

Q. Did you review any documents in preparing for today's deposition?

A. I've been reading through some documents. Yeah.

Q. What documents did you review?

A. Well, I could show you. I can't recollect the names or things of them. But everything that was sent to their firm and the rebuttals back. And I can't recollect a lot of it. I just kind of in general read through them. I don't have a good memory of the exactness of everything.

Q. Did you have an opportunity to review the several pages of notes that were provided by the investigator Mr. Wheeler, some of which pages --

A. I've reviewed them.

Q. -- some of which pages included discussions with you?

A. Yes.

Q. You've had a chance to look at that?



A.   Uh-huh.

Q.   Okay.   It sounds like, based on testimony this morning, that Mr. Cardinal was your employee for about nine years?

A.   Yes.

Q.   And at the end of that time, was he laid off, or did he quit?

A.   It was a combination of the two.   We came to a mutual belief that it was best for him to start on his own.

Q.   To the extent part of that decision process was heading or trending towards you laying him off, what were the reasons why you felt he needed to be laid off?

A.   He pretty much -- the majority of his employment over his life had been with me.   And he was treated much like a son in the sense that I really gave him a lot of preferential taking care of.   And I just felt it had come to a point where Robbie should probably go out and experience the real world work and that would be a healthy thing for him.

Q.   Did you ever have any occasions in the nine years where you needed to discipline him?

A.   Oh, certainly.



Q.  For what types of conduct?

A.  I would think it's more of his mouth than anything.  Just -- it's more along the lines of taking advantage of how much I treated him like a son.

Q.  I take it then up until today you still have a personal affinity for him?

A.  I sure do.  Yeah.

Q.  I'd like to talk just for a couple minutes about the scope of your business up in the Littleton area.  Because I understand that although SBP Builders operated out of the site at 433 Cottage, you also had at least one or two other businesses that had some involvement with that property; is that fair to say?

A.  Yes.

Q.  Okay.  So other than SBP -- well, first of all, what is the nature of SBP Builders' business?

A.  General construction.

Q.  And do you do commercial construction?

A.  Commercial and residential.

Q.  And when was SBP Builders created?

A.  It would be 14 years ago.  14 or 15 years ago.

Q.  Did it always operate in a corporate



format?

A.   LLC.

Q.   An LLC.  And what other companies do you own or manage?

A.   SBP Property Management.  It's an LLC.

Q.   And what is the nature of that company's business?

A.   For the most part, it's apartment buildings that we manage for clients and owners.

Q.   Are any of the buildings which SBP Property Management assists in overseeing or managing owned by you personally or by companies under your control?

A.   Not that are involved in that business, no, are not mine.  I have my own.  But they're not under SBP Property Management.

Q.   So the services that SBP Property Management provides are dedicated to residential dwellings that are owned by people other than you or your companies?

A.   Yes.

Q.   How many employees does SBP Property Management have?

A.   At this date today, one.

Q.   Previously it's had more?



A.  It -- I think -- I'm trying to remember how we placed it.  But I think it was two.  And they're just office personnel.

Q.  Is SBP Builders, LLC still in operation today?

A.  Builders?  Yes.

Q.  Okay.  And how many employees do you have today?

A.  Eight.

Q.  And how many approximately did you have at the time this fire occurred?

A.  I think it was 12.  Twelve or thirteen between office and construction workers.

Q.  And is there ever any overlap between SBP Builder personnel and Property Management personnel?

A.  Yes.

Q.  How so?

A.  Once again, it's just in the office.  Our bookkeeper may do bookkeeping for both builders and management.

Q.  At the time of the fire, did SBP Property Management have a dedicated office space?

A.  No.

Q.  Where was its principal place of business?

A.  Property Management.  Just a minute.  Let



me think that through for a second.

Q.   Sure.

A.   So Property Management didn't have anybody that I paid to be in an office.  I can say that.

Q.   Did it have a physical office space?

A.   So SBP Builders had a receptionist and that receptionist would take phone calls for SBP Property Management and deal with -- if a tenant walked in that had issues or something, then that receptionist would, you know, get the information to where it needed to be.  But she was paid by SBP Builders.

Q.   So she was an employee of SBP Builders?

A.   Uh-huh.

Q.   But she had a dedicated phone line for the Property Management company that she would answer?

A.   No.  It was SBP Builders.

Q.   The same phone number for both?

A.   Yes.

Q.   And so did she work at the time of the fire at 433 Cottage Street?

A.   Yes.

Q.   In one of the front offices?

A.   Yes.

Q.   What other companies did you own at the



time of the fire?

A.   SBP Investment Properties.  And those are my own properties.

Q.   Are those both commercial and residential?

A.   Apartment buildings.

Q.   So only residential?

A.   Yeah.

Q.   And did SBP Investments have a principal place of business?

A.   No.

Q.   Did it have any employees?

A.   No.

Q.   Did it have files and records?

A.   It's what we had at SBP Builders, was just a file cabinet.

Q.   That was maintained at 433 Cottage Street?

A.   Uh-huh.  Yeah.

Q.   So there was no lease between SBP Builders and SBP Property Management for use of any space at 433 --

A.   No.

Q.   -- Cottage?

A.   No, there wasn't.

Q.   And the same is true for SBP Investments?

A.   Correct.

Q.   And with regard to those three entities, are you the sole owner?

A.   Yes.

Q.   100 percent of all shares?

A.   Yes.

Q.   Do you own any other companies?

A.   No.  Well, there's one building that's separate.  I don't know if you call it a company.  It's not an LLC or anything.  It's just -- I own one building separately that houses a recovery center.  And I don't -- I just set that up separate from everything else, that one building.

Q.   With regard to your investment company, how many apartment buildings does it own?

A.   Investment Properties.  At the time of the fire or no?

Q.   Let's just stick to at the time of the fire.

A.   At the time of the fire, there was -- I think I owned the Dells home.  That was a home.  And then one, two -- two apartments and another home.

Q.   So five or six?

A.   Four.

Q.   Four.  Okay.  And were the occupants of all those tenants of SBP Investments?



A.   Yes.

Q.   And they all operated with leases?

A.   Yes.

Q.   Between the tenant and SBP Investments?

A.   Correct.

Q.   And how long had SBP Investments been around, or how long have you, through your company, been --

A.   I could give you --

Q.   -- managing apartment buildings or houses?

A.   Yeah.  I can give you some guesstimates on that.  Investment Properties.  So after I had Builders, it was a while before.  So maybe four years.  So that would be maybe -- Investment Properties, maybe nine years or ten years.  And Property Management, probably the same amount of time.

Q.   So since SBP Property Management does not perform property management services for the properties that are owned by SBP Investments, who oversees those leases and the conditions at the properties owned by SBP Investments?

A.   SBP investments, I do.

Q.   So you're the de facto property manager for the properties owned by SBP Investments?



A.   Correct.

Q.   Okay.  And you manage the leases with those properties?

A.   Yes.

Q.   So you're no stranger to leases?

A.   Right.

Q.   With regard to the business property of SBP Builders at 433 Cottage Street, am I correct that SBP Builders leased that space from ADS?

A.   I was having a hard time remembering if I understood it to be ADS or New England Tire Company. But it is my understanding that ADS would be who I was renting from -- leasing from.

Q.   Did you have a point person at either ADS or New England Truck Tire Centers that you dealt with specifically --

A.   It started with --

Q.   Just let me finish my question.  That you dealt with in negotiating the very first leasehold period on that property?

A.   I think it was John and his daughter Rachel.  But certainly John.

Q.   And over the course of the years up until the time of fire, did you deal with anyone either at ADS or New England Truck Tire other than Rachel or



John?

A.  No.

Q.  Do you recall when SBP Builders first started occupying space at 433 Cottage Street?

A.  I can't remember the year.

Q.  Approximately how many years had you been in that space --

A.  Up until the fire?

Q.  -- at the time the fire occurred?

MR. HUGO:  Stan, just let him finish his questions.  It's going to be difficult for the court reporter.

Do you want to repeat it?  Sorry.  I didn't mean to interrupt.

MR. LEAVITT:  Thank you.

Q.  Do you recall approximately how many years SBP Builders had occupied the space at 433 Cottage Street by the time the fire occurred?

A.  Five years.  Four or five years.

Q.  And during that four-to-five year period, am I correct that SBP Builders didn't operate out of any other location?

A.  Correct.

Q.  And SBP Builders was a tenant at 433 Cottage Street on the date of the fire?



A.  Yes.

Q.  At time of the fire, was there a lease between SBP builders and your landlord that governed the relationship between you and your landlord?

A.  Well, what I do know about that had been -- we had not been doing yearly leases.  And that is a good possibility we were a tenant at will at that time, because we weren't doing yearly leases.

Q.  At one point in time, did you have a lease?

A.  We started with a lease.  Yes.

Q.  And at least during that time period, did that lease govern the relationship between you and your landlord?

A.  Well, it does.  But I'm confused about -- I've seen the lease.  And that's not what I was paying for my rent.  And I know that the lease had started and then as I became a tenant there and decided that I could use some more space, we had changed the space and the price of what I was paying.  And I don't remember seeing a new or doing a new lease or --

Q.  So you're saying that over the course of your occupancy at 433, the amount of square footage



that your company was using changed over time?

A.  Yes.

Q.  And as a result, you ended up paying more in monthly rent?

A.  Uh-huh.

Q.  That's a yes?

A.  Yes.

Q.  Do you recall how much you were paying in rent at the time of the fire?

A.  1750 is my guess.

Q.  And do you recall what you paid when you originally leased?

A.  Oh, at the time of the fire, I'm sorry, it was 2,100.  And the original was 17-something.  1750.

Q.  Did your original lease require your company as a tenant to comply with all state and municipal local laws?

A.  Yes.

Q.  And did your original lease require SBP Builders to indemnify the landlord for all losses that the landlord might suffer in connection with your use of the rental space?

A.  If that means the same as named insured on the insurance policy, yes.



Q.   No.   That's not my question.

A.   I don't understand "indemnified" then.

Q.   To be financially responsible for all losses that occur arising out of your use of the property?

MR. HUGO:   Objection.

A.   I guess I need you to rephrase it or -- I'm not understanding the question.

Q.   Okay.   We'll get back to that.   When SBP Builders signed the original lease in whatever year that was, did SBP Builders intend to comply with all provisions of the lease?

A.   Yes.

Q.   And did you read the lease before you signed it?

A.   Yes.

Q.   Did you have an opportunity to consult with legal counsel or an attorney before signing the lease?

A.   I know I didn't.

Q.   You had the right to if you had so chosen?

A.   Yeah.

Q.   But you believe you did not?

A.   Right.

Q.   Why did you not consult with an attorney



before signing the lease?

A.  I guess I trusted that it was good.

Q.  If you had any problems with the terms of the lease, is it a fair statement that you would have not signed it?

A.  Yes.

MR. LEAVITT:  If we could mark this document as Parker 1.

(Exhibit 1 marked for ID.)

Q.  Take your time and look through it.  But my question is going to be do you recognize this lease?

A.  Yes.

Q.  And what do you recognize it as?

A.  The lease I had with New England Truck Tire and ADS.  Yeah.

Q.  And I'm correct that the lease agreement identifies the lease as being between ADS Properties as the landlord, correct?

A.  Yes.

Q.  And SBP Builders as the tenant?

A.  Yeah.

Q.  And it purports to lease to your company about 4,500 square feet at 433 Cottage Street?

A.  Yes.



Q.  And does this document refresh your memory as to when you first took occupancy of that space?

A.  Yes.

Q.  When was that?

A.  2017, December.  Lease term begins on January 7, 2017.

Q.  If you go down to the -- halfway through the first page under the title of Possession?

A.  Uh-huh.

Q.  It seems to state that you were entitled to possession of the property as of October 6, 2016, rent free, probably in order to fix up the space the way you wanted.  Is that consistent with your recollection?

A.  To the best of my memory.  Until I'm reading that, I don't remember it.

Q.  Now, after you've read that, does that refresh your memory that you had several months to occupy the space to get it ready for the beginning of 2017 when you would be obligated to start paying rent?

A.  I honestly can't remember.  But it makes sense that's what I was doing.

Q.  Do you remember doing any work to the space as you were getting ready to move in?



A.  I don't.

Q.  You've heard the discussions in the earlier deposition about the configuration of your property with the loading dock, covered parking area, and the garage and the paint room and the offices.  Had that layout changed considerably since 2017?

A.  Not the layout.  No.

Q.  What has changed?

A.  Well, the room -- can I look at it?

Q.  Sure.

A.  So in the front office area --

Q.  Yes.

A.  -- we made a conference room and receptionist area.

Q.  Any other material changes to the configuration of the property?

A.  And I made an office on -- well, I can point.  I don't know how to explain it.

Q.  You indicated at one point that your rent went up because you got more space?

A.  Right.  That was --

Q.  Where is that space located?

A.  I think it was the paint shop area in this.  So I think that's what got added.



Q.  So some of those rooms adjacent to New England Tire toward the back of your property --

A.  Yes.

Q.  -- were not part of your original lease space?

A.  Correct.

Q.  And they added over time?

A.  It was probably within four or five months.  It was in a very short time.  Yeah.

Q.  Okay.  Could you turn to the second page of Exhibit 1.  The third section down, it's headlined Renewal Terms.  Do you see that?

A.  Yes.

Q.  I'm going to read that to you.  "This lease shall automatically renew for an additional period of one year per renewal term unless either party gives written notice of termination no later than 60 days prior to the end of the term or renewal term."  Did I read that correctly?

A.  Yes.

Q.  At any time during the course of your relationship with ADS on this property, did you provide 60 days' notice of your right to terminate the lease?

A.  No.



Q.   So do you understand that this lease automatically renewed every year absent you giving them a notice of termination?

MR. HUGO:   Objection.

A.   The way I'm reading it, that was good for a year.

Q.   So you don't understand that the lease automatically renews unless you terminate?

A.   Period of one year per renewal term.  The part where it says per renewal term.  What is a "renewal term"?

Q.   Well, this was a one-year lease when you originally signed it, correct?

A.   Yes.  Yeah.

Q.   So one of two things was going to happen, either you terminated this lease at the end of one year with 60 days' notice, or it was going to automatically renew.  Is that a fair statement?

MR. HUGO:   Objection.

A.   I see it says one year and renewal term. So I don't know if it's consecutive year after year after year after year.

Q.   In any event, you agree that you never gave a notice of termination --

A.   I never did.



Q.  -- of the lease?

A.  No.

Q.  The fire that occurred on March 13, 2013 (sic), do you agree that the fire originated somewhere within the space occupied by SBP Builders?

MR. HUGO:  Objection.

A.  No.  I don't know.

Q.  Do you have any reason to dispute that?

A.  Yeah.

Q.  What basis do you have to dispute it?

A.  I'm one of the few people that have been able to see the short video that David Wheeler was able to see before the investigation which no one else was able to see before the investigation.  And I'm not a professional.  And I've expressed this with SBP Builders' lead investigator, that it looks, to me, as the fire was just starting through the garage doors on the loading dock from the maintenance shop.  And if you're looking to the distance, it looks like the roof from that -- behind the shop is gone and you can see smoke coming out of it.

Q.  Can you show me on the exhibit of the overhead where you think there was either smoke or fire coming from?



A.   Right there.

Q.   This section right here?

A.   Yes.  This area.

Q.   Okay.

A.   And the video was taken from this -- from here out of a house.

Q.   Do you have any other basis that --

MR. HUGO:  Just -- can we just clarify. So if we're looking at Exhibit 1, we would agree that white intact roof, right below that is where you saw that you think the fire originated.  Is that what you're testifying to, Mr. Parker?  Just so the record is clear.

A.  Yes.

Q.  Do you have any other basis to conclude that the fire did not originate within the leased space occupied by SBP Builders?

A.   Only by listening to the investigators that had been hired by my insurance company from SBP Builders.  When I walked through with them, they felt there was other reasons that the fire could've started.  And all I know in this process is I thought it was going to follow through and all the investigations and determinations were going to be made.  And as it was explained to me how the



investigation was going to proceed with the findings on the materials that were taken to a laboratory, like all that got dropped and nothing ever happened. And then I got a letter of it was closed. The case was closed. And none of those investigations got determined. So I don't know what the outcomes of what my investigators were going to find in their discoveries. So in short, it would be because I walked around with my investigators and they had other thoughts on how the fire could've started that never got -- the final decisions never got made or the research never -- didn't get followed through on.

Q. I'm going to ask you to go back to Exhibit 1, which is the lease, and turn to the fourth page. The second section has a heading Indemnity Regarding Use of Premises. Do you see that?

A. Yeah.

Q. Do you know what the word "indemnity" means?

A. No.

Q. So you signed the agreement not knowing what the word meant?

A. I must have.



Q.  Okay.  I'll represent to you that the word "indemnify" means to compensate someone for a harm or a loss.  Okay?

A.  Uh-huh.

Q.  I'm going to read this provision to you. It says, "To the extent permitted by law, tenant agrees to indemnify, hold harmless, and defend landlord from and against any and all losses, claims, liabilities, and expenses, including reasonable attorney's fees, if any, which the landlord may suffer or incur in connection with tenant's possession, use, or misuse of the premises, except landlord's act or negligence."  Did I read that correctly?

A.  Yes.

Q.  If a jury in this case determines that the fire originated within the space used and occupied by SBP Builders, do you agree that the lease, if in effect at the date of loss of the fire, contractually obligates your company to compensate ADS Properties for all loss and harm suffered as a result of the fire?

A.  If I may --

MR. HUGO:  Objection.  Calls for legal conclusion.



Case 1:25-cv-00425-LM-TSM   Document 21-15   Filed 05/05/26   Page 29 of 98

A.  If I may add to that, you stated if it started in SBP space I think I should pay.  But if it's not my fault, it was an electrical or there was another reason for the fire that wasn't my fault and it happened in my space, no, I would not.

Q.  Well, I will grant you that the last five words of that section says "except the landlord's act or negligence."  So if the landlord created a condition in your space that caused the fire, then I think we can all agree that you would not be responsible.

A.  Uh-huh.

Q.  But if the fire was determined to have started in your space, do you agree that under the provision that we've just read, that your company would be obligated to compensate the landlord for all damages sustained?

MR. HUGO:  Objection.  Calls for legal conclusion.  Assumes fact that may not be accurate.

You can answer to the extent you know.

But I do have concerns given what his testimony is about the lease.

But go ahead.  You can answer.

A.  To what I'm understanding you're saying, yes.



Q.   Go back to the first page of the lease, please, under Lease Payments.  At the inception of the lease, as I read it, the original lease payment was $1,500.  Do you recall if that was the case?

A.   I don't recall.  No.

Q.   On page 2, if you could turn to that, there's a section called Liability Insurance.  The first sentence says "Tenant shall maintain liability insurance on the premises in the total aggregate sum of at least $1 million."  To the best of your knowledge, did SBP Builders always comply with that condition?

A.   Yes.

MR. HUGO:  Objection.

Q.   Are you aware as to whether SBP Builders ever acquired more than a million dollars of liability insurance?

A.   SBP Builders?  I don't think so.

Q.   What is your present understanding with respect to how much liability insurance your company SBP Builders has at its disposal in the event that it is found legally responsible for the fire?

A.   My understanding is a million.

Q.   And through which company is that?

A.   Crum & Forster.



Q.   So you've not received any correspondence from a company called Century Insurance Company with respect to additional coverage for SBP Builders with regard to the loss?

A.   There was another company that denied coverage.

Q.   Completely?

A.   I believe that was their statement.  I think all of that's been shared with you.

Q.   Have you personally taken issue with that determination or contested it?

A.   I know that I have spoke with Hadlock Insurance Agency to confirm why.  That's my broker agency.

Q.   What position are they taking?  That -- are they taking the side of the denial that you got, or they're being an advocate for you that perhaps you have more coverage than what Century is saying?

A.   I don't have an answer for that.  I don't know which way.

Q.   You understand Mr. Hugo has been retained by Crum & Forster to defend your company in this lawsuit, correct?

A.   Yes.

Q.   Are you also working with a personal



attorney who's looking out for your company and any exposure your company has to a judgment in this case?

A. No.

Q. Does your company SBP Builders have legal counsel that normally does routine work, corporate work for you?

A. No.

Q. You recall that the date of the fire was March 13, 2023?

A. Yes.

Q. And I guess we've discussed it, that at this point in time, you do not know the cause of the fire?

A. Right.

Q. Has anyone -- any investigator, any person other than Mr. Hugo, any employee told you what the cause of the fire is?

A. No.

Q. Has anyone other than Mr. Hugo, any person told you where the fire originated within the building?

A. No.

Q. I just wanted to back up a little bit and cover just a little background information. Can you

give me your date of birth?

A.  7/8/61.

Q.  You're two weeks older than my wife.  Did you grow up in the Littleton area?

A.  I did.

Q.  And go to high school there?

A.  I did.

Q.  Did you pursue any -- or what year did you get your high school degree?

A.  1980.

Q.  And did you pursue any post high school education?

A.  I went to Comair Aviation Academy and became a pilot.

Q.  Could you state the name again?  It was a little fast.

A.  Comair Aviation Academy.

Q.  Where is Comair located?

A.  Sanford, Florida.

Q.  Did you complete the program --

A.  Yes.

Q.  -- there?

A.  Uh-huh.

Q.  And what certification did you get as a result of that?



A.  Single engine, multi-engine instrument commercial pilot.  Went on further to get my instructor ratings in single engine, multi-engine, and glider.

Q.  Through Comair?

A.  No.  In separate places.

Q.  Other than the pilot training and certifications or licenses that you got, did you pursue any other college or vocational training?

A.  No.

Q.  Did you ever work as a pilot?

A.  Yes.

Q.  Where?

A.  Started at Franconia Airport in Franconia, New Hampshire.  And then Blairstown.  I can't remember the name of the company.  I was a glider instructor/tow pilot there.  And then I went to Flagstaff Safe Fliers in Flagstaff, Arizona, and worked there.

Q.  Was that your principal employment during the earlier stages of your career?

A.  No.  That was more in my 30s, 40s.

Q.  What was your work history starting with your graduation from high school?

A.  I became a chef.




Q.  Where?

A.  The first place was Ausable Club in Upstate New York.  Then I went to Plattsburgh, New York.  I was a chef in a place called Anthony's.  At the Mount Washington Hotel.  Chatham, Cape Cod. Colorado.

Q.  Do you have any formal training as a chef?

A.  I appreticed under Chef Dancel (phonetic) for a year.

Q.  And where was he working?

A.  That was in Plattsburgh, New York.

Q.  All right.  And how long did you work in the kitchen?

A.  Fifteen years.

Q.  And what changed after that?

A.  That's when I started working at Franconia Airport as a manager of the Franconia Airport glider operation.

Q.  How long did you do that?

A.  I was there four years.

Q.  What did you do after that?

A.  That's when I went to Blairstown for one summer season of working as a pilot at a glider operation.  And then from there I went to Arizona, Flagstaff, Arizona.



Q.   What work did you do in Flagstaff?

A.   I was -- I started out as a flight instructor.  At the end, I was a Part 135 pilot.  I was the assistant chief flight instructor.  Assistant chief -- what is it called? -- assistant chief of the 135 operations.  And I gave tours, as well, with that company.

Q.   What was your next stop on the employment road?

A.   Base director of a ski school at Bretton Woods.  Bretton woods, New Hampshire.

Q.   Had you grown up skiing?

A.   Yeah.

Q.   Pretty much have to if you live up there, right?

A.   Yeah.  Yeah.

Q.   And after working as a ski instructor?

A.   I opened a bike and ski shop in Lincoln, New Hampshire.

Q.   How long did you do that?

A.   Four years.

Q.   What did you do after the bike and ski shop?

A.   Then I took a little sabbatical and just kind of did a little bit of construction work.  And



just picked up odd jobs for a couple years.

Q.   And then was your next stop along the tour your inception of SBP Builders?

A.   Yes.

Q.   You heard Mr. Cardinal's testimony with regard to his training in the use of oil-based stain products.  And my recollection was he testified that you were part of that training?

A.   Uh-huh.

Q.   Do you agree with that statement?

A.   Yes.

Q.   Okay.  Describe for me what you did to train Mr. Cardinal with regard to the safe use of oil-based stains?

A.   So anybody who worked for SBP Builders and specifically in the oil-based staining process comes from an experience I went through.  I was -- my family has property at Partridge Lake that looks at another hill called Slate Ledge.  And I was camping and I watched a fire start and watched a home burn that night.  The next day, I went up to investigate what happened.  And it was a just-finished home by a friend of mine, Jamie Myers', construction company. And it was because oil rags were left on a floor that had just been stained.  And so I tell that

story to every employee that picks up anything that's oil based in my company.  And that we put -- and I didn't, at the time, have metal containers. But I always made sure that they had a bucket of water that they put their rags in because of that experience that I had.  And Robbie knew it and anybody else that ever picked up an oil-based product around us, that they should be having a bucket of water to put their rags into.

Q.  And based on Mr. Cardinal's testimony today, it seems apparent that he understood that?

A.  He did.  Yes.

Q.  Not just from you, but from other people with whom he had worked in the past, correct?

A.  Yes.

Q.  And he also testified that he had read the language on the stain can and had an understanding of that prior to March 13, 2023?

A.  Yes.

Q.  Now, putting aside whether the rags he left in the paint room were responsible for causing the fire, you do know and you've learned at least today that at the time he left that day, those rags never made their way to a bucket of water, correct?

A.  Yes.



Q.   And putting aside whether that was the cause of the fire, it must strike you as an unfortunate set of circumstances that it seems like he got called out to do something and then never finished from a safety standpoint what he would have otherwise probably have done.  Is that a fair statement?

A.   Yes.

Q.   And you don't have any dispute with his testimony with regard to the fact that he left oil-based stain rags in some orientation in the paint room at the time he left for good that day?

A.   I have to believe what he's saying because I did not see them, but...

Q.   So you never entered that room to see what was there to be seen at any time that day?

A.   No, I didn't.

Q.   You were on-site, however, overseeing work that -- was it Mr. George was doing --

A.   Tom George.

Q.   -- on the trailer?

A.   Yeah.

Q.   And that was in a garage room closer to the back of the property?

A.   Yes.



Q.  And, in fact, I believe it was Mr. George who was the last one among your crew to have left the property that day?

A.  Correct.  Yeah.

Q.  I saw in the notes with Mr. Wheeler that you had had an incident earlier that year where you lost or someone stole a catalytic converter from your property?

A.  Uh-huh.

Q.  And as a result of that, you installed some security cameras around the perimeter of your space?

A.  Yes.

Q.  Is it true that on some of those cameras, by the time of the fire the batteries had died?

A.  Yes.

Q.  But there was one camera that was still working?

A.  Yes.

Q.  Have you preserved the video footage from that camera?

A.  Did I -- boy.  I can't remember.  I believe it's in -- it would be in our computers somewhere.  And I believe we shared them.

Q.  You did look at the video after the fire,



correct?

A.   Yeah.  And I think we've shared it with investigators.  I'm, like, trying to remember back then.  Because I believe the investigators looked at it.  And I believe it was available.

Q.   Was this -- I'm sorry.  I cut you off. Were you finished?

A.   I believe it was available for the investigators.

Q.   What was the location of that particular camera, do you recall?

A.   It was focused on the door that's directly across from the paint room, the exterior door.

Q.   On any of those aerial shots, does it depict the location where the camera was installed?

A.   My recollection would be here, facing this door.

Q.   So it was in the --

A.   Or was it -- I'm trying to remember.  I know it had this door in its view.  But I can't remember exactly where it was.

Q.   My memory of reading Mr. Wheeler's notes was that after the fire you reviewed the one camera that was working and it showed the time when Mr. George left for the day, correct?



A.  Yes, it did.

Q.  And what door did he leave out of when he left that day?

A.  This door.  That would be -- you see him come out -- it would be right here.

Q.  So somewhere --

A.  It was right across from the paint room area.

Q.  So he was in the loading dock area?

A.  He was here.  And he would go out this way.

Q.  Okay.  So he came from the garage where he was working on the trailer?

A.  Uh-huh.

Q.  Yes?

A.  Yeah.

Q.  And then walked toward the street through the loading dock area?

A.  I think he went out -- there's a hallway here -- and then out a door here.  That's where that camera was.  And then his vehicle was parked back here.

Q.  So did the view of the camera show his vehicle or him getting into his vehicle?

A.  It showed him walking out the door.



Q.   Okay.   So would this -- the bottom of exhibit -- Cardinal Exhibit 1 being the back of the structure and the top being Cottage Street and the left side being the loading dock side of the property, what direction was the camera pointing?

A.   This is to my best -- I'm not positive of this.   But I think it was pointing from the loading dock section.

Q.   Towards the New England Truck Tire section?

A.   Angling towards this door here, towards the truck center.   I think that's what it was.   Or was it going from this way?

Q.   And you believe that the video camera got backed up to a computer?

A.   Well, I know it did.   Yeah.

MR. LEAVITT:   And do you know about that video?

MR. HUGO:   I have -- I'll look into it.   I don't know.   But I will look into it.   If we have it, obviously -- I think we must, but.

MR. LEAVITT:   It's not anything I've ever seen.   So, obviously, it would be helpful.

MR. HUGO:   Okay.   Absolutely.   I agree.

Q.   (By Mr. Leavitt) Are you aware of any



other potential video that might have captured the day of the fire?

A.   Just the one that was taken by Scott Powers.

Q.   From, yeah, up on the hill looking towards your property?

A.   Yeah.

Q.   The camera that depicted Mr. George leaving, was that a motion-activated camera?

A.   Yes.

Q.   Do you recall, in that part of the video that you looked at, was it dark out when it depicted him coming out of the property?

A.   Well, there's lights in the loading dock. So I know that he left about eight, after he got done.

Q.   And you've talked to Mr. George since the fire?

A.   Uh-huh.

Q.   And at the time he left that night, did he tell you he saw, heard, smelled anything out of the ordinary?

A.   He didn't say anything either way about saying he smelled or heard anything.

Q.   Mr. Cardinal testified this morning that



he worked for your company for about nine years.
Does that sound accurate?

    A.  Yes.

    Q.  You were in the room this morning when I
went through Mr. Wheeler's notes of his
conversations with you and his telephone
conversation with Mr. Cardinal, correct?

    A.  Yes.

    Q.  I want to ask you, as I did with
Mr. Cardinal, whether any of the information that
Mr. Wheeler took down and included in his notes you
believe to be inaccurately recorded.  I can either
ask you that question and you can answer, or if it's
easier, we can walk through --

    A.  Walk through.

    Q.  Okay.  The first paragraph, under Stanley
B. Parker, says that you own and operated SBP
Builders and had been a tenant at 433 Cottage Street
for approximately five years.  That was something
you agreed with, correct?

    A.  Yeah.

    Q.  You stated that you were insured through
Liberty Mutual Insurance Company.  Do you have a
recollection of telling him that you were insured by
Liberty Mutual?



A.   I can't remember.  I don't remember that whole conversation, only what I'm reading.

Q.   Putting aside what you told Mr. Wheeler, as you sit here today, do you have a memory of having been insured by Liberty Mutual?

A.   I don't think so.

Q.   "Mr. Parker stated all of his vehicle equipment was inside the right end of the building, which is comprised of a loading dock covered with a metal roof and open sides."  Other than the trailer which was in the garage, that's a fair statement?

A.   Yes.

Q.   And he stated that the only thing that was plugged in in that area was your 2016 Terex loader?

A.   Yeah.

Q.   The next paragraph states "When I asked, Mr. Parker stated that they had been painting and staining woodwork in the shop throughout the day using Old Masters oil-based stain."  Agreed?

A.   Yes.

Q.   "He stated that they used paintbrushes and rags while applying the stain and then discarded the rags on the floor along the right-hand wall of the workshop."  Did you tell Mr. Wheeler that?

A.   None of that makes any sense.  One, like I



said, I don't remember the conversation.  But we don't -- when we do that kind of stain, we don't use a brush.  We always apply it with a rag.  So that wouldn't make sense.  And I wouldn't have known how they got discarded.  I wasn't there.

Q.  Was it your belief that your employee was using brushes to do work that day?

A.  Not staining with Old Masters.  Not -- I wasn't there.  But that's not a methodology.  We use a rag to apply it.

Q.  So if Mr. Wheeler were to testify at trial in this matter that you told him that the rags were discarded along the floor on the right-hand wall of the workshop, you would dispute having told him that?

A.  Not remembering the day.  But I don't know why I would have said that because I wouldn't have known what Robbie did.

Q.  "When I asked, Mr. Parker stated that the front office area is heated via electric baseboard heat."  Is that accurate?

A.  Yes.  It's accurate that it is heated by electric baseboard heat.  Yes.

Q.  The area referred to as the paint room is heated via a hot water Modine-style heater; is that



accurate?

A.   Yes.

Q.   And the rear portion of the shop was heated via an LP-fired Modine heater; is that accurate?

A.   Yes.

Q.   Okay.   Mr. Wheeler next writes "He," being you, "stated that the gas heater was left off unless needed."

A.   Correct.

Q.   He then writes "He also stated there are additional space heaters."   However, when you were in the shop during the evening of March 13 none of the heaters were on other than the heat in the office?

A.   That should be the correct way.

Q.   That would be the practice or habit?

A.   Yeah.

Q.   Now, if you use the word "shop" to him, does that comprise a larger area than just the paint room?

A.   Yes.

Q.   The entirety of your operation there?

A.   We might differentiate by saying office or the office space.   And the shop is the back part.



Q.  Okay.  So your best memory is that when you were in the shop area that late afternoon and evening, none of the heaters were on?

A.  So I wasn't in that section.  When I came back and found out that I was called to be told that the trailer had been damaged, I pulled up out back and called Tom George to come in and worked with Tom.  And I believe it was Tom and I that got the trailer into the shop and designed a way to fix it.  Because we needed the trailer the next day, and that's why he was working late to get it fixed.  And I was parked out back.  And I believe I hopped in my truck and left from there.

Q.  Not based on what Mr. Wheeler recorded, but do you have a recollection of calling Rob to go retrieve the trailer to bring it back to the shop?

A.  I don't remember it.  I can't say that I can envision it in my head.  But I must have.  It seems as though it was his whole part of the day.

Q.  In any event, the trailer got back to the shop for repair that late afternoon?

A.  It did.

Q.  And going back to Mr. Wheeler's notes of his conversation with you, it states, "When asked, Mr. Parker stated that he had called his mechanic



Tom George around 5 p.m. to come down and repair a tongue jack on his trailer and he met Mr. George there."  Is that accurate?

A.  Yeah.

Q.  "He stated that he worked with Mr. George for a while before leaving sometime after 7 p.m.";  accurate?

A.  Around about.

Q.  "Mr. Parker stated that when he left the shop it was locked and only Mr. George was in the building."  Is that true?

A.  Yeah.

Q.  Further on down, it states -- it discusses the catalytic converter incident.  And it states, "Mr. Parker stated that as a result he installed cameras.  However, the batteries were dead on all other than one that faced the rear side."  Is that correct?

A.  Yeah.

Q.  "He stated that the cameras are motion activated and the only thing he was able to see was when Mr. George left through the door around 8:15 p.m."  Correct?

A.  Yeah.

Q.  The next section goes on to talk about



what was going on in the paint room that day.  And about halfway through he attributes the following to his conversation with you.  "He," being Mr. Parker, "stated that they had seven bi-fold doors and two standard split-jamb doors that were being either painted or stained with Old Masters oil-based wiping stain."  True?

A.  Uh-huh.

Q.  Did you have any knowledge as to what was queued up for staining that day?

A.  To my best understanding that it was the doors.

Q.  Is that because you walked in the room sometime that day and saw what was being prepped?

A.  I would have taken Robbie in to show him what he was doing that morning.

Q.  Who would have staged the doors and the jambs for treatment?  Rob or --

A.  Sometimes we have a guy help.  It's a little difficult to hold and screw them together. But sometimes we'll do it by ourselves.

Q.  Do you have a memory on that specific date of --

A.  I don't have memory.  A lot of the stuff I'm talking about because we have ways of doing



things.  But it's not -- I don't remember specifically the day.  But I know how we usually do things.

Q.  Okay.  But the typical practice was to, as Mr. Cardinal described, is to stage the doors and jambs close to the perimeter of the room with room on both sides so they could be stained?

A.  Well, what he wasn't getting to was all four sides.  Because you had to get all the way around the door because you have to do the outside too.  So there would be enough room to be able to get around to where a full --

Q.  Even in between the doors as well?

A.  And even in between.  You have to get around to work on it.  Yes.

Q.  You then discussed apparently the description of the layout of the room with Mr. Wheeler.  And I'll read what he wrote. "Mr. Parker described the various openings in the walls and their respective condition at the time stating that as you enter the room from the right side, the side facing the loading dock, there are two large openings the size of garage doors."

A.  So at one time there might have been two openings.  But one opening was boarded over.  If you



were facing from the loading dock looking towards the paint room, the right-hand side, what at one time was an open door, was boarded over.

Q.  So the one closest to the back of the property was covered with plywood?

A.  Yes.

Q.  And the one to the left of it, which was the size of a garage door had a tarp?

A.  Yes.

Q.  So where Mr. Wheeler writes "There are two large openings the size of garage doors which were covered with painters tarps to prevent sawdust from entering the staining area," the one that was covered --

A.  It was --

Q.  -- the purpose was to keep dust out?

A.  Yes.

Q.  You just disagree that there was only a tarp covering one of those two large garage doors on the loading dock side?

A.  Uh-huh.

Q.  One with plywood and the other with a tarp?

A.  Yeah.  If I may --

Q.  Yes.



A.   The one that was covered was maybe an eight-foot door, the other one was, like, 12.  I don't know if we're thinking that's two doors.  It was a very large opening.  Twelve feet.

Q.   But there were two separate openings in the wall?

A.   One opening that was open.  And that was about 12 feet.

Q.   With the tarp?

A.   With the tarp.  The one on the other -- it had shelves.  Inside the paint room it had shelves up against it.  It was walled over.  I think it was walled over the whole time.  Even when I rented, it was walled over.  It was a door at some previous time, but --

Q.   That was the one closest to the back of the property --

A.   Yes.

Q.   -- that was about eight foot in size?

A.   Yeah.  But my guess -- I'm wondering when he keeps referring to two doors, is it the 12 foot he's thinking it's two doors?  I don't know.

Q.   But it was one door?

A.   It was one door twelve foot wide.

Q.   Okay.  I suppose after the fire it might

have looked like two doors because the plywood probably burned.  But you've clarified.  Okay.  Continuing on, Mr. Wheeler writes, "To the left, moving clockwise in the room, there is a door to the office area that would've been closed."

A.  That was a door to what was a carpentry room.  We did a little bit of carpentry work in there.  It didn't go to the offices at all.  It couldn't get to the offices really from there.  And I'm trying to remember.  There was -- it was originally a door going into a freezer when it was Lotta Rock Dairy.  And for a time, that freezer door was there.  I can't remember if we had removed it by then or -- and we -- like if there was a point where we removed it.  So we must have.  Yeah.  It was removed.  And then there would've been something to keep dust and heat in that room out, like a tarp or a drop cloth.

Q.  Okay.  Then he continues, continuing clockwise around the room, which I think brings us to the wall that's opposite the loading dock, he writes, "And no openings along the opposite wall, the wall closest to the tire company."  Is that correct?

A.  Yes.



Q.  Is there shelving on that wall?

A.  There was shelving.  Yeah.

Q.  Next he writes, "He," Mr. Parker, "stated that the two openings along the right-side wall, the wall facing the rear of the building, were covered with plywood."

A.  I only knew there to be one opening, not two.

Q.  And it was covered with plywood?

A.  And it was a regular 36 -- like a 36-inch regular door covered with plywood.

Q.  Mr. Wheeler then writes, "I," being Mr. Wheeler, "explained that" -- it says "were had located," I think he meant "we had located a small ceramic heater in the paint room which, he" Mr. Parker, "immediately replied that it was not running when he was there with Mr. George, nor was the LP space heater."

A.  And it's not recollection.  It's -- I trained my guys on work sites, anything -- when we leave at the end of the day, any cords get unplugged.  So it would be my hope and belief that when Robbie left that everything got unplugged.

Q.  Okay.  The next paragraph states "Mr. Parker stated that there were fluorescent



lighting fixtures on the ceiling which were controlled via a wall switch."  Is that accurate?

A.  I believe there were two wall switches on the door that was plywooded over on the backside. And on the door that he's talking and thinking it's an office, I think there was another switch there as well.

Q.  That both were --

A.  Did the overhead lights.

Q.  They both operated the same bank of lights?  So you could turn them on or off from either location?

A.  It was a three-way switch.  Yeah.

Q.  "When asked, "he" you, "had difficulty recalling if there was a finished ceiling in the room or not, but thought it was comprised of open joists."  Do you have any -- do you agree with that?

A.  At the same time I -- I agree with I said that.

MR. HUGO:  Can we go off the record for a second.

MR. LEAVITT:  Sure.

(Discussion off the record.)

MR. LEAVITT:  Back on the record.

Q.  We'd been discussing how it's -- when you

were interviewed by Mr. Wheeler, you had a difficult time specifically recollecting how the ceiling in the paint room was constituted.  That's fair?

A.  Uh-huh.  Yes.

Q.  Mr. Cardinal believed that it was a finished ceiling with some kind of particle board to which the lights were mounted.  But as you sit here today, you don't know one way or the other?

A.  Correct.

Q.  You wouldn't have in your possession from the years that you occupied that space, any photographs of --

A.  We went through all of that before.  We didn't find any back there.

Q.  Okay.  Mr. Wheeler's notes go on to talk about your discussion on March 29th, 10:05 in the morning.  Mr. Wheeler inquired with you as to the placement of the material that was used to apply the stain "at which time he called his employee Robbie Cardinal who agreed to speak with us and the phone was placed on speaker mode."  Do you recall doing that physically on your telephone?

A.  When I read that, I tried to think about it.  I don't remember doing that.

Q.  Okay.  You have no reason to dispute it



didn't happen?

A.  No.  Right.  I don't.

Q.  The rest of the statements are attributed to Mr. Cardinal, so I'm not going to ask you about that.

A.  There was one thing in that statement that he made, Mr. Cardinal.  I'm not sure about what was going on with the trim statement.

Q.  Do you want to look at that?  That's the top paragraph is his summary of the speaker call with Mr. Cardinal.  If you want to review it and comment, that's fine.

A.  It must have been a conversation I had with Mr. Wheeler.  But when he was talking about trim, I don't recollect if we did trim or not that day for sure.  But I know that we wouldn't take trim and stack it the way he was stating it.  And I wouldn't have said that.  We have a different methodology of how we stack the trim if we were drying it.  We don't lean it up against stuff, the trim.  So I think it was just something that stuck out in my mind.  I didn't remember if it was in here.  But it was a conversation I had with Wheeler at some point.

Q.  Okay.  Thank you.  Do you recall what the



flooring in the paint room was made out of?

A. I want to say concrete. That's to my best recollection.

Q. Did you have any awareness of the presence of milk crates in the paint room at any time?

A. Yeah. We had milk crates we used a lot around.

Q. Were they used for staging product that was being painted or stained?

A. Just to carry things around or -- yeah. They were a very useful tool for us.

Q. So to the extent Mr. Cardinal said he used milk crates in the room that day to place the rags on, that doesn't come as a surprise, the fact that they were in the room?

A. No, not at all.

Q. What were the walls made of in the paint room?

A. I think it was various materials. Wood. I think there was maybe a stuccoed over or a concrete -- no. There was some concrete. Because one side was a --

Q. Masonry wall?

A. Was a freezer in the past. So I think that was some kind of masonry. And block. And I



think the wall -- a possibility the wall that was against New England Truck Tire was Sheetrock, the framing was Sheetrock.

Q.   The shelves that were along the wall, the New England Truck Tire wall opposite the loading dock, that shelving, was that metal?

A.   Uh-huh.

Q.   And did that -- was that shelving present at the time you took over the lease, or is that something that you would have put there?

A.   I know I brought some shelving in.  Not that I can remember, but most likely I brought that shelving in.

Q.   Was that shelving anchored to the wall, or was it freestanding?

A.   Pretty -- I'm not positive if we screwed it to the wall or not.

Q.   Mr. Cardinal testified about some plastic Home Depot buckets that were used for proper disposal of rags in water.  Do you agree with his description of those buckets?

A.   Yes.

Q.   And where were those kept for employees' use?

A.   They were in the paint shop.  They were



probably in the carpentry room.  There was some on the loading dock.

Q.  How did you first become aware that the fire had occurred?

A.  Three -- 2:30, 3 o'clock in the morning a police officer was knocking on my door at home.

Q.  Where do you live?

A.  Partridge Lake.

Q.  And what did he have to say?

A.  Excuse me?

Q.  What did the police officer tell you?

A.  That my business was on fire.

Q.  Did you go out to --

A.  Immediately.

Q.  And had the fire been extinguished by then?

A.  No.  That's another issue.

Q.  Do you know where your company acquired the Old Masters product for use in the paint room?

A.  Yes.

Q.  Where?

A.  Littleton Paint Gallery.

Q.  Do you know where they acquired the rags?

A.  I couldn't say specific.  But what would be typical is Littleton Paint Gallery or Home Depot.



Q.   My understanding from listening to Mr. Cardinal's testimony was that the Old Masters product was a product that had been used frequently in the past?

A.   Yes.

Q.   Were there other products that the company would use for staining, wood staining?

A.   Yes.

Q.   What other products did you use?

A.   We used water-based products as well a lot.  I can't think of names right now.

Q.   Any other wood-based -- I mean oil-based products?

A.   Polyurethane.

Q.   Any particular manufacturers?

A.   Old Masters, I think it was.  I'm not positive on that.

Q.   I know you described that experience in your life where you learned someone had lost their home because they left rags out after staining floors or a deck or something.  Had you ever had any prior incidents associated with your properties or working in the shop where an improperly disposed of rag led to an ignition of a rag?

A.   No.



Q.   Other than staining or painting in the paint room as its been called, were there any other activities that were performed routinely in that room?

A.   No.

Q.   Were employees allowed to ever do any sanding in that room?

A.   Yeah.  They could've.  Yeah.

Q.   And what equipment or tools did your company have at its disposal for cleaning up any residual sawdust from sanding operations?

A.   Shop vacs.

Q.   Where were those kept?

A.   All over.  We had them multiple places in the shop.

Q.   Did your company have a policy for the disposal of fine dust from the shop vacs?

A.   No.

Q.   Where would the shop vacs be emptied when they were emptied?

A.   They would be emptied into -- I'm only talking to what normally might happen -- is into garbage receptacle cans and then into a -- we had on-site a dumpster.

Q.   Did the garage receptacle cans have



polyethylene trash bag liners, or they were just metal cans?

A.   Sometimes.  A lot of times not.

Q.   So when they didn't, they would just dump the can into a dumpster?

A.   Yeah.

Q.   Do you have an awareness today that New Hampshire law has code provisions that specifically refer to the proper disposal of oil-stained rags?

A.   No.

Q.   With regard to the condition in which the rags were left in the paint room at the time Mr. Cardinal left that day, you agree that at the time he left, those rags had not been properly disposed of based on your previous instructions and the warnings on the can, correct?

A.   Yes.

Q.   Are you aware of any other time where you determined that an employee or Mr. Cardinal had failed to heed the instructions you had provided or those that accompanied the Old Masters product?

A.   No.

Q.   When Mr. Cardinal was performing staining operations in the paint room, was he required by the company to wear any particular personal protective



equipment?

A.   Just gloves.

Q.   No respirator?

A.   No.

Q.   Other than what you'd instructed him on the proper disposal of rags and wearing gloves, did you have any other safety protocols for the use of stains in your paint room?

A.   No.

Q.   Did your company have a written SOP or standard operating procedure regarding the proper disposal of rags, or was that something that was just trained to --

A.   Trained.

Q.   -- them verbally?

A.   Trained verbally.

MR. HUGO:  Just make sure that you let him finish his question before you answer.

Q.   Did the employees or your company use any fans in the paint room to facilitate drying and ventilation?

A.   No.  Dust would --

Q.   As of the day of the fire, to the best of your knowledge, were the fluorescent lights functioning properly in the paint room?



A.   Yes.

Q.   And they were switched at the wall?

A.   Two switches.

Q.   Their operation was controlled by wall switches?

A.   Yes.

Q.   And the practice was that the lights and the heaters were to be turned off when the last person left?

A.   Yes.

Q.   What type of work did Mr. George do in the garage area in the late afternoon and evening of the date of the fire?

A.   He was repairing the dump trailer with -- he had welding to do.

Q.   Did you observe that work personally?

A.   I didn't observe it once he got going.  I stayed and helped him design how we were going to fix it.  And then once that was accomplished, I left him to his work.

Q.   Had he completed his work by the time you left that evening?

A.   No.  He was still working when I left.

Q.   When he was doing welding on the trailer in the garage area, did that work create sparks?



A.  Yeah.

Q.  What was the housekeeping of the floor surface in and around the area where he was performing welding?

A.  It was concrete.

Q.  And do you think that any sparks created by his welding in the garage area could've found their way into the paint room?

A.  No.  Too far away.

Q.  When we went through the drone camera photos with Mr. Cardinal and he used the red Sharpie to indicate the location of the paint room, are you in agreement that he got it correct?

A.  Yes.

MR. LEAVITT:  That's all I've got for questions.

MR. HUGO:  I don't have any questions.

THE COURT REPORTER:  And, John, you're ordering a copy of this one as well?

MR. HUGO:  Yes.

(Whereupon the deposition was concluded at 12:32 p.m.)



ESQUIRE ERRATA SHEET

Esquire Job ID:  J13373890

Case Caption:  Acadia Insurance Company a/s/o New England Truck Tire Centers, Inc. v. SBP Builders, LLC

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the above-captioned matter or the same has been read to me and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ESQUIRE ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the_____ day of _____, 20___.

_____

STANLEY PARKER



STANLEY PARKER
ACADIA INS CO. vs SBP BUILDERS, LLC

September 05, 2025
69

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


Page No._____Line No._____Change to:_____

_____

Reason for change:_____


Page No._____Line No._____Change to:_____

_____

Reason for change:_____


Page No._____Line No._____Change to:_____

_____

Reason for change:_____


Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____

                    STANLEY PARKER



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


Page No._____Line No._____Change to:_____

_____

Reason for change:_____


Page No._____Line No._____Change to:_____

_____

Reason for change:_____


Page No._____Line No._____Change to:_____

_____

Reason for change:_____


Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____

STANLEY PARKER



C E R T I F I C A T E


          I, Lauren M. Buzzerio, a Licensed
Shorthand Reporter for the State of New Hampshire, do
hereby certify that the foregoing is a true and accurate
transcript of my stenographic notes of the proceeding
taken at the place and on the date hereinbefore set
forth to the best of my skill and ability under the
conditions present at the time.
          I further certify that I am neither attorney
or counsel for, nor related to or employed by any of the
parties to the action in which this proceeding was
taken, and further that I am not a relative or employee
of any attorney or counsel employed in this case, nor am
I financially interested in this action.
          The foregoing certification of this transcript
does not apply to any reproduction of the same by any
means unless under the direct control and/or direction
of the certifying reporter.
          IN WITNESS WHEREOF, I have hereunto set my
hand on this 9th day of September, 2025.



          Lauren M. Buzzerio
          LCR 173, RPR


DEPOSITION SOLUTIONS

                                          800.211.DEPO (3376)
                                          EsquireSolutions.com

**$**

**$1**
29:10

**$1,500**
29:4

**1**

**1**
19:8,9
22:11
25:9
26:15
42:2

**100**
12:4

**10:05**
57:16

**10:53**
4:3

**12**
9:12
53:2,8,21

**12:32**
67:22

**13**
24:3
31:10
37:18
47:13

**135**
35:3,6

**14**
7:23

**15**
7:23

**17-something**

17:14

**1750**
17:10,15

**1980**
32:10

**2**

**2**
29:6

**2,100**
17:14

**2013**
24:3

**2016**
20:11
45:14

**2017**
20:5,6,20
21:7

**2023**
31:10
37:18

**29th**
57:16

**2:30**
61:5

**3**

**3**
61:5

**30s**
33:22

**36**
55:10

**36-inch**
55:10

**4**

**4,500**
19:24

**40s**
33:22

**433**
7:12
10:21
11:16,20
14:8
15:4,17,
24 16:25
19:24
44:18

**5**

**5**
49:1

**6**

**6**
20:11

**60**
22:18,23
23:17

**7**

**7**
20:6 49:6

**7/8/61**
32:2

**8**

**8:15**
49:23

**A**

**a.m.**
4:3

**absent**
23:2

**Absolutely**
42:24

**Academy**
32:13,17

**accompanied**
64:21

**accomplished**
66:19

**accurate**
28:19
44:2
46:21,22
47:1,5
49:3,7
56:2

**accurately**
5:1

**acquired**
29:16
61:18,23

**act**
27:13
28:8

**activated**
49:21

**activities**
63:3

**add**
28:1

**added**
21:25
22:7

**additional**
22:15
30:3
47:12

**adjacent**
22:1

**ADS**
14:9,11,
12,14,25
19:16,18
22:22
27:21

**advantage**
7:4

**advocate**
30:17

**aerial**
40:14

**affinity**
7:7

**afternoon**
48:2,21
66:12

**agency**
30:13,14

**aggregate**
29:9

**agree**
23:23
24:4 25:9
27:18
28:10,14
36:10
42:24
56:17,18
60:20
64:13

**agreed**
44:20
45:19
57:20



**agreement**
19:17
26:23
67:13

**agrees**
27:7

**ahead**
28:23

**Airport**
33:14
34:17

**allowed**
63:6

**amount**
13:16
16:25

**anchored**
60:14

**Angling**
42:11

**Anthony's**
34:4

**apartment**
8:8 11:5
12:14
13:10

**apartments**
12:21

**apparent**
37:11

**apparently**
51:16

**apply**
46:3,10
57:18

**applying**
45:22

**apprenticed**
34:8

**approximately**
9:10
15:6,16
44:19

**area**
7:11
21:5,12,
15,24
25:3 32:4
41:8,9,18
45:14
46:20,24
47:20
48:2
52:13
54:5
66:12,25
67:3,7

**arising**
18:4

**Arizona**
33:18
34:24,25

**assistant**
35:4,5

**assists**
8:11

**Assumes**
28:19

**attorney**
18:18,25
31:1

**attorney's**
27:10

**attributed**
58:3

**attributes**
50:2

**Ausable**
34:2

**automatically**
22:15
23:2,8,18

**Aviation**
32:13,17

**aware**
29:15
42:25
61:3
64:18

**awareness**
59:4 64:7

---

**B**

---

**back**
5:14 18:9
22:2
26:14
29:1
31:24
38:24
40:3
41:21
42:2
47:25
48:5,6,
12,16,20,
23 52:4
53:16
56:24
57:14

**backed**
42:15

**background**
31:25

**backside**
56:4

**bag**
64:1

**bank**

56:10

**Barros**
4:12

**Base**
35:10

**baseboard**
46:20,23

**based**
6:2 37:2,
10 48:14
64:15

**basis**
24:10
25:7,15

**batteries**
39:15
49:16

**beginning**
20:19

**begins**
20:5

**belief**
6:9 46:6
55:22

**believed**
57:5

**beneficial**
4:22

**bi-fold**
50:4

**bike**
35:18,22

**birth**
32:1

**bit**
31:24
35:25
54:7

**Blairstown**
33:15

34:22

**block**
59:25

**board**
57:6

**boarded**
51:25
52:3

**bookkeeper**
9:19

**bookkeeping**
9:19

**bottom**
42:1

**boy**
39:22

**Bretton**
35:10,11

**bring**
48:16

**brings**
54:20

**broker**
30:13

**brought**
60:11,12

**brush**
46:3

**brushes**
46:7

**bucket**
37:4,9,24

**buckets**
60:19,21

**Builder**
9:15

**builders**
7:12,22
9:4,6,19



10:6,12,
13,17
11:14,18
13:13
14:8,9
15:3,17,
21,24
16:3
17:21
18:10,11
19:21
24:5
25:17,20
27:18
29:11,15,
18,21
30:3 31:5
36:3,15
44:18

**Builders'**
7:18
24:16

**building**
12:7,10,
12 31:22
45:8
49:11
55:5

**buildings**
8:9,10
11:5
12:14
13:10

**burn**
36:20

**burned**
54:2

**business**
7:10,18
8:7,14
9:24 11:9
14:7
61:12

**businesses**
7:13

_____

**C**

_____

**cabinet**
11:15

**call**
12:8
58:10

**called**
29:7 30:2
34:4 35:5
36:19
38:4
48:5,7,25
57:19
63:2

**calling**
48:15

**calls**
10:7
27:24
28:18

**camera**
39:17,21
40:11,15,
23 41:21,
23 42:5,
14 43:8,9
67:10

**cameras**
39:11,14
49:16,20

**camping**
36:19

**cans**
63:23,25
64:2

**Cape**
34:5

**captured**
43:1

**Cardinal**
4:20 6:3
36:13
42:2
43:25
44:7,10
51:5
57:5,20
58:4,7,11
59:12
60:18
64:13,19,
23 67:11

**Cardinal's**
36:5
37:10
62:2

**care**
6:18

**career**
33:21

**carpentry**
54:6,7
61:1

**carry**
59:10

**case**
26:4
27:16
29:4 31:3

**catalytic**
39:7
49:14

**caused**
28:9

**causing**
37:21

**ceiling**
56:1,15
57:2,6

**center**
12:10
42:12

**Centers**
14:15

**Century**
30:2,18

**ceramic**
55:15

**certificati
on**
32:24

**certificati
ons**
33:8

**chance**
5:25

**changed**
16:21
17:1
21:6,9
34:15

**Chatham**
34:5

**chef**
33:25
34:4,7,8

**chief**
35:4,5,6

**chosen**
18:21

**circumstanc
es**
38:3

**claims**
27:9

**clarified**
54:2

**clarify**
25:8

**cleaning**
63:10

**clear**
25:13

**clients**
8:9

**clockwise**
54:4,20

**close**
51:6

**closed**
26:4,5
54:5

**closer**
38:23

**closest**
52:4
53:16
54:23

**cloth**
54:18

**Club**
34:2

**Cod**
34:5

**code**
64:8

**college**
33:9

**Colorado**
34:6

**Comair**
32:13,17,
18 33:5

**combination**
6:8

**comment**
58:12

**commercial**



7:20,21
11:4 33:2

**companies**
8:3,12,20
10:25
12:6

**company**
10:16
12:8,13
13:7
14:11
17:1,17
19:23
25:19
27:20
28:15
29:20,24
30:2,5,22
31:1,2,5
33:16
35:7
36:23
37:2
44:1,23
54:23
61:18
62:6
63:10,16
64:25
65:10,19

**company's**
8:6

**compensate**
27:2,20
28:16

**complete**
32:20

**completed**
66:21

**Completely**
30:7

**comply**
17:17

18:11
29:11

**comprise**
47:20

**comprised**
45:9
56:16

**computer**
42:15

**computers**
39:23

**concerns**
28:21

**conclude**
25:15

**concluded**
67:21

**conclusion**
27:25
28:19

**concrete**
59:2,21
67:5

**condition**
28:9
29:12
51:20
64:11

**conditions**
13:21

**conduct**
7:1

**conference**
21:14

**configuration**
21:3,17

**confirm**
30:13

**confused**
16:16

**connection**
17:22
27:11

**consecutive**
23:21

**considerably**
21:6

**consistent**
20:13

**constituted**
57:3

**construction**
7:19,20
9:13
35:25
36:23

**consult**
18:17,25

**containers**
37:3

**contested**
30:11

**continues**
54:19

**continuing**
54:3,19

**contractually**
27:20

**control**
8:13

**controlled**
56:2 66:4

**conversation**
44:7 45:2

46:1
48:24
50:3
58:13,23

**conversations**
44:6

**converter**
39:7
49:14

**copy**
67:19

**cords**
55:21

**corporate**
7:25 31:6

**correct**
11:25
13:5
14:1,8
15:21,23
19:17,19
22:6
23:13
30:23
37:14,24
39:4
40:1,25
44:7,20
47:10,16
49:18,23
54:24
57:9
64:16
67:13

**correctly**
22:19
27:14

**correspondence**
30:1

**Cottage**
7:12

10:21
11:16,22
14:8
15:4,17,
25 19:24
42:3
44:18

**could've**
25:21
26:10
63:8 67:7

**counsel**
18:18
31:6

**couple**
7:9 36:1

**court**
15:11
67:18

**cover**
31:25

**coverage**
30:3,6,18

**covered**
21:4 45:9
52:5,12,
14 53:1
55:5,9,11

**covering**
52:19

**crates**
59:5,6,13

**create**
66:25

**created**
7:22 28:8
67:6

**crew**
39:2

**Crum**
29:25



30:22

cut
  40:6

―――――――――

        D
―――――――――

Dairy
  54:12

damaged
  48:6

damages
  28:17

Dancel
  34:8

dark
  43:12

date
  8:24
  15:25
  27:19
  31:9 32:1
  50:22
  66:13

daughter
  14:21

David
  24:12

day
  36:21
  37:23
  38:12,16
  39:3
  40:25
  41:3 43:2
  45:18
  46:7,16
  48:10,19
  50:1,10,
  14 51:2
  55:21
  58:16
  59:13

64:13
65:23

days
  22:18

days'
  22:23
  23:17

de
  13:24

dead
  49:16

deal
  10:8
  14:24

dealt
  14:15,19

December
  20:5

decided
  16:20

decision
  6:11

decisions
  26:11

deck
  62:21

dedicated
  8:18 9:22
  10:15

defend
  27:7
  30:22

degree
  32:9

Dells
  12:20

denial
  30:16

denied

30:5

depict
  40:15

depicted
  43:8,12

deposition
  4:16,19
  5:8 21:3
  67:21

Depot
  60:19
  61:25

Describe
  36:12

description
  51:17
  60:21

design
  66:18

designed
  48:9

determinati
on
  30:11

determinati
ons
  25:24

determined
  26:6
  28:13
  64:19

determines
  27:16

died
  39:15

differentia
te
  47:24

difficult
  15:11

50:20
57:1

difficulty
  56:14

direction
  42:5

directly
  40:12

director
  35:10

disagree
  52:18

discarded
  45:22
  46:5,13

discipline
  6:24

discoveries
  26:8

discussed
  31:12
  51:16

discusses
  49:13

discussing
  56:25

discussion
  56:23
  57:16

discussions
  5:23 21:2

disposal
  29:21
  60:20
  63:10,17
  64:9
  65:6,12

disposed
  62:23
  64:15

dispute
  24:8,10
  38:9
  46:14
  57:25

distance
  24:20

dock
  21:4
  24:18
  41:9,18
  42:4,8
  43:14
  45:9
  51:22
  52:1,20
  54:21
  60:6 61:2

document
  19:8 20:1

documents
  5:7,9,11

dollars
  29:16

door
  40:12,13,
  17,20
  41:2,4,
  20,25
  42:11
  49:22
  51:10
  52:3,8
  53:2,14,
  23,24
  54:4,6,
  11,12
  55:11
  56:4,5
  61:6

doors
  24:18
  50:4,5,
  12,17



51:5,13,
23 52:11,
19 53:3,
21,22
54:1

**drone**
67:10

**drop**
54:18

**dropped**
26:3

**drying**
58:20
65:20

**duly**
4:6

**dump**
64:4
66:14

**dumpster**
63:24
64:5

**dust**
52:16
54:17
63:17
65:22

**dwellings**
8:19

— E —

**earlier**
21:3
33:21
39:6

**easier**
44:14

**education**
32:12

**effect**
27:19

**eight-foot**
53:2

**electric**
46:20,23

**electrical**
28:3

**employee**
6:3 10:13
31:17
37:1 46:6
57:19
64:19

**employees**
8:22 9:7
11:11
63:6
65:19

**employees'**
60:23

**employment**
6:16
33:20
35:8

**emptied**
63:19,20,
21

**end**
6:6 22:18
23:16
35:3 45:8
55:21

**ended**
17:3

**engine**
33:1,3

**England**
14:11,15,
25 19:15
22:2 42:9

60:2,5

**enter**
51:21

**entered**
38:15

**entering**
52:13

**entirety**
47:23

**entities**
12:1

**entitled**
20:10

**envision**
48:18

**equipment**
45:8 63:9
65:1

**evening**
47:13
48:3
66:12,22

**event**
23:23
29:21
48:20

**exactness**
5:17

**EXAMINATION**
4:9

**examined**
4:6

**Excuse**
61:10

**exhibit**
19:9
22:11
24:23
25:9
26:15

42:2

**expenses**
27:9

**experience**
6:20
36:17
37:6
62:18

**explain**
21:19

**explained**
25:25
55:13

**exposure**
31:2

**expressed**
24:15

**extent**
6:11 27:6
28:20
59:12

**exterior**
40:13

**extinguishe
d**
61:15

— F —

**faced**
49:17

**facilitate**
65:20

**facing**
40:16
51:22
52:1 55:5

**fact**
28:19
38:10

39:1
59:14

**facto**
13:24

**failed**
64:20

**fair**
7:15 19:4
23:18
38:6
45:11
57:3

**family**
36:18

**fans**
65:20

**fast**
32:16

**fault**
28:3,4

**Feeling**
5:3

**fees**
27:10

**feet**
19:24
53:4,8

**felt**
6:13,19
25:21

**Fifteen**
34:14

**file**
11:15

**files**
11:13

**final**
26:11

**financially**
18:3



find
26:7
57:14

findings
26:1

fine
58:12
63:17

finish
14:18
15:10
65:18

finished
38:5 40:7
56:15
57:6

fire
9:11,21
10:21
11:1
12:16,18,
19 14:24
15:8,9,
18,25
16:2
17:9,13
24:3,4,
17,25
25:11,16,
21 26:10
27:17,19,
22 28:4,
9,13
29:22
31:9,14,
18,21
36:20
37:22
38:2
39:15,25
40:23
43:2,18
53:25
61:4,12,

15 65:23
66:13

firm
5:14

fix
20:12
48:9
66:19

fixed
48:11

fixtures
56:1

Flagstaff
33:18
34:25
35:1

Fliers
33:18

flight
35:2,4

floor
36:24
45:23
46:13
67:2

flooring
59:1

floors
62:21

Florida
32:19

fluorescent
55:25
65:24

focused
40:12

follow
25:23

foot
53:19,21,

24

footage
16:25
39:20

formal
34:7

format
8:1

Forster
29:25
30:22

found
29:22
48:5 67:7

four-to-
five
15:20

fourth
26:16

framing
60:3

Franconia
33:14
34:16,17

free
20:12

freestandin
g
60:15

freezer
54:11,12
59:24

frequently
62:3

friend
36:23

front
10:23
21:12
46:20

full
4:10
51:12

functioning
65:25

_____

G
_____

Gallery
61:22,25

garage
21:5
24:18
38:23
41:12
45:11
51:23
52:8,11,
19 63:25
66:12,25
67:7

garbage
63:23

gas
47:8

gave
6:18
23:24
35:6

general
5:16 7:19

George
38:19,20
39:1
40:25
43:8,17
48:7
49:1,2,5,
10,22
55:17
66:11

get all

51:9

give
13:9,11
32:1

giving
23:2

glad
4:13

glider
33:4,16
34:17,23

gloves
65:2,6

good
4:15 5:4,
16 16:7
19:2 23:5
38:12

govern
16:14

governed
16:3

graduation
33:24

grant
28:6

grow
32:4

grown
35:12

guess
17:10
18:7 19:2
31:12
53:20

guesstimate
s
13:11

guy
50:19



**guys**
55:20

---

**H**

---

**habit**
47:17

**Hadlock**
30:12

**halfway**
20:7 50:2

**hallway**
41:19

**Hampshire**
33:15
35:11,19
64:8

**happen**
23:15
58:1
63:22

**happened**
26:3 28:5
36:22

**hard**
14:10

**harm**
27:2,21

**harmless**
27:7

**head**
48:18

**heading**
6:12
26:16

**headlined**
22:12

**healthy**
6:21

**heard**
21:2 36:5
43:21,24

**heat**
46:21,23
47:14
54:17

**heated**
46:20,22,
25 47:4

**heater**
46:25
47:4,8
55:15,18

**heaters**
47:12,14
48:3 66:8

**heed**
64:20

**helped**
66:18

**helpful**
42:23

**high**
32:6,9,11
33:24

**hill**
36:19
43:5

**hired**
25:19

**history**
33:23

**hold**
27:7
50:20

**home**
12:20,21
36:20,22
60:19
61:6,25

62:20

**honestly**
20:22

**hope**
55:22

**hopped**
48:12

**hot**
46:25

**Hotel**
34:5

**house**
25:6

**housekeepin
g**
67:2

**houses**
12:10
13:10

**Hugo**
15:10
18:6
23:4,19
24:6 25:8
27:24
28:18
29:14
30:21
31:17,20
42:19,24
56:20
65:17
67:17,20

---

**I**

---

**ID**
19:9

**identifies**
19:18

**ignition**
62:24

**III**
4:12

**immediately**
55:16
61:14

**improperly**
62:23

**inaccuratel
y**
44:12

**inception**
29:2 36:3

**incident**
39:6
49:14

**incidents**
62:22

**included**
5:22
44:11

**including**
27:9

**incur**
27:11

**indemnified**
18:2

**indemnify**
17:21
27:2,7

**indemnity**
26:17,20

**information**
10:10
31:25
44:10

**inquired**
57:17

**inside**
45:8
53:11

**installed**
39:10
40:15
49:15

**instructed**
65:5

**instruction
s**
4:23
64:15,20

**instructor**
33:3
35:3,4,17

**instructor/
tow**
33:17

**instrument**
33:1

**insurance**
17:25
25:19
29:7,9,
17,20
30:2,13
44:23

**insured**
17:24
44:22,24
45:5

**intact**
25:10

**intend**
18:11

**interrupt**
15:14

**interviewed**
57:1

**investigate**



36:21

**investigation**
24:13,14
26:1

**investigations**
25:24
26:5

**investigator**
5:20
24:16
31:16

**investigators**
25:18
26:7,9
40:3,4,9

**investment**
11:2
12:13,15
13:12,14

**investments**
11:8,24
12:25
13:4,6,
20,22,23,
25

**involved**
8:14

**involvement**
7:14

**issue**
30:10
61:17

**issues**
10:9

_____

**J**

**jack**

49:2

**jambs**
50:18
51:6

**Jamie**
36:23

**January**
20:6

**jobs**
36:1

**John**
14:21,22
15:1
67:18

**joists**
56:17

**judgment**
31:2

**jury**
27:16

**just-finished**
36:22

_____

**K**

**kind**
5:15
35:25
46:2 57:6
59:25

**kitchen**
34:13

**knew**
37:6 55:7

**knocking**
61:6

**knowing**
26:23

**knowledge**
29:11
50:9
65:24

_____

**L**

**laboratory**
26:2

**laid**
6:6,14

**Lake**
36:18
61:8

**landlord**
16:3,4,15
17:21,22
19:19
27:8,11
28:8,16

**landlord's**
27:13
28:7

**language**
37:17

**large**
51:23
52:11,19
53:4

**larger**
47:20

**late**
48:2,11,
21 66:12

**law**
27:6 64:8

**laws**
17:18

**lawsuit**
30:23

**laying**
6:12

**layout**
21:6,8
51:17

**lead**
24:16

**lean**
58:20

**learned**
37:22
62:19

**lease**
11:18
16:2,11,
12,14,17,
18,23
17:16,20
18:10,12,
14,19
19:1,4,
12,15,17,
18,23
20:5
22:4,15,
24 23:1,
7,12,16
24:1
26:15
27:18
28:22
29:1,2,3
60:9

**leased**
14:9
17:12
25:16

**leasehold**
14:19

**leases**
13:2,21
14:2,5
16:6,9

**leasing**
14:13

**leave**
41:2
55:21

**leaving**
43:9 49:6

**Leavitt**
4:9 15:15
19:7
42:17,22,
25 56:22,
24 67:15

**led**
62:24

**Ledge**
36:19

**left**
36:24
37:21,23
38:10,12
39:2
40:25
41:3 42:4
43:15,20
47:8
48:13
49:9,22
52:7 54:3
55:23
62:20
64:12,13,
14 66:9,
19,22,23

**legal**
18:18
27:24
28:18
31:5

**legally**
29:22

**letter**
26:4



letters
4:14

liabilities
27:9

liability
29:7,8,
17,20

Liberty
44:23,25
45:5

licenses
33:8

life
6:16
62:19

lighting
56:1

lights
43:14
56:9,11
57:7
65:24
66:7

Lincoln
35:18

liners
64:1

lines
7:3

listening
25:18
62:1

Littleton
7:10 32:4
61:22,25

live
35:14
61:7

LLC
8:2,3,5

9:4 12:9

loader
45:14

loading
21:4
24:18
41:9,18
42:4,7
43:14
45:9
51:22
52:1,20
54:21
60:5 61:2

local
17:18

located
21:23
32:18
55:14

location
15:22
40:10,15
56:12
67:12

locked
49:10

long
5:6 13:6,
7 34:12,
19 35:20

looked
40:4
43:12
54:1

loss
27:3,19,
21 30:4

losses
17:21
18:4 27:8

lost
39:7
62:19

lot
5:15 6:18
50:24
59:6
62:11
64:3

Lotta
54:12

LP
55:18

LP-FIRED
47:4

—————————

**M**

—————————

made
21:14,18
25:25
26:11
37:4,24
58:7
59:1,17

maintain
29:8

maintained
11:16

maintenance
24:19

majority
6:15

make
46:4
65:17

makes
20:22
45:25

manage
8:4,9

14:2

management
8:5,11,
16,18,23
9:15,20,
22,25
10:3,8,16
11:19
13:16,18,
19

manager
13:24
34:17

managing
8:12
13:10

manufacture
rs
62:15

March
24:3
31:10
37:18
47:13
57:16

mark
19:7

marked
19:9

masonry
59:23,25

Masters
45:19
46:8 50:6
61:19
62:2,16
64:21

material
21:16
57:18

materials
26:2

59:19

matter
46:12

means
17:24
26:21
27:2

meant
26:24
55:14

mechanic
48:25

medications
5:5

memory
5:17
20:1,15,
18 40:22
45:4 48:1
50:22,24

met
49:2

metal
37:3
45:10
60:6 64:2

methodology
46:9
58:19

milk
59:5,6,13

million
29:10,16,
23

mind
58:22

mine
8:15
36:23

minute



9:25

**minutes**
7:9

**misuse**
27:12

**mode**
57:21

**Modine**
47:4

**Modine-
style**
46:25

**monthly**
17:4

**months**
20:18
22:9

**morning**
6:3 43:25
44:4
50:16
57:17
61:5

**motion**
49:20

**motion-
activated**
43:9

**Mount**
34:5

**mounted**
57:7

**mouth**
7:2

**move**
20:25

**moving**
54:4

**multi-
engine**
33:1,3

**multiple**
63:14

**municipal**
17:18

**mutual**
6:9
44:23,25
45:5

**Myers'**
36:23

---

**N**

---

**named**
17:24

**names**
5:13
62:11

**nature**
7:18 8:6

**needed**
6:14,24
10:11
47:9
48:10

**negligence**
27:13
28:8

**negotiating**
14:19

**night**
36:21
43:20

**notes**
5:19 39:5
40:22
44:5,11
48:23

57:15

**notice**
22:17,23
23:3,17,
24

**number**
10:18

---

**O**

---

**Objection**
18:6
23:4,19
24:6
27:24
28:18
29:14

**obligated**
20:20
28:16

**obligates**
27:20

**observe**
66:16,17

**occasions**
6:23

**occupancy**
16:25
20:2

**occupants**
12:24

**occupied**
15:17
24:5
25:17
27:17
57:11

**occupy**
20:19

**occupying**
15:4

**occur**
18:4

**occurred**
9:11
15:9,18
24:3 61:4

**October**
20:11

**odd**
36:1

**office**
9:3,13,
18,22
10:4,5
21:12,18
46:20
47:15,24,
25 54:5
56:6

**officer**
61:6,11

**offices**
10:23
21:6
54:8,9

**oil**
36:24
37:2

**oil-based**
36:6,14,
16 37:7
38:11
45:19
50:6
62:12

**oil-stained**
64:9

**older**
32:3

**on-site**
38:18
63:24

**one-year**
23:12

**open**
45:10
52:3 53:7
56:16

**opened**
35:18

**opening**
51:25
53:4,7
55:7

**openings**
51:19,23,
25 52:11
53:5
54:22
55:4

**operate**
7:25
15:21

**operated**
7:12 13:2
44:17
56:10

**operating**
65:11

**operation**
9:4
34:18,24
47:23
66:4

**operations**
35:6
63:11
64:24

**opportunity**
5:18
18:17

**opposite**
54:21,22
60:5



| | | | | |
|---|---|---|---|---|
| **order** 20:12 | **owner** 12:2 | **painting** 45:17 63:1 | 59:24 62:4 | **personal** 7:7 30:25 64:25 |
| **ordering** 67:19 | **owners** 8:9 | **paragraph** 44:16 45:16 55:24 58:10 | **pay** 28:2 | **personally** 8:12 30:10 66:16 |
| **ordinary** 43:22 | ———— **P** ———— | **parked** 41:21 48:12 | **paying** 16:18,22 17:3,8 20:20 | **personnel** 9:3,15 |
| **orientation** 38:11 | **p.m.** 49:1,6,23 67:22 | **Parker** 4:6,12 19:8 25:12 44:17 45:7,17 46:19 48:25 49:9,15 50:3 51:19 55:3,16, 25 | **payment** 29:3 | **phone** 10:7,15, 18 57:20 |
| **original** 17:14,16, 20 18:10 22:4 29:3 | **pages** 5:19,20, 22 | | **Payments** 29:2 | **phonetic** 34:8 |
| **originally** 17:12 23:13 54:11 | **paid** 10:4,11 17:11 | | **people** 8:19 24:11 37:13 | **photographs** 57:12 |
| **originate** 25:16 | **paint** 21:5,24 37:21 38:12 40:13 41:7 46:24 47:20 50:1 52:2 53:11 55:15 57:3 59:1,5,17 60:25 61:19,22, 25 63:2 64:12,24 65:8,20, 25 67:8, 12 | | **percent** 12:4 | **photos** 67:11 |
| **originated** 24:4 25:11 27:17 31:21 | | **parking** 21:4 | **perform** 13:19 | **physical** 10:5 |
| **outcomes** 26:6 | | **part** 6:11 8:8 22:4 23:10 35:3 36:8 43:11 47:25 48:19 | **performed** 63:3 | **physically** 57:22 |
| **overhead** 24:24 56:9 | | | **performing** 64:23 67:4 | **picked** 36:1 37:7 |
| **overlap** 9:14 | | | **perimeter** 39:11 51:6 | **picks** 37:1 |
| **overseeing** 8:11 38:18 | | **particle** 57:6 | **period** 14:20 15:20 16:13 22:16 23:9 | **pilot** 32:14 33:2,7, 11,17 34:23 35:3 |
| **oversees** 13:21 | **paintbrushe s** 45:21 | **Partridge** 36:18 61:8 | **permitted** 27:6 | **place** 9:24 11:9 34:2,4 59:13 |
| **owned** 8:12,19 12:20 13:20,22, 25 | **painted** 50:6 59:9 | **party** 22:17 | **person** 14:14 31:16,20 66:9 | **placement** 57:18 |
| | **painters** 52:12 | **past** 37:14 | | **places** 33:6 |



**plastic**
60:18

**Plattsburgh**
34:3,11

**plugged**
45:14

**plywood**
52:5,22
54:1
55:6,9,11

**plywooded**
56:4

**point**
6:19
14:14
16:10
21:19,20
31:13
54:14
58:24

**pointing**
42:5,7

**police**
61:6,11

**policy**
17:25
63:16

**polyethylene**
64:1

**Polyurethane**
62:14

**portion**
47:3

**position**
30:15

**positive**
42:6

63:14
60:16
62:17

**possession**
20:8,11
27:12
57:10

**possibility**
16:7 60:1

**post**
32:11

**potential**
43:1

**Powers**
43:4

**practice**
47:17
51:4 66:7

**preferential**
6:18

**premises**
26:17
27:12
29:9

**preparing**
5:7

**prepped**
50:14

**presence**
59:4

**present**
29:19
60:8

**preserved**
39:20

**pretty**
6:15
35:14
60:16

**prevent**

52:12

**previous**
53:14
64:15

**Previously**
8:25

**price**
16:21

**principal**
9:24 11:8
33:20

**prior**
22:18
37:18
62:22

**problems**
19:3

**procedure**
65:11

**proceed**
26:1

**process**
6:12
25:22
36:16

**product**
37:8 59:8
61:19
62:3
64:21

**products**
36:7
62:6,9,
10,13

**professional**
24:15

**program**
32:20

**proper**

60:19
64:9
65:6,11

**properly**
64:14
65:25

**properties**
11:2,3
12:15
13:12,15,
20,22,25
14:3
19:18
27:21
62:22

**property**
7:14 8:5,
11,16,17,
22 9:15,
21,25
10:3,8,16
11:19
13:16,18,
19,24
14:7,20
18:5
20:11
21:4,17
22:2,22
36:18
38:24
39:3,8
42:5
43:6,13
52:5
53:17

**protective**
64:25

**protocols**
65:7

**provide**
22:23

**provided**
5:19

64:20

**provision**
27:5
28:15

**provisions**
18:12
64:8

**pulled**
48:6

**purports**
19:23

**purpose**
52:16

**pursue**
32:8,11
33:9

**put**
37:2,5,9
60:10

**putting**
37:20
38:1 45:3

---

**Q**

---

**question**
14:18
18:1,8
19:11
44:13
65:18

**questions**
15:11
67:16,17

**queued**
50:10

**quit**
6:7



STANLEY PARKER
ACADIA INS CO. vs SBP BUILDERS, LLC

September 05, 2025
Index: Rachel..respective

**R**

Rachel
14:22,25

rag
46:3,10
62:24

rags
36:24
37:5,9,
20,23
38:11
45:22,23
46:12
59:13
60:20
61:23
62:20
64:9,12,
14 65:6,
12

ratings
33:3

read
5:16
18:14
20:17
22:14,19
27:5,13
28:15
29:3
37:16
51:18
57:23

reading
5:9 20:16
23:5
40:22
45:2

ready
20:19,25

real

6:21

rear
47:3
49:17
55:5

reason
4:25 24:8
28:4
57:25

reasonable
27:10

reasons
6:13
25:21

rebuttals
5:14

recall
15:3,16
17:8,11
29:4,5
31:9
40:11
43:11
57:21
58:25

recalling
56:15

received
30:1

receptacle
63:23,25

receptionis
t
10:6,7,10
21:15

recognize
19:11,14

recollect
5:12,15
58:15

recollectin
g
57:2

recollectio
n
20:14
36:7
40:16
44:24
48:15
55:19
59:3

record
4:11
25:13
56:20,23,
24

recorded
44:12
48:14

records
11:13

recovery
12:10

red
67:11

refer
64:9

referred
46:24

referring
53:21

refresh
20:1,18

regard
12:1,13
14:7 30:4
36:6,13
38:10
64:11

regular

55:10,11

relationshi
p
16:4,14
22:22

remember
9:1 15:5
16:22
20:16,22,
24 33:16
39:22
40:3,19,
21 45:1
46:1
48:17
51:1
54:10,13
57:24
58:22
60:12

remembering
14:10
46:16

removed
54:13,15,
16

renew
22:15
23:18

renewal
22:12,16,
18 23:9,
10,11,20

renewed
23:2

renews
23:8

rent
16:18
17:4,9
20:12,21
21:20

rental
17:23

rented
53:13

renting
14:13

repair
48:21
49:1

repairing
66:14

repeat
4:23
15:13

rephrase
18:7

replied
55:16

reporter
15:12
67:18

represent
27:1

require
17:16,20

required
64:24

research
26:12

residential
7:21 8:18
11:4,6

residual
63:11

respect
29:20
30:3

respective
51:20



respirator
  65:3

responsible
  18:3
  28:11
  29:22
  37:21

rest
  58:3

result
  17:3
  27:22
  32:25
  39:10
  49:15

retained
  30:21

retrieve
  48:16

review
  5:7,11,18
  58:11

reviewed
  5:21
  40:23

right-hand
  45:23
  46:13
  52:2

right-side
  55:4

road
  35:9

Rob
  48:15
  50:18

Robbie
  6:20  37:6
  46:18
  50:15
  55:23

57:19

Rock
  54:12

roof
  24:20
  25:10
  45:10

room
  21:5,10,
  14 37:21
  38:12,15,
  23 40:13
  41:7 44:4
  46:24
  47:21
  50:1,13
  51:6,11,
  17,21
  52:2
  53:11
  54:4,7,
  17,20
  55:15
  56:16
  57:3
  59:1,5,
  13,15,18
  61:1,19
  63:2,4,7
  64:12,24
  65:8,20,
  25 67:8,
  12

rooms
  22:1

routine
  31:6

routinely
  63:3

rules
  4:23

running
  55:17

─────────
    S
─────────

sabbatical
  35:24

safe
  33:18
  36:13

safety
  38:5 65:7

sanding
  63:7,11

Sanford
  32:19

sat
  4:19

sawdust
  52:12
  63:11

SBP
  7:11,17,
  18,22
  8:5,10,
  16,17,22
  9:4,14,21
  10:6,7,
  11,13,17
  11:2,8,
  14,18,19,
  24 12:25
  13:4,6,
  18,20,22,
  23,25
  14:8,9
  15:3,17,
  21,24
  16:3
  17:20
  18:9,11
  19:21
  24:5,16
  25:17,19
  27:18

28:2
  29:11,15,
  18,21
  30:3 31:5
  36:3,15
  44:17

school
  32:6,9,11
  33:24
  35:10

scope
  7:10

Scott
  43:3

screw
  50:20

screwed
  60:16

season
  34:23

section
  22:11
  25:2
  26:16
  28:7 29:7
  42:8,10
  48:4
  49:25

security
  39:11

sense
  6:17
  20:23
  45:25
  46:4

sentence
  29:8

separate
  12:8,11
  33:6 53:5

separately

12:10

sequence
  4:13

services
  8:17
  13:19

set
  12:11
  38:3

shared
  30:9
  39:24
  40:2

shares
  12:4

Sharpie
  67:11

Sheetrock
  60:2,3

shelves
  53:11
  60:4

shelving
  55:1,2
  60:6,8,
  11,13,14

shop
  21:24
  24:19,21
  35:18,23
  45:18
  47:3,13,
  19,25
  48:2,9,
  16,21
  49:10
  60:25
  62:23
  63:12,15,
  17,19

short
  22:9



24:12
26:8

**shots**
40:14

**show**
5:12
24:23
41:23
50:15

**showed**
40:24
41:25

**sic**
24:4

**side**
30:16
42:4
49:17
51:22
52:2,20
59:22

**sides**
45:10
51:7,9

**signed**
18:10,15
19:5
23:13
26:23

**signing**
18:18
19:1

**single**
33:1,3

**sit**
45:4 57:7

**site**
7:12

**sites**
55:20

**size**

51:23
52:8,11
53:19

**ski**
35:10,17,
18,22

**skiing**
35:12

**Slate**
36:19

**small**
55:14

**smelled**
43:21,24

**smoke**
24:21,24

**sole**
12:2

**son**
6:17 7:5

**SOP**
65:10

**sound**
44:2

**sounds**
6:2

**space**
9:22 10:5
11:19
14:9
15:4,7,17
16:20,21
17:23
20:2,12,
19,25
21:21,23
22:5 24:5
25:17
27:17
28:2,5,9,
14 39:12

47:12,25
55:18
57:11

**sparks**
66:25
67:6

**speak**
57:20

**speaker**
57:21
58:10

**specific**
50:22
61:24

**specificall
y**
14:16
36:16
51:2 57:2
64:8

**split-jamb**
50:5

**spoke**
30:12

**square**
16:25
19:24

**stack**
58:17,19

**stage**
51:5

**staged**
50:17

**stages**
33:21

**staging**
59:8

**stain**
36:6
37:17

38:11
45:19,22
46:2 50:7
57:19

**stained**
36:25
50:6 51:7
59:9

**staining**
36:16
45:18
46:8
50:10
52:13
62:7,20
63:1
64:23

**stains**
36:14
65:8

**Stan**
15:10

**standard**
50:5
65:11

**standpoint**
38:5

**Stanley**
4:6,12
44:16

**start**
6:9 20:20
36:20

**started**
14:17
15:4
16:12,19
25:22
26:10
28:2,14
33:14
34:16
35:2

**starting**
24:17
33:23

**state**
4:10
17:17
20:10
32:15

**stated**
28:1
44:22
45:7,13,
17,21
46:19
47:8,11
48:25
49:5,9,
15,20
50:4
55:3,25

**statement**
19:4
23:18
30:8
36:10
38:7
45:11
58:6,8

**statements**
58:3

**states**
45:16
48:24
49:13,14
55:24

**stating**
51:21
58:17

**stayed**
66:18

**stick**
12:17



STANLEY PARKER                                          September 05, 2025
ACADIA INS CO. vs SBP BUILDERS, LLC                        Index: stole..Tom

**stole**
  39:7

**stop**
  35:8 36:2

**story**
  37:1

**stranger**
  14:5

**street**
  10:21
  11:16
  14:8
  15:4,18,
  25 19:24
  41:17
  42:3
  44:18

**strike**
  38:2

**structure**
  42:3

**stuccoed**
  59:20

**stuck**
  58:21

**stuff**
  50:24
  58:20

**suffer**
  17:22
  27:11

**suffered**
  27:21

**sum**
  29:9

**summary**
  58:10

**summer**
  34:23

**suppose**

53:25

**surface**
  67:3

**surprise**
  59:14

**sustained**
  28:17

**switch**
  56:2,6,13

**switched**
  66:2

**switches**
  56:3
  66:3,5

**sworn**
  4:6

_____

**T**

**taking**
  6:18 7:4
  30:15,16

**talk**
  7:9 49:25
  57:15

**talked**
  43:17

**talking**
  50:25
  56:5
  58:14
  63:22

**tarp**
  52:8,19,
  23 53:9,
  10 54:17

**tarps**
  52:12

**telephone**
  44:6

57:22

**telling**
  44:24

**ten**
  13:15

**tenant**
  10:8 13:4
  15:24
  16:7,19
  17:17
  19:21
  27:6 29:8
  44:18

**tenant's**
  27:12

**tenants**
  12:25

**Terex**
  45:14

**term**
  20:5
  22:16,18,
  19 23:9,
  10,11,20

**terminate**
  22:23
  23:8

**terminated**
  23:16

**termination**
  22:17
  23:3,24

**terms**
  19:3
  22:12

**testified**
  4:7 36:7
  37:16
  43:25
  60:18

**testify**

4:25
  46:11

**testifying**
  25:12

**testimony**
  6:2 28:22
  36:5
  37:10
  38:10
  62:2

**thing**
  6:21
  45:13
  49:21
  58:6

**things**
  5:13
  23:15
  51:1,3
  59:10

**thinking**
  53:3,22
  56:5

**thirteen**
  9:12

**thought**
  25:23
  56:16

**thoughts**
  26:10

**three-way**
  56:13

**time**
  5:6 6:6
  9:11,21
  10:20
  11:1
  12:15,17,
  19 13:17
  14:10,24
  15:9,18
  16:2,8,

10,13
  17:1,9,13
  19:10
  22:7,9,21
  31:13
  37:3,23
  38:12,16
  39:15
  40:24
  43:20
  51:20,24
  52:3
  53:13,15
  54:12
  56:18
  57:2,19
  59:5 60:9
  64:12,14,
  18 66:21

**times**
  64:3

**tire**
  14:11,15,
  25 19:16
  22:2 42:9
  54:23
  60:2,5

**title**
  20:8

**today**
  5:1,6 7:6
  8:24 9:5,
  8 37:11,
  23 45:4
  57:8 64:7

**today's**
  5:8

**told**
  31:17,21
  45:3
  46:12,14
  48:5

**Tom**
  38:20



48:7,8
49:1

**tongue**
49:2

**tool**
59:11

**tools**
63:9

**top**
42:3
58:10

**total**
29:9

**tour**
36:2

**tours**
35:6

**trailer**
38:21
41:13
45:10
48:6,9,
10,16,20
49:2
66:14,24

**train**
36:13

**trained**
55:20
65:13,14,
16

**training**
33:7,9
34:7
36:6,8

**trash**
64:1

**treated**
6:17 7:4

**treatment**

50:18

**trending**
6:12

**trial**
46:11

**trim**
58:8,15,
16,19,21

**truck**
14:15,25
19:15
42:9,12
48:13
60:2,5

**true**
11:24
39:14
49:11
50:7

**trusted**
19:2

**truthfully**
5:1

**turn**
22:10
26:15
29:6
56:11

**turned**
66:8

**twelve**
9:12
53:4,24

**type**
66:11

**types**
7:1

**typical**
51:4
61:25

———————————

**U**
———————————

**Uh-huh**
6:1 10:14
11:17
17:5 20:9
27:4
28:12
32:23
36:9 39:9
41:14
43:19
50:8
52:21
57:4 60:7

**understand**
7:11 18:2
23:1,7
30:21

**understandi
ng**
14:12
18:8
28:24
29:19,23
37:17
50:11
62:1

**understood**
14:11
37:11

**unfortunate**
38:3

**unplugged**
55:22,23

**Upstate**
34:3

———————————

**V**
———————————

**vacs**
63:12,17,

19

**vehicle**
41:21,24
45:7

**ventilation**
65:21

**verbally**
65:15,16

**video**
24:12
25:5
39:20,25
42:14,18
43:1,11

**view**
40:20
41:23

**vocational**
33:9

———————————

**W**
———————————

**walk**
44:14,15

**walked**
10:9
25:20
26:9
41:17
50:13

**walking**
41:25

**wall**
45:23
46:13
53:6
54:21,22,
23 55:1,
4,5 56:2,
3 59:23
60:1,4,5,
14,17

66:2,4

**walled**
53:12,13,
14

**walls**
51:20
59:17

**wanted**
20:13
31:24

**warnings**
64:16

**Washington**
34:5

**watched**
36:20

**water**
37:5,9,24
46:25
60:20

**water-based**
62:10

**ways**
50:25

**wear**
64:25

**wearing**
65:6

**weeks**
32:3

**welding**
66:15,24
67:4,7

**Wheeler**
5:20
24:12
39:5
44:11
45:3,24
46:11



47:7
48:14
51:18
52:10
54:3
55:12,13
57:1,17
58:14,23

**Wheeler's**
40:22
44:5
48:23
57:15

**white**
25:10

**wide**
53:24

**wife**
32:3

**wiping**
50:6

**wondering**
53:20

**wood**
59:19
62:7

**wood-based**
62:12

**woods**
35:11

**woodwork**
45:18

**word**
26:20,24
27:1
47:19

**words**
28:7

**work**
6:21
10:20

20:24
31:6,7
33:11,23
34:12
35:1,25
38:18
46:7
51:15
54:7
55:20
66:11,16,
20,21,25

**worked**
33:19
36:15
37:14
44:1  48:7
49:5

**workers**
9:13

**working**
30:25
34:10,16,
23  35:17
39:18
40:24
41:13
48:11
62:23
66:23

**workshop**
45:24
46:14

**world**
6:21

**would've**
54:5,16

**writes**
47:7,11
52:10
54:3,22
55:3,12

**written**

22:17
65:10

**wrote**
51:18

_____

                Y
_____

**year**
15:5,20
18:10
22:16
23:2,6,9,
17,20,21,
22  32:8
34:9  39:6

**yearly**
16:6,8

**years**
6:4,24
7:23
13:14,15
14:23
15:6,16,
19  34:14,
20  35:21
36:1
44:1,19
57:11

**York**
34:3,4,11





EXHIBIT
WIT:
DATE:
Lauren Buzzerio, RPR

# *REAL ESTATE LEASE*

This Lease Agreement (this "Lease") is dated January 01, 2017, by and between ADS PROPERTIES ("Landlord"), and SBP BUILDERS ("Tenant").  The parties agree as follows:

**PREMISES.**  Landlord, in consideration of the lease payments provided in this Lease, leases to Tenant APPROXIMATELY 4,500 SQ FT OF COMBINED OFFICE AND WAREHOUSE SPACE AT 433 COTTAGE STREET IN LITTLETON, NH 03561 (the "Premises") located at 433 COTTAGE STREET, LITTLETON, NH 03561.

**LEGAL DESCRIPTION.**  The legal description for the premises is: 433 COTTAGE ST. LITTLETON NH 03561.

**TERM.**  The lease term will begin on January 01, 2017 and will terminate on December 31, 2017.

**LEASE PAYMENTS.**  Tenant shall pay to Landlord monthly installments of $1,500.00, payable in advance on the first day of each month, for a total lease payment of $18,000.  Lease payments shall be made to the Landlord at 38 RAINBOW LANE, SANFORD, ME 04073, which address may be changed from time to time by the Landlord.

**SECURITY DEPOSIT.**  At the time of the signing of this Lease, Tenant shall pay to Landlord, in trust, a security deposit of $1,500.00 to be held and disbursed for Tenant damages to the Premises (if any) as provided by law.

**POSSESSION.**  Tenant shall be entitled to possession on October 6,2016 until December 31, 2016 free of charge in order to make their required improvement to the property. Tenant shall yield possession to Landlord on the last day of the term of this Lease, unless otherwise agreed by both parties in writing.  At the expiration of the term, Tenant shall remove its goods and effects and peaceably yield up the Premises to Landlord.

**USE OF PREMISES.**  Tenant may use the Premises only for conducting its business related activities. The Premises may not be used for any other purpose only with the prior written consent of Landlord, which shall not be unreasonably withheld.  Tenant shall notify Landlord of any anticipated extended absence from the Premises not later than the first day of the extended absence.

**FURNISHINGS.**  The following furnishings will be provided:  none.  Tenant shall return all such items at the end of the lease term in a condition as good as the condition at the beginning of the lease term, except for such deterioration that might result from normal use of the furnishings.

**PARKING.**  Tenant shall be entitled to use 10 + parking space(s) for the parking of the Tenant's vehicles and the Tenant's customer and employee vehicles. Parking spots are located in the front

of the building however this is also room in the rear and side of this unit for plenty of parking.

**PROPERTY INSURANCE.** Landlord and Tenant shall each maintain appropriate insurance for their respective interests in the Premises and property located on the Premises. Landlord shall be named as an additional insured in such policies. Tenant shall deliver appropriate evidence to Landlord as proof that adequate insurance is in force issued by companies reasonably satisfactory to Landlord. Landlord shall receive advance written notice from the insurer prior to any termination of such insurance policies. Tenant shall also maintain any other insurance which Landlord may reasonably require for the protection of Landlord's interest in the Premises. Tenant is responsible for maintaining casualty insurance on its own property.

**LIABILITY INSURANCE.** Tenant shall maintain liability insurance on the Premises in a total aggregate sum of at least $1,000,000.00. Tenant shall deliver appropriate evidence to Landlord as proof that adequate insurance is in force issued by companies reasonably satisfactory to Landlord. Landlord shall receive advance written notice from the insurer prior to any termination of such insurance policies.

**RENEWAL TERMS.** This Lease shall automatically renew for an additional period of 1 YEAR per renewal term, unless either party gives written notice of termination no later than 60 days prior to the end of the term or renewal term. The lease terms during any such renewal term shall be the same as those contained in this Lease except that the lease installment payments shall be $1,650.00 per month.

**MAINTENANCE.** Landlord shall have the responsibility to maintain the Premises in good repair at all times.

**UTILITIES AND SERVICES.** Tenant shall be responsible for all utilities and services incurred in connection with the their unit. A monthly bill will be sent to Tenant for payment for electricity, heat and water. Utilities are shared between the units so we will look at the historical difference from when the unit was vacant to when occupied to determine the proper billing rate for the first year. For any lease extensions we can likely agree on a fixed amount based on the first year average. Tenant will also be billed for any significat usages during Oct/Nov/Dec when rent is not being charged.

**TAXES.** Taxes attributable to the Premises or the use of the Premises shall be allocated as follows:

   REAL ESTATE TAXES. Landlord shall pay all real estate taxes and assessments for the Premises.

   PERSONAL TAXES. Landlord shall pay all personal taxes.

**DESTRUCTION OR CONDEMNATION OF PREMISES.** If the Premises are partially destroyed by fire or other casualty to an extent that prevents the conducting of Tenant's use of the Premises in a normal manner, and if the damage is reasonably repairable within sixty days after

the occurrence of the destruction, and if the cost of repair is less than $5000.00, Landlord shall repair the Premises and a just proportion of the lease payments shall abate during the period of the repair according to the extent to which the Premises have been rendered untenantable. However, if the damage is not repairable within sixty days, or if the cost of repair is $5000.00 or more, or if Landlord is prevented from repairing the damage by forces beyond Landlord's control, or if the property is condemned, this Lease shall terminate upon twenty days' written notice of such event or condition by either party and any unearned rent paid in advance by Tenant shall be apportioned and refunded to it. Tenant shall give Landlord immediate notice of any damage to the Premises.

**DEFAULTS.** Tenant shall be in default of this Lease if Tenant fails to fulfill any lease obligation or term by which Tenant is bound. Subject to any governing provisions of law to the contrary, if Tenant fails to cure any financial obligation within 5 days (or any other obligation within 10 days) after written notice of such default is provided by Landlord to Tenant, Landlord may take possession of the Premises without further notice (to the extent permitted by law), and without prejudicing Landlord's rights to damages. In the alternative, Landlord may elect to cure any default and the cost of such action shall be added to Tenant's financial obligations under this Lease. Tenant shall pay all costs, damages, and expenses (including reasonable attorney fees and expenses) suffered by Landlord by reason of Tenant's defaults. All sums of money or charges required to be paid by Tenant under this Lease shall be additional rent, whether or not such sums or charges are designated as "additional rent". The rights provided by this paragraph are cumulative in nature and are in addition to any other rights afforded by law.

**LATE PAYMENTS.** For any payment that is not paid within 5 days after its due date, Tenant shall pay a late fee of $25.00.

**HOLDOVER.** If Tenant maintains possession of the Premises for any period after the termination of this Lease ("Holdover Period"), Tenant shall pay to Landlord lease payment(s) during the Holdover Period at a rate equal to the normal payment rate set forth in the Renewal Terms paragraph.

**CUMULATIVE RIGHTS.** The rights of the parties under this Lease are cumulative, and shall not be construed as exclusive unless otherwise required by law.

**NON-SUFFICIENT FUNDS.** Tenant shall be charged $50.00 for each check that is returned to Landlord for lack of sufficient funds.

**REMODELING OR STRUCTURAL IMPROVEMENTS.** Tenant shall have the obligation to conduct any construction or remodeling (at Tenant's expense) that may be required to use the Premises as specified above. Tenant may also construct such fixtures on the Premises (at Tenant's expense) that appropriately facilitate its use for such purposes. Such construction shall be undertaken and such fixtures may be erected only with the prior written consent of the Landlord which shall not be unreasonably withheld. Tenant shall not install awnings or advertisements on any part of the Premises without Landlord's prior written consent.

**ACCESS BY LANDLORD TO PREMISES.** Subject to Tenant's consent (which shall not be unreasonably withheld), Landlord shall have the right to enter the Premises to make inspections, provide necessary services, or show the unit to prospective buyers, mortgagees, tenants or workers. However, Landlord does not assume any liability for the care or supervision of the Premises. As provided by law, in the case of an emergency, Landlord may enter the Premises without Tenant's consent. During the last three months of this Lease, or any extension of this Lease, Landlord shall be allowed to display the usual "To Let" signs and show the Premises to prospective tenants.

**INDEMNITY REGARDING USE OF PREMISES.** To the extent permitted by law, Tenant agrees to indemnify, hold harmless, and defend Landlord from and against any and all losses, claims, liabilities, and expenses, including reasonable attorney fees, if any, which Landlord may suffer or incur in connection with Tenant's possession, use or misuse of the Premises, except Landlord's act or negligence.

**DANGEROUS MATERIALS.** Tenant shall not keep or have on the Premises any article or thing of a dangerous, flammable, or explosive character that might substantially increase the danger of fire on the Premises, or that might be considered hazardous by a responsible insurance company, unless the prior written consent of Landlord is obtained and proof of adequate insurance protection is provided by Tenant to Landlord.

**COMPLIANCE WITH REGULATIONS.** Tenant shall promptly comply with all laws, ordinances, requirements and regulations of the federal, state, county, municipal and other authorities, and the fire insurance underwriters. However, Tenant shall not by this provision be required to make alterations to the exterior of the building or alterations of a structural nature.

**MECHANICS LIENS.** Neither the Tenant nor anyone claiming through the Tenant shall have the right to file mechanics liens or any other kind of lien on the Premises and the filing of this Lease constitutes notice that such liens are invalid. Further, Tenant agrees to (1) give actual advance notice to any contractors, subcontractors or suppliers of goods, labor, or services that such liens will not be valid, and (2) take whatever additional steps that are necessary in order to keep the premises free of all liens resulting from construction done by or for the Tenant.

**ARBITRATION.** Any controversy or claim relating to this contract, including the construction or application of this contract, will be settled by binding arbitration under the rules of the American Arbitration Association, and any judgment granted by the arbitrator(s) may be enforced in any court of proper jurisdiction.

**SUBORDINATION OF LEASE.** This Lease is subordinate to any mortgage that now exists, or may be given later by Landlord, with respect to the Premises.

**ASSIGNABILITY/SUBLETTING.** Tenant may not assign or sublease any interest in the Premises, nor effect a change in the majority ownership of the Tenant (from the ownership existing at the inception of this lease), nor assign, mortgage or pledge this Lease, without the prior written consent of Landlord, which shall not be unreasonably withheld.

**NOTICE.** Notices under this Lease shall not be deemed valid unless given or served in writing and forwarded by mail, postage prepaid, addressed as follows:

**LANDLORD:**

ADS PROPERTIES
38 RAINBOW LANE
SANFORD, ME 04073

**TENANT:**

SBP BUILDERS
433 COTTAGE STREET
LITTLETON, NH 03561

Such addresses may be changed from time to time by either party by providing notice as set forth above. Notices mailed in accordance with the above provisions shall be deemed received on the third day after posting.

**GOVERNING LAW.** This Lease shall be construed in accordance with the laws of the State of New Hampshire.

**ENTIRE AGREEMENT/AMENDMENT.** This Lease Agreement contains the entire agreement of the parties and there are no other promises, conditions, understandings or other agreements, whether oral or written, relating to the subject matter of this Lease. This Lease may be modified or amended in writing, if the writing is signed by the party obligated under the amendment.

**SEVERABILITY.** If any portion of this Lease shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Lease is invalid or unenforceable, but that by limiting such provision, it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**WAIVER.** The failure of either party to enforce any provisions of this Lease shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Lease.

**BINDING EFFECT.** The provisions of this Lease shall be binding upon and inure to the benefit of both parties and their respective legal representatives, successors and assigns.

**LANDLORD:**
**ADS PROPERTIES**

By: _____    Date: _____

    _____,

    _____

**TENANT:**
**SBP BUILDERS**

By: _____    Date: _____

    Stan Parker,
    SBP Builders

**LANDLORD:**
**ADS PROPERTIES**

By: _Rachel Stevens_____    Date: _10-18-16_____

_____

_____

**TENANT:**
**SBP BUILDERS**

By: _____    Date: _10-17-16_____
Stan Parker,
SBP Builders